**No. 23-4106**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

GARFIELD COUNTY, UTAH, ET AL.,
*Plaintiffs-Appellants,*

ZEBEDIAH GEORGE DALTON, ET AL.,
*Consolidated Plaintiffs-Appellants,*

v.

JOSEPH R. BIDEN, JR., ET AL.,
*Defendants-Appellees,*

HOPI TRIBE, ET AL.,
*Defendants-Intervenors-Appellees.*

On Appeal from the United States District Court for the
District of Utah, No. 4:22-CV-0059 (Nuffer, J.)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## GARFIELD COUNTY, UTAH, ET AL.

Stanford E. Purser
Kathy A.F. Davis
Utah Attorney General's Office
1600 E. 300 S.
Salt Lake City, UT 84114-2320
(801) 538-9600

*Counsel for Plaintiff-Appellant*
*State of Utah*

Dated: February 9, 2024

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Taylor A.R. Meehan
Kathleen L. Smithgall
Jeffrey S. Hetzel
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423

*Counsel for Plaintiffs-Appellants Garfield County, Utah; Kane County, Utah; State of Utah*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................ii

Introduction & Summary of Argument ................................................................1

Argument ..............................................................................................................4

    I.    Utah has standing............................................................................6

        A.    Utah alleges a tidal wave of Article III injuries......................6

        B.    Defendants' standing responses miss the mark...................... 12

    II.    Utah's claims are not barred by sovereign immunity. ...................... 16

        A.    Section 702 waives sovereign immunity as to eight of nine Defendants. .............................................................................. 16

        B.    The ultra vires doctrine waives sovereign immunity as to all nine Defendants. ...................................................................... 18

        C.    The district court's holding splits from every other court and has intolerable implications. .......................................... 21

        D.    Utah has a cause of action. ..................................................... 25

    III.    Utah stated valid claims. ................................................................ 26

        A.    The proclamations declare as national monuments items that are not "objects of historic or scientific interest."...................... 26

        B.    The proclamations reserve more than the "smallest area compatible."......................................................................... 29

    IV.    Utah can separately challenge the interim management plans as final agency action. .................................................................. 33

Conclusion.......................................................................................................... 36

Certificate of Compliance................................................................................... 37

Certificate of Service ......................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ........................................................................... 24

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ........................................................................... 34

*Air All. Houston v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) ........................................................ 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ........................................................................... 10

*Arkla Expl. Co. v. Texas Oil & Gas Corp.*,
  734 F.2d 347 (8th Cir. 1984) ...............................................................8

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................... 25

*Army Corps of Eng. v. Hawkes*,
  578 U.S. 590 (2016) ........................................................................... 34

*Bank of Am. Corp. v. City of Miami*,
  581 U.S. 189 (2017) ...................................................................... 8, 11

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................... 33, 35

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ........................................................................... 34

*Bowen v. Michigan Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ........................................................................... 18

*Brabson v. United States*,
  73 F.3d 1040 (10th Cir. 1996) ..............................................................9

*Carroll v. Safford*,
  44 U.S. 441 (1845) ............................................................................. 25

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
  75 F.3d 1429 (10th Cir. 1996) .......................................................... 11

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ...................................................... 15

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................18, 35

*Cressman v. Thompson*,
    719 F.3d 1139 (10th Cir. 2013) ...............................................5, 6, 12

*Cure Land, LLC v. Dep't of Agric.*,
    833 F.3d 1223 (10th Cir. 2016) .................................................... 33

*Dakota Central Telephone Co. v. S.D. ex rel Payne*,
    250 U.S. 163 (1919) ................................................................20, 21

*Dalton v. Specter*,
    511 U.S. 462 (1994) ...................................................................... 20

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................ 34

*FEC v. Cruz*,
    142 S. Ct. 1638 (2022) .................................................................. 16

*Frozen Food Express v. United States*,
    351 U.S. 40 (1956) ....................................................................4, 34

*Gilmore v. Weatherford*,
    694 F.3d 1160 (10th Cir. 2012) .................................................... 17

*Gladstone, Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979) ..........................................................................8

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ................................................15, 16

*Int'l Union, United Auto., Aero. Agr. v. Brock*,
    783 F.2d 237 (D.C. Cir. 1986) ...................................................... 34

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ...................................................... 13

*Kelley v. United States*,
    69 F.3d 1503 (10th Cir. 1995) ...................................................... 18

*Kerr v. Polis,*
    20 F.4th 686 (10th Cir. 2021) ............................................................... 25, 26

*Kleppe v. New Mexico,*
    426 U.S 529 (1976) ............................................................................... 11

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) ............................................................................. 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ............................................................................. 25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................. 2, 6, 12, 13

*Martin v. Mott,*
    25 U.S. 19 (1827) ................................................................................ 21

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ...................................................................12, 14, 15

*Mass. Lobstermen's Ass'n v. Ross,*
    141 S. Ct. 979 (2021) ...............................................1, 3, 20, 22, 29

*Mass. Lobstermen's Ass'n v. Ross,*
    349 F. Supp. 3d 48 (D.D.C. 2018) ........................................... 1, 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ............................................................................. 17

*McKeen v. USFS,*
    615 F.3d 1244 (10th Cir. 2010) ............................................................. 35

*Mobil Expl. & Producing U.S., Inc. v. DOI,*
    180 F.3d 1192 (10th Cir. 1999) ....................................................... 35, 36

*Mount Evans Co. v. Madigan,*
    14 F.3d 1444 (10th Cir. 1994) ............................................................. 6, 7

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002) .................................1, 21, 23, 24, 25

*Murphy Co. v. Biden,*
    65 F.4th 1122 (9th Cir. 2023) ............................................................... 21

*Nat. Res. Def. Council v. EPA,*
  643 F.3d 311 (D.C. Cir. 2011) ..................................................... 35

*Nat. Res. Def. Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ....................................................... 33

*Nevada v. Hall,*
  440 U.S. 410 (1979) ..................................................................... 18

*New Mexico ex rel. Richardson v. BLM,*
  565 F.3d 683 (10th Cir. 2009) .............................................. 2, 6, 12

*NFIB v. OSHA,*
  142 S. Ct. 661 (2022) ............................................................. 24, 25

*Osborn v. Bank of the United States,*
  22 U.S. 7380 (1824) ..................................................................... 25

*Pan Am. Petroleum Corp. v. Pierson,*
  284 F.2d 649 (10th Cir. 1960 ....................................................... 19

*Riggs v. City of Albuquerque,*
  916 F.2d 582 (10th Cir. 1990) ..................................................... 13

*Rural Water Sewer Solid Waste v. City of Guthrie,*
  654 F.3d 1058 (10th Cir. 2011) ......................................... 2, 16, 17

*Safeway Stores 46, Inc. v. WY Plaza LC,*
  65 F.4th 474 (10th Cir. 2023) ........................................................ 5

*Shaughnessy v. Pedreiro,*
  349 U.S. 48 (1955) ....................................................................... 34

*Simmat v. U.S. Bureau of Prisons,*
  413 F.3d 1225 (10th Cir. 2005) ........................................... 2, 19, 25

*Steel Co. v. Citizens for Better Env't,*
  523 U.S. 83 (1998) ..................................................................... 4, 5

*SUWA v. Palma,*
  707 F.3d 1143 (10th Cir. 2013) ..................................................... 6

*Switzer v. Coan,*
  261 F.3d 985 (10th Cir. 2001) ..................................................... 13

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ................................................................. 35

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170 (2011) ................................................................................ 8

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) .............................................................. 17

*United States v. George S. Bush & Co.,*
  310 U.S. 371 (1940) .............................................................................. 21

*United States v. Scrap,*
  412 U.S. 669 (1973) .............................................................................. 13

*United Tribe of Shawnee Indians v. United States,*
  253 F.3d 543 (10th Cir. 2001) .............................................................. 18

