**Nos. 23-4106 & 23-4107**

# In the United States Court of Appeals for the Tenth Circuit

GARFIELD COUNTY, UTAH, et al., *Plaintiffs-Appellants,*

ZEBEDIAH GEORGE DALTON, et al., *Consolidated Plaintiffs-Appellants*,

*v.*

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al., *Defendants-Appellees,*

HOPI TRIBE, et al., *Defendant Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Utah, No. 4:22-cv-59

### *AMICI CURIAE* BRIEF OF U.S. SENATORS TED CRUZ AND MIKE LEE IN SUPPORT OF PLAINTIFFS-APPELLANTS

RANDALL L. JEFFS
Jeffs & Jeffs
90 N 100 E
PO Box 888
Provo, UT 84603
(801) 373-8848
rzjeffs@jeffslawoffice.com

JENNIFER L. MASCOTT
R. TRENT MCCOTTER*
  *Counsel of Record
Separation of Powers Clinic
Gray Center for the Study of the
  Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amici Curiae*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................iii

INTEREST AND IDENTITY OF THE *AMICI CURIAE* ......................... 1

SUMMARY OF THE ARGUMENT ........................................................ 3

ARGUMENT ........................................................................................ 4

I.    The Court Has Jurisdiction to Hear Plaintiffs' Claims for Prospective Relief .......................................................................... 4

II.    The President's Utah Monuments Declarations Implicate Constitutional Separation of Powers ......................................... 9

    A.    The Federal Government's View Disregards the History Predating the Property Clause, and Risks Transferring Congress's Article IV Power to the President ..................... 10

    B.    The Federal Government's View Raises Serious Federalism Concerns ................................................................................. 14

III.    Constitutional Avoidance Favors Plaintiffs' Construction of the Antiquities Act .......................................................................... 19

CONCLUSION ...................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) .................................................................... 14

*Am. Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) ........................................................ 7

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................. 4, 5

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845) ............................................................ 6

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................... 4, 8

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................... 7, 8, 9

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) .................................................................... 15

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund*,
    *Inc.*, 527 U.S. 308 (1999) .............................................................. 5

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) .................................................................... 20

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ............................................................... 12, 16

*Mass. Lobstermen's Ass'n v. Raimondo*,
    141 S. Ct. 979 (2021) .................................................................. 13

*Mass. Lobstermen's Ass'n v. Ross*,
    945 F.3d 535 (D.C. Cir. 2019) ......................................................... 6

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...................................................................... 14, 20

*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) ....................................................... 6, 8

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ............................................................. 6

*Osborn v. Bank of the United States*,
    22 U.S. (9 Wheat.) 738 (1824) ............................................................ 5

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020) ...................................................................... 20

*United States v. Witkovich*,
    353 U.S. 194 (1957) .......................................................................... 19

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ........................................................................... 4, 5

## Constitution and Statutes

U.S. Const. art. IV, § 3 ....................................................................... 10, 15

Judiciary Act of 1789, 1 Stat. 78 ............................................................... 5

16 U.S.C. § 431 ................................................................................... 18

16 U.S.C. § 432 ................................................................................... 18

16 U.S.C. § 433 ................................................................................... 18

42 U.S.C. § 1712 ................................................................................. 16

54 U.S.C. § 320301 .......................................................................... 12, 20

Utah Code § 23-13-1 ............................................................................ 16

Utah Code § 23-14-1 ....................................................................... 16, 17

Utah Code § 63J-8-101 ........................................................................ 17

**Other Authorities**

43 C.F.R. § 1601.0-5 ................................................................... 16

43 C.F.R. § 1610.3-2 ................................................................... 16

William Blackstone, COMMENTARIES................................................. 10, 11

Niraj Chokshi, *More Than Half the West is Federally Owned. Now Some States Want that Land*, WASH. POST, Oct. 15, 2013 ................................................................... 19

RECORDS OF THE FEDERAL CONVENTION OF 1787 (M. Farrand ed. 1911) ................................................................... 11, 12