*Utah v. Babbitt,*
  137 F.3d 1193 (10th Cir. 1998 ............................................................... 6

*Utah Association of Counties v. Bush,*
  316 F. Supp. 2d 1172 (D. Utah 2004) .................................................. 22

*Utah ex rel. Div. of Forestry, Fire, & State Lands v. United States,*
  528 F.3d 712 (10th Cir. 2008) ................................................................ 2

*Western Watersheds Project v. BLM,*
  629 F. Supp. 2d 951 (D. Ariz. 2009) .................................................... 34

*Whitewater Draw Nat. Res. Conserv. Dist. v. Mayorkas,*
  5 F.4th 997 (9th Cir. 2021) ................................................................... 35

*Whitman v. American Trucking Assns., Inc.,*
  531 U.S. 457 (2001) .............................................................................. 34

*Wyoming v. Franke,*
  58 F. Supp. 890 (D. Wyo. 1945) ........................................................... 22

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ........................................................................... 2, 7

*Wyoming ex rel. Crank v. United States,*
  539 F.3d 1236 (10th Cir. 2008 ............................................... 2, 6, 10, 11

*Yates v. United States*,
  574 U.S. 528 (2015) .................................................................... 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................... 18

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) .................................................................... 24

**Constitutional Provisions**

U.S. Const. art. IV, § 3, cl. 2 ....................................................... 24

**Statutes**

18 U.S.C. §1866(b) ................................................................. 2, 7, 14

30 U.S.C. §191 ................................................................................ 8

43 U.S.C. §1901 .............................................................................. 9

43 U.S.C. § 1905 ............................................................................. 9

54 U.S.C. §320301(a) .......................................................... 3, 19, 26

54 U.S.C. §320301(b) .......................................................... 3, 19, 29

Kane Cty. Code §9–27A–3(Y) .................................................... 10

Utah Code Ann. §23A–1–101 ................................................... 11

Utah Code Ann. §23A–1–102 ................................................... 11

Utah Code Ann. §23A–2–201 ................................................... 11

Utah Code Ann. §23A–2–201(2)(a) ........................................ 10

Utah Code Ann. §59–2–101 *et seq.* ........................................... 9

Utah Code Ann. §59–2–102(32)(b) ............................................ 9

Utah Code Ann. §59–2–201 ......................................................... 9

Utah Code Ann. §63J–8–104(1)(d) .......................................... 10

Utah Code Ann. §63J–8–104(1)(e) .......................................... 10

## Presidential Proclamations

Executive Order 12548,
  *Grazing Fees*, 51 Fed. Reg. 5985 (February 19, 1986) .......................................................9

Proclamation 10285, *Bears Ears National Monument*,
  86 Fed. Reg. 57321 (Oct. 8, 2021) ..........................................1, 8, 19, 27, 28

Proclamation 10286, *Grand Staircase-Escalante National Monument*,
  86 Fed. Reg. 57335 (Oct. 8, 2021) ..........................................1, 8, 19, 27, 28

Proclamation 658, *Setting Aside Devils Tower Nat'l Monument*,
  34 Stat. 3236 (Sept. 24, 1906).......................................................... 29

Proclamation 695, *El Morro Nat'l Monument*,
  34 Stat. 3264 (1906) .......................................................... 29

## Rules & Regulations

Fed. R. Civ. P 12(b)(6) ..............................................................4, 26, 33

*Interim Management of the Bears Ears National Monument*,
  Dep't of Int. (Dec. 16, 2021), perma.cc/8WU9-MMH9....................................3, 8, 35

*Interim Management of the Grand Staircase-Escalante National Monument*,
  Dep't of Int. (Dec. 16, 2021), perma.cc/8J37-ELHR....................................3, 4, 8, 35

## Other Authorities

13A C. Wright, A. Miller, & E. Cooper,
  Federal Practice & Procedure (3d ed) ..............................................9, 15, 16

BLM & U.S.F.S., *Bears Ears National Monument Resource Management Plan and
  Environmental Impact Statement: Analysis of the Management Situation* 6-140
  (Sept. 2022), perma.cc/D76U-7NMJ .......................................... 8, 14

Oxford English Dictionary V (H-K) (1913) .......................................... 27

Oxford English Dictionary VII (O) (1913) .......................................... 26

Scalia & Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012)...................................... 27

The Federalist No. 78 (Alexander Hamilton). .......................................... 24

Vincent, *Grazing Fees: Overview and Issues*,
  Cong. Res. Serv., RS21232 (Mar. 4, 2019) .................................................................9

Webster's Dictionary (1913) ............................................................................. 27

## INTRODUCTION & SUMMARY OF ARGUMENT

This case should have readily survived Defendants' motions to dismiss. Defendants confirm that no court has ever agreed with the district court's holding that Antiquities Act challenges are barred by sovereign immunity. Every other court that has addressed the issue has held that "review is available to ensure that … the President has not exceeded his statutory authority." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). The district court broke from this "raft of precedent" without discussing it. *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 54 (D.D.C. 2018). Before this Court, Defendants' combined 41 amici do not even try to defend the district court's holding. They *all* proceed on the assumption that "this Court reverses the district court's reviewability analysis." Arch.-Am.-Br.3. That assumption is sound. Otherwise, the Antiquities Act will be "a power without any discernible limit." *Mass. Lobstermen's Ass'n v. Ross*, 141 S. Ct. 979, 981 (2021) (statement of Roberts, C.J.).

**I.** This Court can begin by rejecting Defendants' standing pivot. The State of Utah, Kane County, and Garfield County—collectively, "Utah"—unequivocally have standing. They challenge the Bears Ears and Grand Staircase-Escalante national monument reservations, which together lock down 3.23 million acres of land within Utah. *See* Proclamation 10285, *Bears Ears National Monument*, 86 Fed. Reg. 57321 (Oct. 8, 2021); Proclamation 10286, *Grand Staircase-Escalante National Monument*, 86 Fed. Reg. 57335 (Oct. 8, 2021). The proclamations that created the monument reservations declare as "national monuments" practically every item within those 3.23 million acres,

1

including hundreds of plants, animals, and rocks. Utah-Br.35-36. They thereby prohibit any actions that injure or disturb a single one of those items, effectively banning all activities on the land. Utah-Br.2; 18 U.S.C. §1866(b). But Utah cares for, uses, and profits from activities on the land, so shutting them down injures Utah. The reservations (1) impede Utah's planned and regular activities on the land, like invasive-species removal, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565-66 (1992); (2) eliminate specific sources of revenue, like from the extraction of natural resources, *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); (3) conflict with Utah's laws providing for other uses of the now-dormant land, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); (4) cause Utah classic economic harms in the form of increased costs, *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 697 n.13 (10th Cir. 2009); and (5) injure Utah's own property on and near the reservations, *Utah ex rel. Div. of Forestry, Fire, & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008). This Court would have to overturn generations of precedent to dismiss this case for lack of standing.

**II.** As to sovereign immunity, the district court's holding was so aberrational because it was so wrong. No party disputes that, as to the eight agency and officer Defendants, sovereign immunity cannot apply because Section 702 of the Administrative Procedure Act waives it. *See Rural Water Sewer Solid Waste v. City of Guthrie*, 654 F.3d 1058, 1070 (10th Cir. 2011). As to the ninth Defendant, President Biden, the ultra vires doctrine provides the "traditional exception to sovereign immunity." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232-33 (10th Cir. 2005). The ultra vires doctrine applies

as long as Utah claims that the national monument reservations exceed the Antiquities Act's limits. The Antiquities Act has two express limits: the President may declare as a national monument only "historic landmarks, historic and prehistoric structures, [or] other objects of historic or scientific interest" that are "situated" on federal land. 54 U.S.C. §320301(a). And he may "reserve" around those national monuments only the "smallest area compatible" with their care and management. *Id.* §320301(b). Utah alleged that the proclamations exceed both limits. As Federal Defendants confirm, affirmance would allow the President to declare anything situated on at least another 100 million acres of federal land to be a "national monument" and then unilaterally cancel out all the other laws governing that land.