Louis L. Jaffe & Edith G. Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L. Q. Rev. 345 (1956)................................................................... 5

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING (2020) ................................................................... 10

James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex Parte Young, 72 Stan. L. Rev. 1269 (2020)................................................................... 5

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473 (2003)................................................................... 18

State of Utah, *State Resource Management Plan* (2022)........................ 17

J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ................................................................... 15

Carol Hardy Vincent, Lauran A. Hanson & Lucas F. Bermejo, *Federal Land Ownership: Overview and Data,* Congressional Research Service (Feb. 21, 2020)................................................................... 9

## INTEREST AND IDENTITY OF THE *AMICI CURIAE*[1]

*Amici curiae* are United States Senators Ted Cruz and Mike Lee. *Amici* represent states where the federal government has significant landholdings. Those states have already been subject to extensive designations of land as national monuments, like the ones at issue in this case. *Amici* are concerned that the District Court's decision declining jurisdiction over challenges to monuments designations under the Antiquities Act will only embolden the federal executive to designate ever-broader monuments, resulting in significant negative consequences for *amici*'s states.

Moreover, as members of Congress, *amici* have a strong interest in judicial interpretations that preserve the legislative powers that the U.S. Constitution vests exclusively in Congress, including its Article IV powers over the property of the United States. *Amici* also have an interest in ensuring that the judiciary serves as an appropriate check on

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amici curiae* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

1

the Article II executive in accordance with the vesting clause of Article III.

*Amici* write to emphasize the history of courts exercising jurisdiction over claims seeking prospective relief against ongoing violations of federal law, and also to explain the serious separation of powers and federalism concerns presented by the federal government's interpretation of the Antiquities Act.

*Amici* are represented by the Separation of Powers Clinic at the Gray Center for the Study of the Administrative State, located within the Antonin Scalia Law School at George Mason University. The Clinic was established during the 2021–22 academic year for the purpose of studying, researching, and raising awareness of the proper application of the U.S. Constitution's separation of powers constraints on the exercise of federal government power, including via federalism principles. The Clinic provides students an opportunity to discuss, research, and write about separation of powers issues in ongoing litigation.

## SUMMARY OF THE ARGUMENT

The Framers of the Constitution, reacting to centuries of regal excesses that had plundered England's national resources, gave Congress the power to issue needful rules and regulations to govern federally owned lands, and Congress in turn authorized the President to designate national monuments within narrowly prescribed limits. The President now asserts unlimited discretion to designate every inch of federal property as a monument and then also escape judicial review altogether.

The Court should reject the federal government's arguments and reverse the decision below. There is a long tradition of federal courts exercising jurisdiction to review claims seeking prospective relief against ongoing violations of federal law. And the federal government's atextual interpretation of the Antiquities Act raises serious concerns about the separation of powers and federalism. The Court can avoid those concerns, however, by adopting Plaintiffs' text-based and logical interpretation of the President's powers under the Act.

## ARGUMENT

### I.     The Court Has Jurisdiction to Hear Plaintiffs' Claims for Prospective Relief.

The District Court concluded that it lacked jurisdiction to review Plaintiffs' claims for prospective relief against the President's Antiquities Act designations. Add.13–19. This Court would create a circuit split by adopting that view, which the D.C. Circuit has long rejected and which the Ninth Circuit recently rejected, as well.

Moreover, completely foreclosing a remedy for challenges seeking prospective relief is inconsistent with the historic availability of injunctive relief against ongoing violations of federal law. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This "negative injunction remedy" is a "'standard tool of equity' that federal courts have authority to entertain under their traditional equitable jurisdiction." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 53 (2021) (Thomas, J., concurring in part) (citation omitted).

And this power extends not just to constitutional violations but also "to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 327, and by the President himself, *see Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28, 1332 (D.C. Cir. 1996).