**III.** It takes little more to conclude that Utah stated valid claims. President Biden declared over 500 items to be national monuments, including hundreds of generic things like "mule deer," "boulders," and "potato[es]." Vanishingly few of those would strike a "a speaker of ordinary English," *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 980 (statement of Roberts, C.J.), as "other objects of historic and scientific interest," 54 U.S.C. §320301(a). And even if they were, the 3.23-million-acre monument "reserv[ations]" are not the "smallest area compatible" with their care and management. *Id.* §320301(b).

**IV.** Finally, Utah can challenge under the Administrative Procedure Act the interim management plans that now regulate all activities on the monument reservation lands. *See Interim Management of the Bears Ears National Monument*, Dep't of Int. (Dec. 16, 2021), perma.cc/8WU9-MMH9 [hereafter, "Bears Ears Management Plan"]; *Interim*

3

*Management of the Grand Staircase-Escalante National Monument*, Dep't of Int. (Dec. 16, 2021), perma.cc/8J37-ELHR [hereafter, "Grand Staircase Management Plan"]. Federal Defendants no longer argue that the "interim" nature of those plans renders them non-final. Instead, they merely argue that the plans have no legal effect because they just faithfully implement the law. But agencies always think that their actions faithfully implement the law. The plans still set forth the terms governing the land and are enforced today, so Utah has the right to challenge them. *See Frozen Food Express v. United States*, 351 U.S. 40, 43-44 (1956).

This Court should reject Defendants' standing challenge, reverse the district court's Rule 12(b)(6) dismissal in full, and remand so that this case may proceed to summary judgment.

## ARGUMENT

The parties have slightly different views on the issues before this Court. Federal Defendants think that the district court dismissed the case under Rule 12(b)(1) without prejudice. *E.g.*, U.S.-Br.1, 4, 34 (describing dismissal as jurisdictional). On that basis, they argue that the district court didn't have to reject their standing arguments and that this Court can't reach the statutory-authority question. U.S.-Br.129-30.

But the opposite is true. The district court dismissed Utah's claims "with prejudice" under Rule 12(b)(6). J.A. Vol. IV at 992; *see* Fed. R. Civ. P 12(b)(6). Therefore, the district court either rejected Federal Defendants' jurisdictional standing arguments or committed an obvious error by proceeding to 12(b)(6). *See Steel Co. v. Citizens for Better*

*Env't*, 523 U.S. 83, 94 (1998). Federal Defendants are free to keep making standing arguments, but they should lose again. As to the merits, because the district court dismissed with prejudice, this Court can do the correct 12(b)(6) analysis and decide whether Utah stated claims. *Cf.* U.S.-Br.129-30. Although the district court stopped at the sovereign-immunity part of the merits analysis, we already know its answer to the statutory-authority part. It held that Utah did not state an ultra vires claim for sovereign-immunity purposes *because the terms of the Antiquities Act cannot be exceeded.* J.A. Vol. IV at 981-983. Remand would just allow the district court to say the same thing again.

The statutory-authority issue has been (over-)briefed. *See* Utah-Br.25-29, Dalton-Br.25-29; U.S.-Br.58-71; SUWA-Br.23-24; UDB-Am.-Br.9-26; Arch.-Am.-Br.7-21; GSE-Am.-Br.26-35; Prof.-Am.-Br.5-16; State-Am.-Br.6-9; U.S.-Br.56-58, 62-71; J.A. Vol. II at 477-83; Vol. III at 730-744, 821-830; Vol. IV at 943-46. And Federal Defendants' own case shows that this Court should decide it now. U.S.-Br.130 (citing *Safeway Stores 46, Inc. v. WY Plaza LC*, 65 F.4th 474 (10th Cir. 2023)). In *Safeway Stores*, this Court reversed a merits summary-judgment decision instead of remanding it for consideration of alternative arguments not considered below, because it had the full record before it, just like this Court does now. 65 F.4th at 496. It "s[aw] no need to remand for the district court to consider the defenses [not decided below]." *Id.*

"Accept[ing] as true all material allegations in the complaint," construing them in a manner "most favorable to" Utah, and "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim," *Cressman v. Thompson*,

719 F.3d 1139, 1144 (10th Cir. 2013) (cleaned up), Utah's complaint pleads more than enough to survive a motion to dismiss.

## I.    Utah has standing.

A plaintiff has Article III standing whenever he alleges an "injury in fact" that is "traceable to the conduct complained of" and "redressable by a decision of the court." *Wyoming ex rel. Crank*, 539 F.3d at 1241 (citing *Lujan,* 504 U.S. at 560-61).

### A.    Utah alleges a tidal wave of Article III injuries.

Under the "lenient motion to dismiss standard," *Utah v. Babbitt*, 137 F.3d 1193, 1205 (10th Cir. 1998), Utah alleged many independently sufficient bases for standing. Any one satisfies the Article III standing inquiry. *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1453 (10th Cir. 1994).

**Planned activities on land.** The monument reservations prevent Utah's planned activities on the land. When a plaintiff alleges that he "plans to use [an area] in the future," but his "pursuits … would be harmed by the [challenged action]," that allegation is "plainly sufficient to support individual standing." *N.M. ex rel. Richardson*, 565 F.3d at 697 n.13; *SUWA v. Palma*, 707 F.3d 1143, 1156 (10th Cir. 2013). Few injuries are more familiar to land-use law. *Lujan,* 504 U.S. at 560.

President Biden's Bears Ears and Grand Staircase monument reservations ban or impede Utah's regular activities on the land. They displace the tapestry of statutes allowing multiple uses of the land and then make it a federal crime to injure or remove any of the 500-plus objects and categories of objects now declared to be "national

monuments," including most plants, animals, and rocks within the boundaries. 18

U.S.C. §1866(b). Therefore, Utah's planned activities cannot go forward.

- Utah officials planned to actively manage vegetation on both monument reservations to protect the ecosystem, including by disturbing pinyon, juniper, sagebrush, and other vegetation J.A. Vol. II at 349, 353-34. The proclamations prohibit them from undertaking those activities by declaring all pinyon, juniper, sagebrush, and other vegetation as national monuments. See Utah-Br.35.

- Utah officials planned road maintenance on or adjacent to the monument reservations. The proclamations prevent them from undertaking that road maintenance because it would disrupt vegetation and other features now declared to be national monuments. J.A. Vol. IV at 854, 859, 864.

- Utah officials planned or anticipated wildfire risk-reduction activities, search-and-rescue efforts, wildlife-protection projects, and thousands of hours of other pursuits on the monument reservations. The proclamations prohibit or impede all those activities because they would remove or disturb features now declared to be national monuments. J.A. Vol. II at 349-57, 369; Vol. IV at 851-55, 869-70.

When Utah officials have sought permission to engage in some of these activities, Federal Defendants have denied their requests. J.A. Vol. IV at 855-859, 864, 869-70; *see also* Blanding-Am.-Br.2 (describing inability to manage water supply due to monument reservations' restrictions). They therefore must abandon all these planned and regular activities on the land. *See, e.g.*, J.A. Vol. II at 354-57; J.A. Vol. IV at 853-55, 859-60.