4

Although federal courts lack "power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999), the negative injunction has roots in American equity dating back to the Judiciary Act of 1789, *see* § 11, 1 Stat. 78; *Whole Woman's Health*, 595 U.S. at 53 (Thomas, J., concurring in part), which itself "reflects a long history of judicial review of illegal executive action, tracing back to England," *Armstrong*, 575 U.S. at 327; *see generally* Louis L. Jaffe & Edith G. Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L. Q. Rev. 345 (1956) (cited in *Armstrong*); James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex Parte Young, 72 Stan. L. Rev. 1269, 1296–97, 1301, 1333–35 (2020).

Early American courts followed this English tradition. For example, in *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court affirmed the lower court's injunction prohibiting an Ohio official from executing a state law taxing the Bank of the United States. *Id.* at 838–39, 859. The Court concluded that the case was "cognizable in a Court of equity," and it was "proper" to grant equitable relief insofar as the state tax was "repugnant" to the federal

law creating the national bank. *Id.* at 839, 859. In 1845, the Supreme Court again recognized that "in a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845).

In accordance with this longstanding availability of judicial relief against ongoing violations of federal law, the D.C. Circuit has repeatedly held that "[i]n reviewing challenges under the Antiquities Act, the Supreme Court has indicated generally that review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *see also Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 545 (D.C. Cir. 2019) ("[D]istrict courts possess subject-matter jurisdiction over challenges to Antiquities Act designations.").

The Ninth Circuit recently agreed that such jurisdiction exists. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023). And the D.C. Circuit recently held yet again that "we have consistently reviewed claims challenging national monument designations," including claims that "the designations reached far beyond the purpose, scope, and size of

6

any national monuments contemplated by Congress under the Antiquities Act," and the court deemed those "claims reviewable notwithstanding the broad discretion the Antiquities Act vests in the President." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (cleaned up).

The D.C. and Ninth Circuits thus rejected the theory—adopted here by the District Court—that review is barred under *Dalton v. Specter*, 511 U.S. 462 (1994), which involved a base-closure statute that did "not at all limit the President's discretion in approving or disapproving the Commission's recommendations" as to which bases to close, meaning the President could act "for whatever reason he sees fit," *id.* at 476. In such situations, Congress has withdrawn the federal courts' jurisdiction to review the President's actions and left the matter solely at the President's discretion.

But as the D.C. Circuit has explained, a "somewhat different case is presented … where the authorizing statute or another statute places discernible limits on the President's discretion," as the Antiquities Act does, because those limits indicate that Congress was not delegating the matter solely to the President's discretion—and thus that Congress was

not displacing the federal courts' longstanding role in entertaining claims seeking prospective relief against violations of those limits. *Mountain States*, 306 F.3d at 1136; *see also Reich*, 74 F.3d at 1331.

More, *Dalton* arose in the context of military decisionmaking, where the President likely had at least some inherent Article II powers. This not only made it more likely as a matter of statutory interpretation that Congress had actually intended to give the President unreviewable discretion, but also made the statute less concerning from a nondelegation perspective. But there is no similar inherent Article II authority at play when it comes to designating monuments under the Antiquities Act, which confirms Congress did not intend to confer unreviewable jurisdiction in the first place and thereby also avoids forbidden delegation of Congress's Article IV power over federal property. *See* Part II.A, *infra*.

Plaintiffs here asserted the same types of claims that the D.C. Circuit has long deemed reviewable, as even the District Court seemed to acknowledge. *See* Add.18–19. Although the District Court cited several of those relevant D.C. Circuit decisions, it never attempted to distinguish their reasoning on this important point.

Rather than create a circuit split, this Court should reject the District Court's view that *Dalton* is "similar to" and controls this case. Add.13. The District Court had jurisdiction to review Plaintiffs' claims for prospective relief against ongoing violations of federal law, in accordance with longstanding historical practice.

## II. The President's Utah Monuments Declarations Implicate Constitutional Separation of Powers.

This Court should proceed to the merits and adopt Plaintiffs' interpretation of the Antiquities Act. The federal government's position would preclude any judicial relief even if the President converted every inch of federal property—28% of all land in the United States[2]—into national monuments. Accepting that interpretation, however, risks serious implications for the separation of powers.