**Specific lost revenue.** The monument reservations deprive Utah of "specific tax revenues," which is "clearly" sufficient to establish standing. *Wyoming v. Oklahoma*, 502 U.S. at 448. Countless cases confirm that a government plaintiff is "injured by a loss of revenue sharing and sales tax monies," *Mount Evans Co.*, 14 F.3d at 1451, the

"diminish[ment of] its tax base," *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979), *limited on other grounds by Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011), or specific "lost tax revenue," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017). And when a plaintiff "entitled to … revenues derived from the lease of public lands located within its border" challenges an agency action likely to reduce those revenues, it "[c]learly" has standing. *Arkla Expl. Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 354 n.9 (8th Cir. 1984).

The monument reservations ban new mining and natural-resource extraction. 86 Fed. Reg. at 57331; 86 Fed. Reg. at 57345; Bears Ears Management Plan 2; Grand Staircase Management Plan 2; J.A. Vol. II at 362-365. They also provide for the retirement of cattle grazing permits that are voluntarily relinquished, unlike on other land. *E.g.*, 86 Fed. Reg. at 57332. As a result, Utah loses many sources of specific revenue.

- Utah receives 50% of revenue from mineral leases on federal land. 30 U.S.C. §191; J.A. Vol. II at 362-65. Uranium, vanadium, clean coal, and other natural resources would be mined absent the monument reservations, but now cannot be. J.A. Vol. II at 362-65.

- Utah taxes up to 2.6% of the value of uranium and vanadium sold or otherwise disposed from federal land. Utah Code Ann. §59-5-202(1); *id.* §59-21-1; J.A. Vol. II at 363. It would collect those specific taxes from mineral rights within the reservations, but now is prevented from doing so. *See* J.A. Vol. II at 362-65; BLM & U.S.F.S., *Bears Ears Nat'l Monument RMP and EIS: Analysis of the Management Situation* 6-140 (Sept. 2022), perma.cc/D76U-7NMJ (combined 449,140 acres of "high" or "moderate" potential for "uranium and vanadium development" within enlarged Bears Ears reservation).

- Utah imposes (and the Counties collect) specific natural-resources property taxes on uranium, vanadium, copper, and other specific natural

resources. Utah Code Ann. §§59-2-201, 59-2-101 *et seq.*, 59-2-102(32)(b). Because the monument reservations prevent the extraction of resources, Utah and the Counties lose that revenue. J.A. Vol. II at 362-65.

- Utah receives revenue from federal grazing fees. J.A. Vol. II at 361; 43 U.S.C. §§1901, 1905. Executive Order 12548, *Grazing Fees*, 51 Fed. Reg. 5985 (February 19, 1986); Vincent, *Grazing Fees: Overview and Issues*, Cong. Res. Serv., RS21232 (Mar. 4, 2019). Grazing is common on reservation lands, but is now subject to permanent retirement, so "the State … loses revenue." J.A. Vol. II at 360-61.

Although not necessary at the motion-to-dismiss stage, Utah even identified specific places within the reservations from which they will lose specific tax revenues, like the Spring Water Mine and the Avalanche Mine. Vol. I at 264, 275-276; J.A. Vol II at 363-365. Utah also loses the revenue from the lost mining described by Individual Plaintiffs. *E.g.*, J.A. Vol. I at 177-184, 267, 258, 281; Vol. II at 463-464.

Finally, miners who already located their claims and received their leases cannot continue without paying the "costs of the mineral examination," which either delays their plans for years or renders them impossible. *E.g.*, J.A. Vol. I at 264, 275-276; *accord* Vol. IV at 963 ("The BLM generally estimates the cost to complete a validity examination for a single, uncomplicated mining claim with no existing disturbance on it to be approximately $90,000 to $110,000."). "Delayed payment is a concrete injury." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure §3531.4 (3d ed); *accord Brabson v. United States*, 73 F.3d 1040, 1047 (10th Cir. 1996) ("[T]he longer the procedural delay; the higher the [injury] amount.").

**Law enforcement.** The monument reservations undermine Utah's sovereign interest in enforcing its laws. "States have a legally protected sovereign interest in the exercise of sovereign power over individuals and entities within the relevant jurisdiction, which involves the power to create and enforce a legal code." *Wyoming ex rel. Crank*, 539 F.3d at 1242 (cleaned up) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). The monument reservations limit Utah's ability to enforce its laws.

- Utah law directs its wildlife agency to "protect, propagate, manage, conserve, and distribute protected wildlife" on all lands, including by clearing vegetation, building wells, and patch-burn grazing. Utah Code Ann. §23A–2–201(2)(a); J.A. Vol. II at 348-49, 352-57. But the monument reservations prohibit those activities by, among other things, declaring as national monuments the "vegetation" that state law directs the agency to remove. Utah-Br.14; J.A. Vol. II at 356-57.

- Utah law directs that all land be managed to "achieve and maintain at the highest reasonably sustainable levels a continuing yield of energy, hard rock, and nuclear resources." Utah Code Ann. §63J-8-104(1)(d) (emphasis added). But the monument reservations prohibit any future extraction of those resources, let alone at the highest levels. Utah-Br.13-15.

- Utah law directs that all land, including federal land, be managed to "achieve and maintain livestock grazing in the subject lands at the highest reasonably sustainable levels." Utah Code Ann. §63J-8-104(1)(e). The monument reservation orders retirement of grazing permits under certain circumstances even when grazing can be maintained. Utah-Br.13-15.

- Kane County law directs its search-and-rescue crews to give the "highest priority" to human safety, even when "access[ing] areas prohibited by federal agencies" within the reservations. Kane Cty. Code §9-27A-3(Y). But the monument reservations prevent its crews from doing so, and federal agents have prevented them from saving lives because their equipment might damage items declared to be national monuments. J.A. Vol. IV at 869-70.

Each of these conflicts "sufficiently allege[s] an injury-in-fact." *Wyoming ex rel. Crank.*, 539 F.3d at 1242.

**Economic costs.** The monument reservations also cause classic economic harms. A government plaintiff has standing to challenge an action that causes it to "spend more on 'municipal services that it provided and still must provide to remedy [problems arising] as a result of [the challenged action].'" *City of Miami*, 581 U.S. at 194; *Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms … are precisely the kind of 'pocketbook' injury" that is "sufficient to support standing.").

Here, the enlarged reservations generate increased visitation that strains Utah's budgets. *E.g.*, J.A. Vol. II at 345-47, 351. Utah has had to spend more money on road maintenance, purchase search-and-rescue equipment, and expend "thousands of dollars" on search-and-rescue missions. J.A. Vol. II at 350-52; Vol. IV at 854-59. The enlarged reservations have also caused Kane County to spend $26,000 each year on restroom facilities within the reservations. J.A. Vol. II at 368.

**Property injuries.** Utah has standing on three additional independent bases. First, Utah suffers "damage to its property." *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996). Utah has property rights in (and regulatory authority over) all wildlife on the reservations. Utah Code Ann. §§23A–1–102, 23A–2–201; §§23A-1-101; *see Kleppe v. New Mexico,* 426 U.S 529, 545 (1976). The monument reservations harm and injure their wildlife by drawing crowds that prevent water

11

access and preventing caretakers from clearing pathways, installing water facilities, and restoring natural habitats. J.A. Vol. II at 348-49, 360. Second, Utah's lands next to the reservations have been harmed and devalued by their crippling restrictions. *See New Mexico ex rel. Richardson*, 565 F.3d at 697 n.13; J.A. Vol. II at 369-71. And third, Utah alleges "pending environmental harm" to land within its boundaries. *New Mexico ex rel. Richardson*, 565 F.3d at 697 n.13 (citing *Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007)). The monument reservations have ruined their beloved land by causing tragic spikes in vandalism, litter, human waste, pollution, looting, and the destruction of natural resources—to say nothing of harms that will arise because the reservations prevent its proper care and management. J.A. Vol. II at 345-57; *see* Utah-Br.39.