The federal government's broad view of the President's unreviewable powers would effectively delegate Congress's Article IV power over federal lands to the President, and the federal government's view also implicates important federalism interests because the

---

[2] Carol Hardy Vincent, Lauran A. Hanson & Lucas F. Bermejo, *Federal Land Ownership: Overview and Data,* Congressional Research Service (Feb. 21, 2020).

designation of a monument can dramatically alter the relationship between the federal government and the State in which the monument is declared.

### A. The Federal Government's View Disregards the History Predating the Property Clause, and Risks Transferring Congress's Article IV Power to the President.

Article IV of the Constitution provides Congress alone with the power to "dispose of and make all needful Rules and Regulations respecting" federal "property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. This clause is rooted in English practices designed to stem abuses by the king, who originally had near absolute power over the "forests" of England. Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING 228 (2020). "[E]xtensive sales by kings from Henry VIII through William III to make ends meet" had "sacrifice[d] … the national patrimony to satisfy short-term royal needs," *id.* at 228, and, as a result, the public lands had "been almost entirely granted away to private subjects" by kings desperate for revenue, 1 William Blackstone, COMMENTARIES *276.

Most pertinent here, these regal abuses caused "the parliament frequently to interpose" restrictions on the use of the nation's property,

such as forbidding "all future grants or leases from the crown for any longer term than thirty-one years, or three lives." *Id.*; *see also* McConnell, *supra*, at 228–29.

During the American constitutional drafting debates, the legislature's power to control the nation's property was first mentioned in August 1787, when James Madison requested that "the following powers"—including the power "[t]o dispose of the unappropriated lands of the U. States"—be "referred to the Committee of detail" as "proper to be added to those of the General Legislature." 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 324 (M. Farrand ed. 1911). Notably, Madison distinguished this power from that given to "the Executive to procure and hold for the use of the [United States] landed property for the erection of Forts, Magazines, and other necessary buildings." *Id.* at 325.

The issue resurfaced a few weeks later, when Gouverneur Morris proposed language that broadened Congress's power beyond "dispos[ition]" to include making governing laws, as well: "The Legislature shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the U.

States...." *Id.* at 466. This language was ultimately adopted with only one State dissenting. *Id.*

Although located in Article IV rather than Article I, the Property Clause is best understood as a legislative power textually vested with Congress. Both Madison's initial draft and Morris's subsequent revision explicitly assigned the power to the national legislature, *see* McConnell, *supra*, at 229; *see also Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), and Madison's draft had further distinguished it from a proposed power given to "the Executive" to procure and hold certain smaller property interests, 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, *supra*, at 325.

The District Court's and the federal government's interpretation, however, would provide such unreviewable discretion to the President that it risks *de facto* delegating Congress's enumerated property powers to the executive branch. For example, the federal government argues that the statutory limitation on recognizing "objects ... that are situated on land" includes entire landscapes, geographic areas, ecosystems, habitats, and even species of animals, and thus the President can designate them all as "monuments." 54 U.S.C. § 320301(a). Moreover, the federal government argued below that the Act's requirement that monument

designations "be confined to the smallest area compatible with the proper care and management of the objects to be protected," *id.* § 320301(b), nonetheless allows the President to exercise sole, unreviewable discretion over whether the monument being declared satisfies this standard.

Taken together, the federal government's view of these aspects of the Antiquities Act would impose no meaningful restrictions on the President's discretion to designate every inch of federal property as a national monument. As Chief Justice Roberts has noted, the text of the Act is restrictive, but "[s]omewhere along the line … this restriction has ceased to pose any meaningful restraint. A statute permitting the President in his sole discretion to designate as monuments 'landmarks,' 'structures,' and 'objects'—along with the smallest area of land compatible with their management—has been transformed into a power without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea." *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 981 (2021) (Roberts, C.J., respecting the denial of certiorari).