**B.    Defendants' standing responses miss the mark.**

**1.** Federal Defendants respond mainly by treating this as if it were a post-trial appeal. Instead of "accept[ing] as true all material allegations in the complaint," construing them in a manner "most favorable to" Utah, *Cressman*, 719 F.3d at 1144 (cleaned up), and "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (cleaned up), Federal Defendants invite this Court to discredit Utah's well-pleaded allegations on appeal and accept their alternative version of the facts instead. For example, they allege that Utah's plans aren't really impeded and that mining won't really decrease. *E.g.*, U.S.-Br.105, 110, 113. But Utah's allegations are verifiably true and, at the motion-to-dismiss stage, "must be

accepted as true and construed in the light most favorable to" them regardless of Defendants' rendition. *Switzer v. Coan*, 261 F.3d 985, 990 (10th Cir. 2001).

This appeal does not present a "factual attack" on jurisdiction. U.S.-Br.82-119. When defendants want to argue that "plaintiffs are unable to establish a factual basis" for standing, a court must afford the plaintiffs a "fair opportunity to develop the facts" and then "mo[ve] for summary judgment." *Riggs v. City of Albuquerque*, 916 F.2d 582, 586 (10th Cir. 1990); *see also United States v. Scrap*, 412 U.S. 669, 688-90 (1973). Federal Defendants opposed any discovery and have not moved for summary judgment. *See* E.C.F. Doc. 105 at 5. Absent those measures, Utah must support each element of their standing with no more and no less than "the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Regardless, Utah rebutted Federal Defendants' counter-facts with declarations before the district court, just to be safe. J.A. Vol. IV at 847-67. This Court must accept Utah's allegations as true even if it treats this as a factual attack. *Kareem v. Haspel*, 986 F.3d 859, 867 n.7 (D.C. Cir. 2021). And most of Utah's injuries involve allegations that Federal Defendants' facts aren't relevant to anyway.

**2.** Federal Defendants next overcomplicate the causation and redressability analyses by suggesting that some of Utah's injuries preceded the 2021 proclamations or will not be wholly eliminated by a return to the earlier boundaries. *E.g.*, U.S.-Br.104. But Utah's injuries are caused by the challenged monument reservations because they wouldn't happen without them. For example, Utah could until 2021 actively manage

13

vegetation around the Skutumpah Terrace, where it could use mechanical means to reduce the density of pinyon, juniper, and sagebrush. *See* J.A. Vol. II at 354; J.A. Vol. IV at 864-65. The new Grand Staircase reservation boundaries encompass the Skutumpah Terrace, so Utah cannot do so. J.A. Vol. II at 354; 18 U.S.C. §1866(b). Likewise, Utah now cannot complete planned projects in the Mancos Mesa and Grand Gulch areas that previously fell outside the Bears Ears monument boundaries. J.A. Vol. II at 360. Many of the Counties' road maintenance activities would have been outside of the previous boundaries. J.A. Vol. II at 367; Vol. IV at 849-50, 853-56. And Federal Defendants' own documents confirm that Utah's lost mineral-lease revenues resulted from the 2021 reservations. BLM & U.S.F.S., *Bears Ears National Monument RMP and EIS: Analysis of the Management Situation* 6-140 (Sept. 2022), perma.cc/D76U-7NMJ ("Twenty of the [76 active mining] claims [within Bears Ears] were filed … after the boundaries of BENM were shrunk by Presidential Proclamation 9681.").

Most of Utah's injuries, like economic costs and impediments to planned activity, just scale with the size of the monument reservations. Utah alleged that those harms increased when the 2021 proclamations more than doubled the size of the reservations. *E.g.*, J.A. Vol. II at 334-46, 373. Federal Defendants are wrong that an injury is not "redressable" simply because the requested relief will reduce rather than wholly eliminate that injury. U.S.-Br.102-07. As long as the harm "would be reduced to some extent if [they] received the relief they seek," redressability is satisfied. *Massachusetts v. EPA*,

549 U.S. at 526; *see also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 757 (10th Cir. 2010).

In any event, Federal Defendants ignore that Utah's requested remedy is not limited to the 2021 expansions. Utah challenges "*all acres* encompassed by the current monument boundaries" as "unlawfully designated *regardless of whether those lands were covered by any pre-2021 reservations.*" J.A. Vol. II at 401, 405-06 (emphasis added). Federal Defendants say, in a footnote, that they will raise a statute-of-limitations defense to Utah's claims insofar as they go beyond the pre-2021 boundaries. U.S.-Br.84 n.60. But Utah will win on the statute-of-limitations issue for multiple reasons, including that the 2021 proclamations purport to reincorporate the old ones with new justifications, thereby restarting the statute of limitations; that five of the six proclamations fall within the statute of limitations anyway because they were issued within six years of Utah's lawsuit; and that Federal Defendants forfeited the statute-of-limitations defense below as to Utah. J.A. Vol. II at 465; Vol. III at 790. But for standing purposes, this Court must assume that Utah will win the remedy dispute. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092-93 (10th Cir. 2006).

**3.** Federal Defendants' remaining responses are all foreclosed by longstanding precedent. They argue that Utah "caus[es] themselves" some subset of these injuries because Utah has websites that warmly welcome visitors. U.S.-Br.103. But "[s]tanding is not defeated merely because the plaintiff has in some sense contributed to his own injury." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure §3531.5

(3d ed.). Otherwise, every tort case involving contributory negligence would be dismissed for lack of jurisdiction.

They next argue that some of Utah's injuries aren't to a "legally protected interest" because, for example, "states and counties do not have a legal right to impose their management preferences on federal lands within their boundaries." U.S.-Br.109. But when standing cases talk about a "legally protected interest," this Court has admonished that it does not "open the door to merits considerations at the jurisdictional stage." *Walker*, 450 F.3d at 1093. The "legally protected interest" question is, at most, a threshold inquiry for the district court to discard claims "so preposterous as to be legally frivolous." *Id.* Federal Defendants don't even try to argue that Utah's allegations meet that standard.

Finally, to the extent that Federal Defendants seek to distinguish between injuries caused by the proclamations and by follow-on actions and decisions, precedent rejects that distinction. When a plaintiff is injured by an action derivative of another action, it can challenge everything upstream. *FEC v. Cruz*, 142 S. Ct. 1638, 1649-50 (2022).

## II.    Utah's claims are not barred by sovereign immunity.

### A.    Section 702 waives sovereign immunity as to eight of nine Defendants.

The sovereign immunity analysis as to eight of the nine Federal Defendants is straightforward. Section 702 of the Administrative Procedure Act "waive[s]" sovereign immunity for suits "against the United States, its agencies, and its officers"—but not the President—that seek "relief other than money damages." *Rural Water*, 654 F.3d at

1070; *accord Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (§702 waives immunity in suits against "official[s]" other than the President that seek "relief other than money damages"). Section 702's waiver of sovereign immunity applies regardless of whether the case involves agency action or arises under the APA at all. *Gilmore v. Weatherford*, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012) (quoting *Simmat,* 413 F.3d at 1233); *Trudeau v. FTC*, 456 F.3d 178, 182 (D.C. Cir. 2006).

Utah sued nine Federal Defendants. J.A. Vol. II at 320-21. All except one—President Biden—are "the United States, its agencies, and its officers." *Rural Water*, 654 F.3d at 1070. They are the Department of Interior, Secretary of Interior, Bureau of Land Management, Director of Bureau of Land Management, Department of Agriculture, Secretary of Agriculture, Forest Service, and Chief of Forest Service. J.A. Vol. II at 312. All of Utah's claims are for "relief other than money damages." *Rural Water*, 654 F.3d at 1070. Namely, Utah requests declaratory and injunctive relief preventing these eight Defendants from implementing and enforcing the national monument reservations. J.A. Vol. II at 409. No Defendant disputes that §702 waives sovereign immunity as to eight Defendants. The district court therefore erred in holding that it didn't.