If adopted, this open-ended reading of the Act, combined with a lack of judicial review, would risk transferring the legislative power over federal property from Congress to the President, thereby triggering nondelegation scrutiny, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935) ("Congress cannot delegate legislative power to the President to exercise an unfettered discretion…."), which itself "is rooted in the principle of separation of powers that underlies our tripartite system of Government," *Mistretta v. United States*, 488 U.S. 361, 371 (1989).[3]

## B.   The Federal Government's View Raises Serious Federalism Concerns.

The federal government's interpretation of the Antiquities Act also raises serious federalism concerns. The Property Clause's location within Article IV—which primarily includes provisions relating to the balance of power between the federal government and States, as well as between the States themselves—suggests that the Framers recognized that the United States' treatment of its own property could very well have serious

---

[3] Even if Congress's power to promulgate the Antiquities Act derived from Article I rather than Article IV, the same nondelegation concerns would be present for the same reasons. *See Schechter Poultry*, 295 U.S. at 537–38.

implications for the States in which that property is situated. U.S. Const. art. IV, § 3, cl. 2.

Joseph Story argued that although Congress's power over the *territories* "is clearly exclusive and universal," by contrast "the power of congress to regulate the *other national property* (unless it has acquired, by cession of the states, exclusive jurisdiction) is not necessarily exclusive in all cases." 3 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1322 (1833) (emphasis added). For example, "[i]f the national government own a fort, arsenal, hospital, or lighthouse establishment, not so ceded, the general jurisdiction of the state is not excluded in regard to the site; but, subject to the rightful exercise of the powers of the national government, it remains in full force." *Id.*

Accordingly, to be sure, the federal government has extensive power to regulate its own land, but there are still significant State interests involved when it does so, meaning that an overly broad reading of the Antiquities Act would risk upsetting the "healthy balance of power between the States and the Federal Government," as established by Congress. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

A monument designation drastically alters both the regulatory schemes to which the land is subject and the economic and practical uses of the land. For example, a monument designation displaces other federal policies that are designed to account for State interests in federal lands, such as the flexible "multiple use" mandate governing most federal land management. ECF 91, ¶ 78. The "multiple use" scheme balances conservation and preservation with pre-existing uses of land such as mining, ranching, and recreational activities. *Id.* A monument designation further eliminates the State's statutory right under the Federal Land Policy and Management Act of 1976 to participate in the development of policies for federal land management. *See* 42 U.S.C. § 1712(c)(9); *see also* 43 C.F.R. § 1610.3-2; 43 C.F.R. § 1601.0-5.

A flood of new federal regulations imposed both by the proclamations themselves and by implementing regulations also have a dramatic effect on State interests. For example, States have sovereign authority to protect and manage all wildlife within their borders, *see Kleppe*, 426 U.S. at 545, and, as relevant here, Utah law provides that the State holds title to all wildlife, not already privately held, within the state, Utah Code §§ 23-13-1, *et seq.*, 23-14-1, and requires state agencies

to "protect, propagate, manage, [and] conserve" that protected wildlife, Utah Code § 23-14-1(2)(a).

Included among those State regulations that Utah argued will be preempted is the State's Resource Management Plan for Federal Lands, which sets Utah's and the local counties' goals, policies, and objectives for the protection and utilization of key natural resources and provides federal land managers with required local use plans to use in their own planning processes for public lands. Utah Code § 63J-8-101; State of Utah, *State Resource Management Plan* (2022), bit.ly/3AXy5tC. Utah has argued that the preemption of these land management policies increases the risk of forest fires that strip the land of vegetation, leading to flash floods and destroying state-owned land and state-managed wildlife. ECF 91, ¶ 239.

In addition to drastic shifts in the applicable regulatory schemes, a monument designation also often results in serious practical repercussions for a State's land, economy, and resources. For example, some State-owned lands managed by Utah are now surrounded by property designated as national monuments, where the new restrictions impede access by prohibiting vehicles and equipment. *Id.* ¶ 163. This in

turn harms Utah's ability to manage that land while also decreasing its value. *Id.* ¶ 203.