Only the Federal Defendants offer any response to §702. In a footnote, they argue that Utah's claims should not be allowed to proceed against those eight Defendants because only President Biden *authored* the proclamations that created the monument reservations. U.S.-Br.40-41 n.29. This argument has nothing to do with sovereign immunity, only standing. It is also wrong. As Federal Defendants know well, when a

17

plaintiff wants declaratory and injunctive relief against any legal act, the proper defendants are the "federal entities or officials" charged with its "enforcement." *Kelley v. United States*, 69 F.3d 1503, 1507 (10th Cir. 1995). And "[i]t is now well established that review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (cleaned up); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (suing Secretary Sawyer to enjoin enforcement of President Truman's order). Federal Defendants' only case "assume[d] that section 702 provides a waiver of sovereign immunity" and ruled against the plaintiffs there on *exhaustion* grounds irrelevant here. *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 550-51 (10th Cir. 2001).

**B.     The ultra vires doctrine waives sovereign immunity as to all nine Defendants.**

As to all nine Defendants, this Court should agree with every other court in holding that Defendants are not entitled to sovereign immunity because Utah's claims fall under the ultra vires doctrine. "Americans have never accepted" the sovereign-immunity "fiction" that "the King can do no wrong." States-Am.-Br.2-3 (citing *Nevada v. Hall*, 440 U.S. 410, 415 (1979)). In America, courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986). Therefore, American courts have always

18

recognized the "traditional exception to sovereign immunity" known as the ultra vires doctrine, which "permit[s] suits for prospective relief when government officials act beyond the limits of statutory authority." *Simmat*, 413 F.3d at 1232-33; *accord Pan Am. Petroleum Corp. v. Pierson*, 284 F.2d 649, 651 (10th Cir. 1960).

Utah's claims fall under the ultra vires doctrine because they allege that the Bears Ears and Grand Staircase national monument reservations exceed both of the Antiquities Act's limits. First, the Act allows the President to declare things as national monuments only if they are "historic landmarks, historic and prehistoric structures, [or] other objects of historic or scientific interest" that are "situated" on federal land. 54 U.S.C. §320301(a). Utah alleged that President Biden exceeded the first limit because he declared over 500 things to be national monuments, all but nine of which are not "other objects of historic or scientific interest" under the Act. J.A. Vol. II at 382-91. He declared that every item listed in his proclamations—including "landscapes," "pinyon," "potato[es]," "juniper," "sheep," and hundreds of other plants, animals, and rocks—satisfied the Act. 86 Fed. Reg. at 57321-32; 86 Fed. Reg. at 57335-46.

Second, the Act allows the President to "reserve" land if it is "the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. §320301(b). Utah alleged that President Biden exceeded the second limit because, even if every item satisfied the first limit, 3.23 million acres is not the "smallest area compatible" with their proper care and management. *Id.* Utah analyzed and intends to prove the smallest size of reservations necessary for proper care and management of

any qualifying monuments. J.A. Vol. II at 392-93. Even accepting Federal Defendants' own map, *see* U.S.-Br.27-28, and even accommodating each item with a generous 1,000 acres, only about 6% of the land in the current reservations would be justified. J.A. Vol. II at 428-29.

The Tribal Intervenor-Defendants mischaracterize Utah's claims as simply "disagree[ing] with the President's discretionary decision." Tribe-Br.43; *see also* U.S.-Br.65 (doing the same). Under the Antiquities Act, the President has *no* "discretion" over the two statutory limits that this lawsuit concerns: "[t]he scope of the objects that can be designated under the Act" or "the area necessary for their proper care and management." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.). The Act limits the President's discretion only to deciding, assuming an item objectively qualifies, whether to declare that item a national monument or leave it be. As Utah explained, many statutes follow this same structure, but courts always treat the preconditions as objective and enforceable. Utah-Br.30-33; *accord* Az.-Leg.-Am.-Br.4-10 (explaining history of Congress using this style of "conditional legislation"). Defendants have no answer to these statutes. U.S.-Br.21-22.

Defendants' ultra vires cases all involve statutes with no relevant limits, so they beg the question. And all but one implicated the President's unique constitutional authority over military affairs. The statute in *Dalton v. Specter* "d[id] not at all limit" the President's decision to close a military base, so the plaintiffs could not claim that he exceeded non-existent limits. 511 U.S. 462, 476 (1994). The resolution in *Dakota Central*

20

*Telephone Co. v. S.D. ex rel Payne* gave the President unlimited power to take national-security measures "whenever *he shall deem it necessary* for the national security or defense." 250 U.S. 163, 181 (1919) (emphasis added). The statute in *Martin v. Mott* gave the President unlimited wartime power to decide when the nation was in "imminent danger" to necessitate calling forth the militia. 25 U.S. 19, 23 (1827). Finally, the statute in *United States v. George S. Bush & Co.* gave the President power to "approve" certain rates, but set no limits on that power beyond the President's own "judgment." 310 U.S. 371, 376 (1940). The Antiquities Act *has* express limits and does *not* implicate the President's military powers.

### C. The district court's holding splits from every other court and has intolerable implications.

**1.** The district court's decision "splits" with "[e]very other court that has previously considered whether Antiquities Act challenges are barred by sovereign immunity." Utah-Br.29. "The claims at issue in this appeal are similar in all material respects to these cases from the D.C. Circuit Court of Appeals." Prof.-Am.-Br.4. The D.C. Circuit held that such claims were not barred by sovereign immunity. *Mountain States Legal Found.*, 306 F.3d at 1136. So has the Ninth Circuit. *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-31 (9th Cir. 2023); Sen.-Am.-Br.4. The district court, in contrast, held that they were barred. J.A. Vol IV. at 979-983. If this Court affirms, it will therefore create a "circuit split with at least the Ninth Circuit and the District of Columbia Circuit." States-Am.-Br.9; *accord* PLF-Am.-Br.13.

In fact, no case has sided with the district court. Federal Defendants say two district courts did, but they didn't. *See* U.S.-Br.56. *Wyoming v. Franke* interpreted the Act broadly, but only after a *trial* on the merits. 58 F. Supp. 890, 892-93 (D. Wyo. 1945). *Utah Association of Counties v. Bush* did not dismiss the claims until after discovery, more than six years after the defendants moved to dismiss. 316 F. Supp. 2d 1172 (D. Utah 2004); J.A. Vol. III at 836. *Franke* explicitly rejected a sovereign-immunity defense. 58 F. Supp. at 893-94. No court has ever reached the same conclusion as the district court.

The district court's decision is also irreconcilable with Chief Justice Roberts's 2021 statement about the Antiquities Act, which Utah discussed at length in its opening brief, but Federal Defendants have no answer to. *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 980 (statement of Roberts, C.J.). The Chief Justice's concern about the "trend of ever-expanding antiquities," 141 S. Ct. at 980, deserves more from the Federal Government than the silent treatment.

**2.** Defendants have 41 combined amici. Not one of them defends the district court's sovereign-immunity dismissal. Every amicus either admits that the district court was wrong or assumes that it will be reversed. As Defendants' Professor Amici diplomatically put it, the district court's ultra vires holding went "considerably further than any of the Antiquities Act decisions" preceding it. Prof.-Am.-Br.23-24. Defendants' Archaeological Amici write their whole brief on the assumption that "this Court reverses the district court's reviewability analysis." Arch.-Am.-Br.3. Their Grand Staircase Escalante Partners Amici likewise write assuming that "the Court determines that

challenges to the Antiquities Act proclamations are reviewable in federal court." GSE-Am.-Br.25. Even the SUWA Intervenor-Defendants argue only what should happen next after "this Court disagrees with the reviewability bases for the judgment below." SUWA-Br.2. The Professor Amici even ask the Court to adopt the D.C. Circuit's "framework for judicial review." Prof.-Am.-Br.20. Of course, that is exactly the "framework for judicial review"—allowing it—that the district court rejected. *See Mountain States Legal Found.*, 306 F.3d at 1136.