Other economic effects are sizable as well. For instance, Escalante previously had a stable economy consisting of logging, mining, ranching, and farming. ECF 90, ¶ 88. Because of new limitations on the use of the lands designated as monuments, many of these economic activities have been (or will soon be) replaced by much less reliable revenue from tourism activities. *Id.* ¶¶ 88–89. And that increased tourism means increased strain on State resources. ECF 91, ¶¶ 21–23, 165–71, 220–27. These additional expenses are not offset by federal funding, and in fact Congress has a history of underfunding monuments as a retaliatory measure. *See* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 498 (2003).

* * *

These separation of powers concerns are heightened by the often sudden and drastic changes in the scope of monuments between presidential administrations, as monuments can be established and disestablished by presidential edict alone, with no public process, congressional approval, or internal procedural requirements. *See* 16

U.S.C. §§ 431–433. And this is especially salient in western States, where the federal government owns significant tracts of land. For example, about 65% of land in Utah is federally owned. Niraj Chokshi, *More Than Half the West is Federally Owned. Now Some States Want that Land*, WASH. POST, Oct. 15, 2013.

As explained next, however, the Court can avoid these separation of powers concerns by rejecting the federal government's construction of the Antiquities Act.

## III. Constitutional Avoidance Favors Plaintiffs' Construction of the Antiquities Act.

As Plaintiffs explain, the Antiquities Act's plain meaning is at odds with the federal government's position that the President has unfettered discretion to designate all federal-owned land—and even species of animals—as monuments. *See, e.g.*, ECF 90, ¶¶ 1–8, 41–47; ECF 91, ¶¶ 3–10. But even if the Act were susceptible to multiple interpretations, constitutional avoidance would still strongly counsel in favor of rejecting the federal government's broad view and thereby avoiding the serious separation of powers concerns addressed above. *See United States v. Witkovich*, 353 U.S. 194, 201–02 (1957).

The Supreme Court has long applied this avoidance canon in the context of nondelegation concerns, thus favoring statutory interpretations that avoid open-ended grants of authorities to executive branch officials. *See Mistretta*, 488 U.S. at 373 n.7; *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality). The Court has done the same where important federalism interests are at stake. *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020).

Accordingly, even if there were ambiguity about the scope of "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land," 54 U.S.C. § 320301(a), constitutional avoidance favors rejecting the federal government's definition that would give the President authority to designate anything—ranging from landscapes to animals—as "monuments." Adopting Plaintiffs' commonsense interpretation of "objects" prevents the nearly wholesale delegation of Congress's power over federal property to the President. *See* Part II.A, *supra*.

Similarly, interpreting "smallest area compatible with the proper care and management of the objects to be protected," *id*. § 320301(b), as

imposing a meaningful limitation—rather than as encompassing every inch of federal property—will minimize concerns about enormous designations unsettling the balance of power between the federal government and the States in which the land is situated.

*** 

A textually faithful construction of the Antiquities Act provides no basis for the broad discretionary authority claimed by the federal government. But even if there were ambiguity in the relevant provisions in the Act, constitutional avoidance favors Plaintiffs' interpretation, which respects separation of powers and federalism.

## CONCLUSION

The Court should reverse.

November 6, 2023                    Respectfully submitted,


RANDALL L. JEFFS                   /s/ R. Trent McCotter
Jeffs & Jeffs                      JENNIFER L. MASCOTT
90 N 100 E                         R. TRENT MCCOTTER*
PO Box 888                             *Counsel of Record
Provo, UT 84603                    Separation of Powers Clinic
(801) 373-8848                     Gray Center for the Study of
rzjeffs@jeffslawoffice.com         the Administrative State
                                   Antonin Scalia Law School
                                   George Mason University
                                   3301 Fairfax Dr.
                                   Arlington, VA 22201
                                   (202) 706-5488
                                   rmccotte@gmu.edu

                                   Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2023, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ R. Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This brief complies with the type-volume limitation of Rule 29 because it contains 3467 words, excluding the parts exempted under Rule 32(f).

/s/ R. Trent McCotter