**3.** As Federal Defendant confirm, affirming would mean that no plaintiff can ever challenge a national monument reservation on any federal land, no matter what the qualifying "other objects of historic or scientific interest," and no matter what "smallest area" is reserved. U.S.-Br.49. "The federal government's position would preclude any judicial relief even if the President converted every inch of federal property—28% of all land in the United States—into national monuments" on any basis whatsoever. Sen-Am.-Br.9. The President could declare a single pinecone to be an "object of historic or scientific interest" and on that basis unilaterally shut down tens of billions of dollars in economic activity and override all the federal laws governing all federal land today. *See* PLF-Am.-Br.24-25. A President could also use this power to shut down federal courthouses, the southern border, or every major shipping port—without judicial review. The Chief Justice's warning against decisions "transform[ing]" the Act "into a power without any discernible limit to set aside vast and amorphous expanses of

terrain" was supposed to deter such decisions—not invite them. *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.).

It is no answer to say that Congress could step in to enforce its own law. *See* U.S.-Br.71-82. Congress already acted. It deliberated for years and set careful and strict limits on the Act's scope. Once Congress enacts the text, the Judiciary must interpret and enforce it. "[I]t is the solemn responsibility of the Judicial Branch 'to say what the law is' under the Constitution's Separation of Powers and act as a check on government excesses of power." PLF-Am.-Br.7-8 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)). And the only members of Congress to have chimed in here expect this Court to enforce their limits. *See* Sen.-Am.-Br. The "interpretation of the laws" is, of course, the "proper and peculiar province of the courts." PLF-Am.-Br.10 (quoting The Federalist No. 78 (Alexander Hamilton)).

If the Antiquities Act had no reviewable limits, it would be unconstitutional. The Constitution vests power over federal lands in Congress, not the President. U.S. Const. art. IV, § 3, cl. 2.; Manhattan-Inst.-Am.-Br.10-11; PLF-Am.-Br.13-18; Sen.-Am.-Br.19-21. An unlimited delegation would therefore violate the separation of powers. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541-42 (1935). Especially if the Act contained, as Federal Defendants argue, no "judicially manageable standards." U.S.-Br.49. The major-questions doctrine would require "clear" authority for an expansive or unreviewable power with such drastic economic effects. *NFIB v. OSHA*, 142 S. Ct.

661, 665 (2022). All these problems are avoided if this Court enforces the Act's limits according to their plain meaning.

### D.    Utah has a cause of action.

Utah brought its statutory-authority claims under the judiciary's "equitable powers." J.A. Vol. II at 319. Equity has always provided a cause of action for persons injured by a government official acting beyond the limits of statutory authority—or ultra vires. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 701-02 (1949); *accord Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Centuries of case law establish "the historic availability of injunctive relief against ongoing violations of federal law." Sen.-Am.-Br.4. This Court and the Supreme Court describe this equitable cause of action as allowing suit "when government officials act beyond the limits of statutory authority." *Simmat*, 413 F.3d at 1233; *accord Osborn v. Bank of the United States*, 22 U.S. 738, 870 (1824); *Carroll v. Safford*, 44 U.S. 441, 463 (1845). Every Antiquities Act challenge except this one has been allowed to proceed on this basis. *E.g.*, *Mountain States Legal Found.*, 306 F.3d at 1136; *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d at 545.

There is no separate "zone of interests" problem. U.S.-Br.55-56, 62. The "zone of interests" test applies only to "statutorily created causes of action," not equitable ones. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). It is "not meant to be especially demanding, and the benefit of any doubt goes to the plaintiff." *Kerr v. Polis*, 20 F.4th 686, 698 (10th Cir. 2021) (cleaned up). And it now collapses

into the cause-of-action inquiry anyway: whenever someone has a "cause of action," they satisfy whatever remains of the zone-of-interests test. *Id.* at 697.

### III.   Utah stated valid claims.

If Utah alleges that the national monument reservations exceed at least one of the Act's two limits, then it has stated a claim for Rule 12(b)(6) purposes.

#### A.   The proclamations declare as national monuments items that are not "objects of historic or scientific interest."

**1.** A President exceeds his statutory authority under the Antiquities Act if he declares as a national monument anything other than "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" that are "situated" on federal land. 54 U.S.C. §320301(a). To justify the 500-plus items declared as national monument reservations here, Federal Defendants rely on only the third category—"other objects of historic or scientific interest" that are "situated" on federal land. Accepting Utah's allegations as true, ordinary statutory interpretation compels the conclusion that President Biden exceeded his statutory authority by declaring items that fall outside that category.

First, any qualifying item must be an "object." Landscapes, generic categories, and regions that President Biden declared to be national monuments are not "objects." *See Object*, Oxford English Dictionary VII (O) 14 (1913) ("an individual thing seen or perceived"). President Biden therefore exceeded his statutory authority in declaring them national monuments.

Second, any qualifying item must be "situated" on land. Animate living things like "mule deer," "birds," and "big-eared bats" are not "situated" on land. *Situate; Situated*, Webster's Dictionary (1913) ("permanently fixed; placed; located"). President Biden therefore exceeded his statutory authority in declaring many such things national monuments. *See* 86 Fed. Reg. at 57321-32; 86 Fed. Reg. at 57335-46.

Third, any qualifying item that is not "scientific" must be "historic." Most things from the past, like "cabins" and "pottery," are not "historic." *Historic*, Oxford English Dictionary V (H-K) 304 (1913) ("[f]orming an important part or item of history; noted or celebrated in history; having an interest or importance due to conne[ct]ion with historical events"). President Biden therefore exceeded his statutory authority in declaring hundreds of items from the past national monuments. *See* 86 Fed. Reg. at 57321-32; 86 Fed. Reg. at 57335-46.

Fourth, any objects of "scientific" interest must be interpreted to "apply only to persons or things of the same general kind or class" as the first two categories. Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). When the phrase "objects of … scientific interest" follows the phrase "historic landmarks" and "historic and prehistoric structures," it refers to similar discrete and important items. *See Yates v. United States*, 574 U.S. 528, 536 (2015). It does not refer to generic, ubiquitous, or nondescript items, like "broad desert mesas" and "rock walls." Any broader interpretation would run into problems with the statutory title, legislative history, constitutional avoidance, and the major-questions doctrine. Utah-Br.35-38. President Biden therefore

exceeded his statutory authority in declaring hundreds of generic, ubiquitous, or non-descript items national monuments. *See* 86 Fed. Reg. at 57321-32; 86 Fed. Reg. at 57335-46.

Utah alleged detailed facts about each of President Biden's 500-plus declared national monuments and classified them based on whether they satisfied the statutory requirements. J.A. Vol. II at 383-90. It challenges all but nine of the items. But to rule for Utah at this stage, this Court need only find that one listed item—"a bird, a blade of grass," Az.-Leg.-Am.-Br.1, or any of the other 500-plus declared items—plausibly does not constitute an "object of historic or scientific interest." If so, then Utah has stated a claim that the national monument reservations exceed statutory authority and can proceed to summary judgment.

**2.** Defendants' amici raise a few responses. First, the GSE Partners Amici offer maps alleging that the monument reservations have lots of "potential fossil yield." GSE-Am.-Br.22-23. But even if that factual allegation were allowed, "potential fossil yield" is not an "object"; it's a prediction. Second, the Archaeological Amici say that the President may reserve entire landscapes because "analysis of landscapes is considered a best practice for archaeological research." Arch.-Am.-Br.5. But the Act protects objects, not levels of analysis. Third, the Utah Dine Bikeyah Amici offer a list of past national monument reservations predicated on similar declarations. But their lists may be more misleading than insightful. For example, they claim that "the very first national monument" disproves "Plaintiffs' theory that the Act does not cover landscapes." UDB-Am.-Br.9.

But it declared as a national monument one extraordinary tower, reserved only 1,000 acres, and said nothing about landscapes. Proclamation 658, *Setting Aside Devils Tower Nat'l Monument*, 34 Stat. 3236, 3236-37 (Sept. 24, 1906). The second national monument reservation reserved only 160 acres. Proclamation 695, *El Morro Nat'l Monument*, 34 Stat. 3264, 3264-65 (1906). That said, Utah agrees with Chief Justice Roberts and many others that other national monument reservations may have been overbroad too. *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (statement of Roberts, C.J.); *accord* PLF-Am.-Br.18-25; Az.-Leg.-Am.-Br.4-10. Finally, the Utah Dine Bikeyah Amici confidently assert that "[e]very object identified in the 2021 Proclamation falls within" the third category—"other objects of historic or scientific interest." UDB-Am.-Br.6. But they then attempt to justify only a cherry-picked *14* of 500-plus items. *Id.* at 7. What about "potato[es]"?

### B.    The proclamations reserve more than the "smallest area compatible."

Once a president validly declares national monuments, he exceeds his statutory authority if he "reserve[s]" more than the "smallest area compatible" with their care and management. 54 U.S.C. §320301(b). Utah described and analyzed the smallest amount of land necessary for proper care of any validly declared national monuments in reference to the possible threats to them and the appropriate safeguards against those threats. J.A. Vol. II at 395-400. Based on that analysis, most items need no more than a few acres, and few needed more than 160 acres. *Id.* But even assuming that every item qualifies as a national monument, giving each one 320 acres to be generous, and

assuming that none of them overlap, they could justify only *6%* of the land currently reserved. *Id.* Utah also alleged that vast expanses of the reserved terrain include no listed items and are not needed for the care and protection of any. *Id.* at 396-99. Of course, assuming that's true—as the Court must at this stage—the proclamations exceed the "smallest area compatible" limitation.

Defendants and their amici say that Utah's allegations are insufficiently particular. Utah "fail[ed] to allege any specific allegations regarding proper care and management of the objects actually included in the proclamations." Prof.-Am.-Br.26. Utah "fail[ed] to propose how the boundaries would need to change with any particularity." U.S.-Br.52. And Utah "failed to plead with adequate particularity that any relevant portion of either monument lacks historic or scientific value." U.S.-Br.129 n.89.

Those arguments reflect a startling unfamiliarity with the record. Utah's complaint does what no past complaint has by alleging exactly what kind of care and management is needed for the objects included in the proclamation in far more detail than is required for a motion-to-dismiss. J.A. Vol. II at 395-400. And Utah produced maps, reproduced below, showing exactly "how the boundaries would need to change" to come into conformity with the Act's two limits, down to the acre. U.S.-Br.52. How could Utah have been any more "particula[r]"?







J.A. Vol. II at 397-98.

Because Utah alleged facts that, if true, would establish that the 2021 proclamations declare ineligible items to be national monuments and reserve more land than the smallest area compatible with their care and management, Utah states a claim under Rule 12(b)(6).

## IV.  Utah can separately challenge the interim management plans as final agency action.

At a minimum, Utah can challenge the proclamations through the agency actions implementing them. The interim management plans published by the Department of Interior constitute final agency action because they "mark the consummation of the agency's decisionmaking process" and impose "legal consequences." *Cure Land, LLC v. Dep't of Agric.*, 833 F.3d 1223, 1230-31 (10th Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Federal Defendants seem to have abandoned the district court's reasoning that the management plans are not final simply because they are temporary. J.A. Vol. IV at 988. That's because the interim management plans are "the final word from the agency on what will happen up to the time of any different permanent decision." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). Federal Defendants instead take the position that the plans cannot be challenged because they "simply summarize existing law … and have no legal effect." U.S.-Br.120.

Federal Defendants' position is wrong. The APA creates a strong "presumption" of judicial review. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984). It covers "a broad spectrum of administrative actions" and its review provisions must be given a "'hospitable' interpretation." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955). Agencies rarely win under the "pragmatic" final-agency-action analysis. *Id.*; *see also Army Corps of Eng. v. Hawkes*, 578 U.S. 590, 599 (2016). Only upon "'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs.*, 387 U.S. at 141.

Agencies cannot evade APA review by claiming that they're just rephrasing preexisting law. Agencies believe that much of what they do just rephrases preexisting law. *See Int'l Union, United Auto., Aero. Agr. v. Brock*, 783 F.2d 237, 247 (D.C. Cir. 1986). But that of course does not make it *unchallengeable. See Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 478 (2001). Courts consistently review agency decisions that execute directions or carry out congressional prescriptions. *E.g.*, *Western Watersheds Project v. BLM*, 629 F. Supp. 2d 951, 966 (D. Ariz. 2009) ("[J]udicial review of agency action or inaction taken pursuant to a proclamation's directives is available under the APA as long as the directives are issued in furtherance of the agency's independent statutory obligation."); *Frozen Food Express*, 351 U.S. at 43-44 (explaining that interpretation of preexisting law is challengeable final agency action). They do the same for actions that carry out presidential prescriptions. *E.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (explaining courts can review an agency action that faithfully

implements a proclamation); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA ….").

The interim management plans regulate all activities within the reservations by implementing restrictive rules and directing the agency how to administer and enforce those rules. They regulate "mining," "travel," "recreation," "grazing," and "vegetation management." Bears Ears Management Plan 2-5; Grand Staircase Management Plan 2-5. They enact a new, two-part analysis for determining whether to allow new activities. *E.g.*, Bears Ears Management Plan 3; Grand Staircase Management Plan 3. Unlike in *Whitewater Draw Nat. Res. Conserv. Dist. v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021), those procedures have consequences because they regulate Utah and others *today*. It is irrelevant that later plans will be more comprehensive. U.S.-Br.122 n.81. Agencies can always make their actions simpler or more complex. And it is irrelevant whether they directly regulate primary conduct or instead direct the agency how to do so. *See, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019) (guidance reviewable because it binds the agency to enforce regulations in a specific manner); *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319-20 (D.C. Cir. 2011) (same).

None of this Court's cases resolve this question in Federal Defendants' favor. Their only Tenth Circuit cases stand for the undisputed two-part *Bennett* test. U.S.-Br.120-21 (citing *McKeen v. USFS*, 615 F.3d 1244 (10th Cir. 2010), and *Mobil Expl. & Producing U.S., Inc. v. DOI*, 180 F.3d 1192, 1197-98 (10th Cir. 1999)). This Court should

not indulge, for the first time, their attempt to make illegal agency actions immune from judicial review simply because the agency claims it is faithfully executing the law.

## CONCLUSION

This Court should reverse the judgment below and remand.

Respectfully submitted,

/s/ Tyler R. Green

Stanford E. Purser
Kathy A.F. Davis
Utah Attorney General's Office
1600 E. 300 S.
Salt Lake City, UT 84114-2320
(801) 538-9600

*Counsel for Plaintiff-Appellant*
*State of Utah*

Dated: February 9, 2024

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Taylor A.R. Meehan
Kathleen L. Smithgall
Jeffrey S. Hetzel
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423

*Counsel for Plaintiffs-Appellants Garfield*
*County, Utah; Kane County, Utah; State*
*of Utah*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7) and this Court's August 25, 2023 briefing order because it contains 8,717 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: February 9, 2024                              */s/ Tyler R. Green*

**CERTIFICATE OF SERVICE**

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: February 9, 2024                              */s/ Tyler R. Green*