Nos. 23-4106 // 23-4107

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

GARFIELD COUNTY, UTAH, *et al.*,
*Plaintiffs-Appellants,*

and

ZEBEDIAH GEORGE DALTON, *et al.*,
*Consolidated Plaintiffs-Appellants,*

v.

JOSEPH R. BIDEN, JR., *et al.*,
*Defendants-Appellees,*

and

HOPI TRIBE, *et al.*,
*Defendant Intervenors-Appellees,*

Appeal from the United States District Court
for the District of Utah
Case No. 4:22-cv-00059-DN (Hon. David Nuffer)

FEDERAL DEFENDANTS'
CONSOLIDATED ANSWERING BRIEF

TODD KIM
*Assistant Attorney General*

JOHN E. BIES
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

**Oral argument is requested.**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................ vi

PRIOR OR RELATED APPEALS ...................................................... xxv

GLOSSARY ...................................................................................... xxvi

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 4

STATEMENT OF THE ISSUES ........................................................... 5

PERTINENT STATUTES .................................................................... 6

STATEMENT OF THE CASE ............................................................... 6

    A.    Legal background ................................................................ 6

        1.    The Nineteenth Century development of public land law ................................................... 6

        2.    The Antiquities Act .................................................. 11

            a.    Drafting history .................................................. 11

            b.    Enactment and codification ................................. 15

            c.    Context ............................................................ 16

            d.    Contemporaneous practice reflected in early monument designations ........................... 18

    B.    Factual background ......................................................... 22

        1.    The challenged Monument designations ..................... 22

a.    The establishment of Grand Staircase-Escalante National Monument ........................... 22

b.    The establishment of Bears Ears National Monument ............................................. 23

c.    The challenged 2021 Proclamations ................... 25

2.    The challenged BLM memoranda ............................... 32

C.    Proceedings below .................................................. 33

SUMMARY OF ARGUMENT ................................................. 35

STANDARD OF REVIEW ..................................................... 37

ARGUMENT ........................................................................ 38

I.    Congress has not provided for judicial review of presidential declarations under the Antiquities Act. .................... 38

A.    Congress has not waived sovereign immunity and consented to suits challenging presidential declarations under the Antiquities Act. ................................ 38

B.    There is no cause of action for private challenges to the President's exercise of discretion in issuing the challenged Proclamations................................................. 41

1.    Only an "express statement" by Congress can authorize judicial review of the President's performance of his statutory duties. .......................................................... 41

2.    Even setting aside the "express statement" requirement, Plaintiffs fail to identify *any* available right of action for their claims...................... 52

3.    No court has ever found a monument
designation to violate the terms of the
Antiquities Act. ............................................................ 56

C.    Plaintiffs cannot rely on the nonstatutory *ultra
vires* doctrine to circumvent federal sovereign
immunity. .................................................................... 58

1.    The *ultra vires* doctrine does not apply to
statutory claims against the President ....................... 59

2.    The *ultra vires* doctrine does not provide a
right of action. ............................................................ 61

3.    The *ultra vires* doctrine does not apply to
routine claims, such as Plaintiffs', that the
challenged action rested on errors of fact or
law. ............................................................................. 62

D.    The President's Antiquities Act authority is not
"limitless" or unchecked ........................................... 71

II.    Plaintiffs lack standing to challenge
the 2021 Proclamations .................................................... 82

A.    The four Individual Plaintiffs fail to adequately
allege standing. ........................................................... 85

1.    Zebediah Dalton ......................................................... 86

2.    Suzette Morris ............................................................ 89

3.    Kyle Kimmerle ............................................................ 90

4.    BlueRibbon Coalition .................................................. 92

a.    Associational Standing ....................................... 93

b.    Organizational Standing ..................................... 99

B.     The *Garfield* Plaintiffs do not allege a cognizable injury, caused by the Proclamations, that would be redressed by a favorable decision. .................................. 102

    1.     The *Garfield* Plaintiffs have not demonstrated harm from increased visitation caused by the challenged Proclamations. ........................................... 102

    2.     Claimed injuries to resources in which *Garfield* Plaintiffs do not have a legally protected interest do not establish standing. ............ 107

    3.     The *Garfield* Plaintiffs cannot demonstrate standing based on speculative claims of lost revenue traceable to the 2021 Proclamations. .......................................... 111

    4.     The *Garfield* Plaintiffs cannot demonstrate standing based on alleged impairment of road maintenance or search-and-rescue activities. .................................................. 116

III.  The Court lacks jurisdiction over Plaintiffs' APA challenge to BLM's interim guidance memoranda. .................... 120

A.     The memoranda are not "final agency actions." ................ 120

B.     Plaintiffs have not established Article III standing to challenge the memoranda. ............................... 128

IV.   If the Court concludes there is jurisdiction to consider any of Plaintiffs' claims, it should remand for the district court to consider Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6). ......................... 129

CONCLUSION ................................................................. 131

STATEMENT REGARDING ORAL ARGUMENT ............................ 132

CERTIFICATE OF COMPLIANCE ....................................................... 133

CERTIFICATE OF DIGITAL SUBMISSION ...................................... 134

CERTIFICATE OF SERVICE ................................................................ 135

ADDENDUM .......................................................................................... 1a

The Antiquities Act of 1906,
      Pub. L. 59-209, 34 Stat. 225 ............................................................ 2a

      54 U.S.C. § 320301 ......................................................................... 4a

The Administrative Procedure Act,
      5 U.S.C. § 702 ................................................................................ 5a

      5 U.S.C. § 704 ................................................................................ 6a

# TABLE OF AUTHORITIES

## Cases

*Acheson Hotels, LLC v. Laufer*,
   601 U.S. ---, 2023 WL 8378965 (Dec. 5, 2023) .................................. 1

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland*,
   24 F.4th 1249 (9th Cir. 2022) ....................................................... 123

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ......................................................................... 53

*American Forest Research Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) ......................................................... 57

*Animal Leg. Def. Fund v. Kelly*,
   434 F.Supp.3d 974 (D. Kan. 2020) ................................................ 100

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) ......................................................................... 54

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................... 83

*Atkinson v. O'Neill*,
   867 F.2d 589 (10th Cir. 1989) ......................................................... 38

*Baca v. King*,
   92 F.3d 1031 (10th Cir. 1996) ....................................................... 112

*Bankshot Billiards, Inc. v. City of Ocala*,
   634 F.3d 1340 (11th Cir. 2011) ....................................................... 96

*Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.*,
   385 F.3d 1291 (10th Cir. 2004) ....................................................... 83

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................... 121

*Bischoff v. Myers,*
  216 F.3d 1086 (10th Cir. 2000) ................................................... 112

*Boswell v. Skywest Airlines, Inc.,*
  361 F.3d 1263 (10th Cir. 2004) ................................................ 53, 54

*Bronson v. Swensen,*
  500 F.3d 1099 (10th Cir. 2007) ...................................................... 34

*Cache Valley Elec. Co. v. State of Utah Dept. of Transp.,*
  149 F.3d 1119 (10th Cir. 1998) ...................................................... 91

*Cameron v. United States,*
  252 U.S. 450 (1920) ................................................................ 21, 57

*Cappaert v. United States,*
  426 U.S. 128 (1976) ................................................................ 21, 57

*Cent. Green Co. v. United States,*
  531 U.S. 425 (2001) ...................................................................... 83

*Central Bank of Denver, N.A. v. First Interstate Bank of
  Denver, N.A.,*
  511 U.S. 164 (1994) ...................................................................... 51

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
  333 U.S. 103 (1948) ........................................................... 43, 48, 49

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .................................................................. 84, 88

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................... 95, 112, 114

*Clark v. Rameker,*
  573 U.S. 122 (2014) ...................................................................... 50

*Clayton Cnty. v. Fed. Aviation Admin.,*
  887 F.3d 1262 (11th Cir. 2018) ................................................... 123

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ........................................................ 103

*Colo. Outfitters Ass'n v. Hickenlooper,*
    823 F.3d 537 (10th Cir. 2016) ...................................................95-96

*Colo. Taxpayers Union, Inc. v. Romer,*
    963 F.2d 1394 (10th Cir. 1992) ........................................ 92, 99, 101

*Corley v. United States,*
    556 U.S. 303 (2009) ........................................................................50

*Dalton v. Spencer,*
    511 U.S. 462 (1994) ........................................................... 42, 43, 46

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ........................................................................72

*Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne.* 250 U.S. 163 (1919) .............................. 43, 44, 45, 47, 48

*D.L.S. v. Utah,*
    374 F.3d 971 (10th Cir. 2004) ............................................ 89, 90, 96

*Dubuque & S.C. R. Co. v. Des Moines Valley R. Co.,*
    109 U.S. 329 (1883) ....................................................................... 10

*Dunn & Black, P.S. v. United States,*
    492 F.3d 1084 (9th Cir. 2007) ........................................................ 39

*Essence, Inc. v. City of Fed. Heights,*
    285 F.3d 1272 (10th Cir. 2002) ...................................................... 88

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ....................................................................... 38

*Fed. Express Corp. v. U.S. Dep't of Commerce,*
    39 F.4th 756 (D.C. Cir. 2022) .................................. 63, 64, 66, 67, 68

*Florida Health Sciences Ctr. v. Secretary of Health & Hum.*
*Servs.,*
   830 F.3d 515 (D.C. Cir. 2016) ........................................... 63

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ............................. 2, 40, 42, 43, 58, 60

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
   528 U.S. 167 (2000) ............................................. 82, 98, 128

*Frozen Food Express v. United States*,
   351 U.S. 40 (1956) ........................................................ 127

*Fund for Animals v. BLM,*
   460 F.3d 13 (D.C. Cir. 2006) ........................................ 120

*Garling v. EPA,*
   849 F.3d 1289 (10th Cir. 2017) ................................... 103

*Gibson v. Anderson,*
   131 F. 39 (9th Cir. 1904) ................................................. 9

*Golden & Zimmerman, LLC v. Domenech*,
   599 F.3d 426 (4th Cir. 2010) ................................. 123, 124

*Gonzaga Univ. v. Doe*,
   536 U.S. 273, 290 (2002) ............................................... 54

*Griffith v. Fed. Labor Rel. Auth.,*
   842 F.2d 487 (D.C. Cir. 1988) ........................................ 59

*Grisar v. McDowell*,
   73 U.S. 363 (1869) ............................................................ 9

*Grupo Mexicano de DeSarrollo, S.A. v. Alliance Bond Fund,*
*Inc.,*
   527 U.S. 308 (1999) ........................................................ 62

*Habecker v. Town of Estes Park, Colo.*,
    518 F.3d 1217 (10th Cir. 2008) ...................................... 98, 104, 106

*Hagen v. Utah*,
    510 U.S. 399 (1994) .......................................................... 6

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ......................................................... 99

*Holt v. United States*,
    46 F.3d 1000 (10th Cir. 1995) ......................................... 83

*Homestead Co. v. Valley Railroad*,
    84 U.S. 153 (1873) .......................................................... 10

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004.................................... 123, 124

*Iowa Tribe Of Kansas and Nebraska v. Salazar*,
    607 F.3d 1225 (10th Cir. 2010) ....................................... 39

*Kane County, Utah v. Salazar*,
    562 F.3d 1077 (10th Cir. 2009) ................................ 87, 88, 93, 110

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
    971 F.3d 1222 (10th Cir. 2020) .................................... 88, 95

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................... 96

*Lane v. Pena*,
    518 U.S. 187, 192 (1996) ............................................... 39

*Larson v. Domestic & Foreign Comm. Corp.*,
    337 U.S. 682 (1949) ..................................... 38, 58, 59, 61, 62, 63, 65

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ....................................................... 59

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................. 55, 62

*Litchfield v. Webster Cty.*,
    101 U.S. 773 (1879) ..................................................................... 10

*Local 130, Int'l Union of Elec., Radio & Mach. Workers v.
    McCulloch*,
    345 F.2d 90 (D.C. Cir. 1965) ........................................................ 66

*Lonsdale v. United States*,
    919 F.2d 1440 (10th Cir. 1990) ............................................... 39, 40

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................... 93, 94, 108

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ..................................................................... 73

*Martin v. Mott*,
    25 U.S. (12 Wheat.) 18 (1827) ..................................... 43, 44, 47, 72

*Mass. Lobstermen's Ass'n v. Ross*,
    945 F.3d 535 (D.C. Cir. 2019) ...................................................... 56

*McFadden v. Mountain View Mining & Milling Co.*,
    97 F. 670 (9th Cir. 1899) ............................................................... 9

*McKeen v. U.S. Forest Serv.*,
    615 F.3d 1244 (10th Cir. 2010) .................................................. 120

*Menominee Indian Tribe of Wis. v. EPA*,
    947 F.3d 1065 (7th Cir. 2020) .................................................... 123

*Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*,
    180 F.3d 1192 (10th Cir. 1999) ........................................... 120, 121

*Mocek v. City of Albuquerque*,
    813 F.3d 912 (10th Cir. 2015) ...................................................... 40

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ................................................. 47, 60

*Mountain States Legal Foundation v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) ....................................................... 56

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ........................................................ 57

*National Ass'n of Postal Supervisors v. USPS*,
    26 F.4th 960 (D.C. Cir. 2022) ........................................................ 66

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ........................................................................ 59

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005) ................................................... 104

*Oestereich v. Selective Serv. Sys. Loc. Board No. 11*,
    393 U.S. 233 (1968) ........................................................... 63, 64, 66

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ..................................................... 26

*Producers of Renewables United for Integrity Truth &*
    *Transparency v. EPA*,
    No. 19-9532, 2022 WL 538185 (10th Cir. Feb. 23, 2022)............. 106

*Radil v. Sanborn W. Camps, Inc.*,
    384 F.3d 1220 (10th Cir. 2004) ..................................................... 83

*Riley v. Welles*,
    154 U.S. 578 (1870) ........................................................................ 10

*Rimbert v. Eli Lilly & Co.*,
    647 F.3d 1247 (10th Cir. 2011) ................................................... 130

*S. Utah Wilderness Alliance v. BLM*,
    425 F.3d 735 (10th Cir. 2005) .......................................................... 8

*Safeway Stores 46, Inc. v. WY Plaza LC,*
    65 F.4th 474 (10th Cir. 2023) ........................................................ 130

*Safe Streets Alliance v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) ........................... 37, 53, 54, 55, 60, 62

*Schaffer v. Clinton,*
    240 F.3d 878 (10th Cir. 2001) ...................................................... 108

*Scott v. Carew,*
    196 U.S. 100 (1905) ......................................................................... 9

*Simmat v. U.S. Bur. of Prisons,*
    413 F.3d 1225 (10th Cir. 2005) ...................................................... 61

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ....................................................................... 112

*Sonnenfeld v. City & County of Denver,*
    100 F.3d 744 (10th Cir.1996) ........................................................ 53

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................. 82, 89

*State of Utah v. Babbitt,*
    137 F.3d 1193 (10th Cir. 1998) ...................................................... 84

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ....................................................................... 94

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ....................................................................... 96

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ................................................................... 60

*Tulare County v. Bush,*
    185 F. Supp. 2d 18 (D.D.C. 2001) ............................................... 126

*Tulare County v. Bush,*
306 F.3d 1138 (D.C. Cir. 2002) ...................................... 56, 126, 129

*Turlock Irrigation Dist. v. FERC,*
786 F.3d 18 (D.C. Cir. 2015) ................................................. 99, 100

*United States v. Alaska,*
545 U.S. 75 (2005) .................................................................... 22, 58

*United States v. Bd. of Cnty. Cmm'rs of Cnty. of Otero,*
843 F.3d 1208 (10th Cir. 2016) ...................................................... 109

*United States v. California,*
436 U.S. 32 (1978) ........................................................................... 58

*United States v. Chemical Foundation,*
272 U.S. 1 (1926) ............................................................................ 73

*United States v. City of San Francisco,*
310 U.S. 16 (1940) .................................................................... 73, 74

*United States v. George S. Bush & Co.,*
310 U.S. 371 (1940) .................................................... 43, 45, 46, 47

*United States v. Gratiot,*
39 U.S. 526 (1840) .......................................................................... 10

*United States v. Hays,*
515 U.S. 737 (1995) ....................................................................... 108

*United States v. Leathers,*
26 F. Cas. 897 (D. Nev. 1879) .......................................................... 9

*United States v. Martin,*
14 F. 817 (D. Or. 1883) .................................................................... 9

*United States v. Midwest Oil Co.,*
236 U.S. 459 (1915) .................................................................... 9, 17

*United States v. Payne,*
    8 F. 883 (W.D. Ark. 1881) ................................................................... 9

*United States v. Texas,*
    599 U.S. 670 (2023) .......................................................................... 109

*United Tribe of Shawnee Indians v. U.S.,*
    253 F.3d 543 (10th Cir. 2001). ......................................................... 41

*Utah Ass'n of Ctys. v. Bush,*
    316 F. Supp. 2d 1172 (D. Utah 2004) .............................................. 56

*Utah Ass'n of Ctys. v. Bush,*
    455 F.3d 1094 (10th Cir. 2006) .................................... 52, 54, 82, 113

*Va. Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) ........................................................................... 55

*Warth v. Seldin,*
    422 U.S. 490 (1975) ......................................................................... 106

*Whitewater Draw Nat. Res. Conservation Dist.*
    *v. Mayorkas,*
    5 F.4th 997 (9th Cir. 2021)............................................ 122, 123, 125

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ......................................................................... 120

*Wolcott v. Des Moines Co.,*
    72 U.S. 681 (1866) ............................................................................ 10

*Wolsey v. Chapman,*
    101 U.S. 755 (1879) .......................................................................... 10

*Work v. United States,*
    267 U.S. 175 (1925) .......................................................................... 67

*Wilcox v. Jackson,*
    38 U.S. 498 (1839) ....................................................................... 9, 10

*Williams v. Baker*,
    84 U.S. 144 (1873) ........................................................ 10

*Winsness v. Yocom*,
    433 F.3d 727 (10th Cir. 2006) ................................. 89, 96

*Wyoming v. Franke*,
    58 F. Supp. 890 (D. Wy. 1945) ...................................... 56

*Wyoming v. United States*,
    279 F.3d 1214 (10th Cir. 2002) ......................... 39, 40, 65

*Wyoming v. U.S. Dep't of Int.*,
    674 F.3d 1220 (10th Cir. 2012) ...................................... 83

## Constitution

U.S. Const. Art. II Sec. 3 ............................................ 59, 73

U.S. Const. Art. IV Sec. 3 Cl. 2 .................................. 10, 73

## Statutes and Court Rules

Administrative Procedure Act

    5 U.S.C. § 702 ....................................................... 40, 120

    5 U.S.C. § 704 ......................................................... 3, 120

Antiquities Act

    16 U.S.C. § 431, et seq. ................................................ 73

    16 U.S.C. § 431 (prior codification) ............................... 16

    54 U.S.C. § 320301 ................................................. 16, 46

    54 U.S.C. § 320301(a) .................................................. 48

54 U.S.C. § 320301(b) ...................................................................... 48

54 U.S.C. § 320301(d) .............................................................. 65, 76

Pub. L. 59-209, 34 Stat. 225 ...................................................... 16

16 U.S.C. § 3213................................................................................51, 76

16 U.S.C. § 470hh(a) ........................................................................ 26

28 U.S.C. § 511 .................................................................................. 73

28 U.S.C. § 1291 .................................................................................. 4

28 U.S.C. § 1331.............................................................................. 4, 39

28 U.S.C. § 1361 ................................................................................ 39

28 U.S.C. § 2201 ................................................................................ 39

28 U.S.C. § 2202 ................................................................................ 39

28 U.S.C. § 2401(a) ........................................................................... 84

Mineral Leasing Act
    30 U.S.C. 181 ............................................................................ 76

42 U.S.C. § 9659(a)(2)...................................................................... 42

43 U.S.C. § 155–158 (1964) ......................................................... 51

43 U.S.C. § 315................................................................................. 112

43 U.S.C. § 315b.............................................................................. 112

43 U.S.C. § 1391–1400 (1964) .................................................... 78

Federal Land Policy and Management Act
    43 U.S.C. § 1701–1782 ............................................................... 77, 78

    43 U.S.C. § 1701 ...................................................................... 9

    43 U.S.C. § 1712(c)(9) ............................................................ 109


    Pub. L. No. 94-579, 90 Stat. 2743 ........................................... 77, 78

    Pub. L. No. 94-579, § 701(f) ..................................................... 79

43 U.S.C. § 2011(b) ....................................................................... 42

Oregon and California Railroad and Coos Bay Wagon Road
    Grant Lands Act,
    43 U.S.C. § 2601, *et seq.* ......................................................... 57

Act of March 3, 1791,
    1 Stat. 221 .............................................................................. 7

2 Stat. 448 (1807) ........................................................................... 7

Act of Mar. 1, 1817,
    3 Stat. 347 .............................................................................. 8

Act of May 29, 1830,
    4 Stat. 420, c. 208 ................................................................... 8

4 Stat. 505 (1832) ........................................................................... 8

Preemption Act of 1841,
    5 Stat. 453 .............................................................................. 7

Oregon Donation Act of 1850,
    9 Stat. 496 .............................................................................. 7

General Swampland Act of 1850,
9 Stat. 519 ........................................................... 7

Homestead Act of 1862,
12 Stat. 392 ......................................................... 7

12 Stat. 413 ......................................................... 7

Mining Act of 1866,
14 Stat. 251 ......................................................... 7

Placer Act of 1870,
16 Stat. 217 ......................................................... 7

Forest Reserve Act of 1891,
26 Stat. 1103 ....................................................... 16

Mining Law of 1872,
17 Stat. 91 ........................................................... 7

Reclamation Act of 1902,
32 Stat. 388 ......................................................... 16

Pickett Act of 1910,
c. 421, 36 Stat. 847 ......................................... 16, 18

Act of Mar. 2, 1927,
ch. 251, 44 Stat. 1264 ......................................... 75

Act of June 22, 1936,
ch. 700, 49 Stat. 1817 ......................................... 76

Pub. L. No. 83-360, 68 Stat. 98 (1954) .................... 75

Pub. L. No. 84-179, 69 Stat. 380 (1955) .................. 75

Pub. L. No. 84-891, 70 Stat. 898 (1956) .................. 75

Pub. L. No. 88-606, 78 Stat. 982 (1964) .................. 78

Pub. L. No. 89-154, 79 Stat. 587 (1965) ................................................... 75

Pub. L. No. 92-537, 86 Stat. 1069 (1972) ................................................ 75

National Parks and Recreation Act of 1978,
    Pub. L. No. 95-625, § 301(13), 92 Stat. 3467, 3474
    (November 10, 1978) ................................................................. 75, 77

Pub. L. No. 104-333 § 205, 110 Stat. 4093 (1996) .................................. 75

Utah Schools and Lands Exchange Act of 1998,
    Pub. Law No. 105-335, 112 Stat. 3139 .......................................... 23

    Pub. L. No. 105-335, 112 Stat. 3140 ............................................ 115

    Pub. Law No. 105-355, 112 Stat. 3247 .......................................... 23

Omnibus Public Land Management Act of 2009,
    § 2604, Pub. Law No, 111-11, 123 Stat. 991 .................................. 23

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, § 408, 136 Stat. 49 ............................... 76, 114

## Presidential Proclamations & Executive Orders

Proclamation 658 (Devil's Tower National Monument),
    34 Stat. 3236 (1906) ......................................................... 18, 19, 20

Proclamation 697 (Petrified Forest National Monument),
    34 Stat. 3266 (1906) ................................................................. 19

Proclamation 753 (Cinder Cone National Monument),
    35 Stat. 2131 (1907) ................................................................. 19

Proclamation 754 (Lassen Peak National Monument),
    35 Stat. 2132 (1907) ................................................................. 19

Proclamation 793 (Muir Woods National Monument),
    35 Stat. 2174 (1908) ........................................................... 19, 20

Proclamation 794 (Grand Canyon National Monument),
35 Stat. 2175 (1908) ................................................................ 19, 20

Proclamation 796 (Pinnacles National Monument),
35 Stat. 2177 (1908) ................................................................... 19

Proclamation 799 (Jewel Cave National Monument),
35 Stat. 2180 (1908) ................................................................... 19

Proclamation 804 (Natural Bridges National Monument),
35 Stat. 2183 (1908) ................................................................... 19

Proclamation 807 (Lewis & Clark Cavern National
Monument),
35 Stat. 2187 (1908) ................................................................... 19

Proclamation 831 (Wheeler National Monument),
35 Stat. 2214 (1908) ................................................................... 19

Proclamation 869 (Mount Olympus National Monument),
35 Stat. 2247 (1909) ................................................................ 19, 20

Proclamation 1487 (Katmai National Monument),
40 Stat. 1855 (1918) ................................................................... 20

Proclamation 1664 (Bryce Canyon National Monument),
43 Stat. 1914 (1923) ................................................................... 20

Proclamation 1694 (Craters of the Moon National
Monument),
43 Stat. 1947 (1924) ................................................................ 20, 21

Proclamation 1733 (Glacier Bay National Monument),
43 Stat. 1988 (1925) ................................................................... 20

Proclamation 2028 (Death Valley National Monument),
47 Stat. 2554 (1933) ................................................................... 20

Proclamation 2032 (Saguaro National Monument),
  47 Stat. 2557 (1933) ........................................................... 21

Proclamation 2193 (Joshua Tree National Monument),
  50 Stat. 1760 (1936) ........................................................... 20

Executive Order 7298 (1936)............................................... 73

Proclamation 6920 (Establishing Grand Staircase-Escalante
  National Monument),
  61 Fed. Reg. 50223 (Sept. 24, 1996) ............................... 22

Proclamation 9558 (Establishing Bears Ears National
  Monument),
  82 Fed. Reg. 1139 (Jan. 5, 2017)..................................... 24

Proclamation 9681 (Modifying Bears Ears National
  Monument),
  82 Fed. Reg. 58081 (Dec. 8, 2017)............................. 24, 25

Proclamation 9682 (Modifying Grand Staircase-Escalante
  National Monument),
  82 Fed. Reg. 58089 (Dec. 8, 2017)................................... 23

Proclamation 10,285 (Bears Ears National Monument),
  86 Fed. Reg. 57321 (Oct. 15, 2021) ..................... 25, 26, 30, 31, 32

Proclamation 10,286 (Grand Staircase-Escalante National
  Monument),
  86 Fed. Reg. 57335 (Oct. 15, 2021) ............... 25, 26, 29, 30, 31, 32

## Federal Regulations

43 C.F.R. Part 1600 ............................................................ 122

43 C.F.R. § 3809.100(b) ..................................................... 127

85 Fed. Reg. 9802 (Feb. 20, 2020) .................................... 110

## Congressional Materials

H.R. 8066, 56th Cong. (1900) .................................................... 12

H.R. 8195, 56th Cong. (1900) .................................................... 13

H.R. 9245, 56th Cong. (1900) .................................................... 13

H.R. 11021, 56th Cong. (1900) .................................................. 13

S. 5603, 58th Cong. § 2 (1905) ................................................. 13

H.R. 7211, 92d Cong., § 502(b) (1972) ..................................... 78

H.R. Rep. No. 59-2224 (1906) ............................................ 24, 30

S. Rep. No. 94-996 (1976) ....................................................... 40

## Other Authorities

Bureau of Land Management, Public Land Statistics
(2022) ............................................................................... 6

Congressional Research Services, *National Monuments and
the Antiquities Act* (R41339; May 3, 2023) ................................... 74

Gates, Paul W., *History of Public Land Law Development*,
(Pub. Lands L. Rev. Comm'n 1968) ................................... 7

Hewett, E. *Circular Relating to Historic and Prehistoric
Ruins of the Southwest and Their Preservation*
(Gov't Printing Ofc. 1904) ............................................... 30

Lee, Robert F., *The Antiquities Act of 1906*
(Dep't of Interior 1970) .......................... 11, 12, 13, 14, 17

Leshy, John D., *Our Common Ground: A History of
America's Public Lands*
(Yale Univ. Press 2022) ............................... 8, 9, 11, 17

Mansfield, M., *A Primer of Public Land Law*,
    68 Wash. L. Rev. 801 (1993) ........................................................... 8

Modern World Dictionary of English Language (1906) ......................... 50

Norris, F., "*The Antiquities Act and the Acreage Debate*,"
    23:3 *The George Wright Forum* 6 (2006) ................................. 11, 12

Peffer, E., *The Closing of the Public Domain: Disposal and
    Reservation Policies 1900-50*
    (Stanford Univ. Press 1951)......................................................... 6, 17

Rothman, H., *Preserving Different Pasts: The American
    National Monuments* (U. of Ill. Press 1989) ................................. 11

Squillace, M., *The Monumental Legacy of the Antiquities Act
    of 1906*,
    37 Ga. L. Rev. 473 (2003) ......................................................... 15, 75

Webster's Practical Dictionary (1906) ..................................................... 50

Wheatley, Jr., Charles F., *Study of Withdrawals and
    Reservations of Public Domain Lands*
    (Pub. Lands L. Rev. Comm'n 1969) ............................................... 80

## PRIOR OR RELATED APPEALS

This appeal consolidates two related cases, *Garfield County, Utah, et al. v. Biden et al.*, No. 23-4106 (10th Cir.), and *Dalton et al. v. Biden et al.*, No. 23-4107 (10th Cir.).

## GLOSSARY

APA                    Administrative Procedure Act

BLM                    Bureau of Land Management

FLPMA                  Federal Land Management & Policy Act of 1976

## INTRODUCTION

President Biden issued proclamations in 2021 exercising his discretion under the Antiquities Act to designate objects of historic and scientific interest for preservation at two existing national monuments and to reserve federal lands for the care and management of designated objects. President Biden's proclamations restored the monuments' prior boundaries after President Trump had reduced them in 2017. The district court dismissed each of Plaintiffs' claims challenging the 2021 Proclamations on various jurisdictional grounds, which this Court "can address … in any order [it] choose[s]." *Acheson Hotels, LLC v. Laufer*, 601 U.S. ⸱⸱⸱, 2023 WL 8378965, at *2 (Dec. 5, 2023).

The Antiquities Act is written in expansive terms committing designation decisions to the President's discretion. It neither expressly subjects those decisions to judicial review nor provides any meaningful guideposts for judicial scrutiny of the President's judgment. In the 117 years since the Antiquities Act became law, *no* court has *ever* found that *any* proclamation designating a national monument violated the terms of the Act.

Plaintiffs disagree with the President's determinations regarding protection of the designated objects and asked the district court to substitute Plaintiffs' judgment on those issues for the President's. But Congress has not waived the United States' sovereign immunity to such claims. Besides, the Supreme Court "require[s] an express statement by Congress before assuming it intended the President's performance of his statutory duties" to be subject to judicial review. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). There is no such "express statement" in the Antiquities Act or any other statute regarding review of the President's Antiquities Act decisions.

Plaintiffs point to the *ultra vires* doctrine as providing an exception to sovereign immunity. But even if that doctrine were available for claims that the President did not comply with statutory requirements, it would not apply to Plaintiffs' claims, which allege at most that the President's decisions rested on errors of fact or law. Courts applying the *ultra vires* doctrine have reserved it for those extreme cases where an official takes actions plainly without authority to do so, such as in contravention of a clear statutory command, not to address routine disputes of fact or legal interpretation.

Plaintiffs also failed to establish Article III standing to challenge the 2021 Proclamations. Plaintiffs' standing arguments gesture to future harms they might suffer but identify no concrete, actual, or immediate injury from restoration of the preexisting monument boundaries. Nor do Plaintiffs adequately allege that any putative injury likely would be redressed by reverting to those monuments' prior boundaries.

Plaintiffs' final claim, an Administrative Procedure Act (APA) challenge to interim memoranda that the Bureau of Land Management (BLM) issued to provide guidance to its Utah State Director, likewise fails. As the district court recognized, the memoranda are not reviewable "final agency action." 5 U.S.C. § 704. They summarize existing applicable law, but they do not consummate any BLM "decision" or carry any legal consequence themselves. Moreover, Plaintiffs have not established standing to challenge the memoranda.

This Court should affirm the district court's sound decision dismissing these cases in their entirety.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under the Antiquities Act, the APA, and the federal-question statute, 28 U.S.C. § 1331. As explained below, the district court lacked jurisdiction for multiple reasons, and properly dismissed the case on August 11, 2023. Plaintiffs timely appealed. This Court has appellate jurisdiction. *Id.* § 1291.

## STATEMENT OF THE ISSUES

1.      Whether, when the President exercises discretion under the Antiquities Act to designate objects of historic and scientific interest and to reserve federal lands for the care and management thereof, Congress has provided for judicial review of that decision by (a) waiving the United States' sovereign immunity and (b) creating a cause of action allowing private parties to enforce the Act's requirements.

2.      Whether Plaintiffs have established Article III standing to challenge the 2021 Proclamations where Plaintiffs have alleged speculative injuries from hypothesized future events but have not identified a concrete and immediate injury traceable to the challenged action that would be redressed by the relief sought.

3.      Whether this Court has jurisdiction over Plaintiffs' APA claims challenging BLM interim guidance memoranda where (a) the memoranda are not "final agency action" but instead simply summarize applicable sources of law for internal agency officials and have no binding legal effect; and (b) Plaintiffs have not established Article III standing by identifying any concrete injury from the memoranda redressable by the relief sought.

## PERTINENT STATUTES

All pertinent statutes are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

A.    Legal background

     1.    The Nineteenth Century development of public land law

In the century following its founding, the United States acquired more than 1.8 billion acres of public lands.[1] The primary public lands policy in the early years of the Nation pursued the divestment, exploitation, and development of this public domain.[2] This policy sought both to generate income from land sales and to encourage migration and development of the frontier. Congress enacted laws providing for

---

[1] *See* Bureau of Land Management (BLM), *Public Land Statistics* 3 (2022) (Table 1-1. Acquisition of the Public Domain, 1781–1867), https://perma.cc/KUC4-RJN6. These lands were largely acquired by treaty from other nations, including Indian tribes, or ceded to the federal government by the thirteen original states. *Id.*

[2] The Supreme Court described "the public domain" as "the land owned by the Government, mostly in the West, that was 'available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws." *Hagen v. Utah*, 510 U.S. 399, 412 (1994) (quoting Peffer, *The Closing of the Public Domain* 6 (1951)).

homesteading or settlement by sale or preemption;[3] opening lands for

mining and resource development;[4] selling or granting land to

railroads;[5] and granting land to existing or new states.[6] These general

land laws typically either directly transferred title from the United

States or allowed qualifying individuals or entities to obtain a patent

from the federal government upon meeting certain conditions, thereby

transferring ownership.

Because the federal government itself also had uses for these

lands and resources, it could "reserve" or "withdraw" lands from the

---

[3] *See*, *e.g.*, Ordinance of 1788, re-enacted by the Act of March 3, 1791, 1 Stat. 221; Preemption Act of 1841, 5 Stat. 453; Oregon Donation Act of 1850, 9 Stat. 496, 497; the Homestead Act of 1862, 12 Stat. 392 & 12 Stat. 413.

[4] *See*, *e.g.*, 2 Stat. 448 (1807) (authorizing the President to lease lead mines for a term not exceeding 5 years); An Act Granting Right of Way to Ditch and Canal Owners Over the Public Lands and for Other Purposes, a/k/a the Mining Act of 1866, 14 Stat. 251; the Placer Act of 1870, 16 Stat. 217; the Mining Law of 1872, 17 Stat. 91.

[5] *See* Gates, *History of Public Land Law Development* 341–68 (1968) (summarizing sales and grants to railroads).

[6] *See*, *e.g.*, General Swampland Act of 1850, 9 Stat. 519; Gates, *supra*, 285–318 (summarizing land grants to new states on admission); *id.* 319–340 (summarizing general grants to states).

operation of the general land laws.[7] This could happen in one of three

ways. First, Congress itself could directly reserve or withdraw specific

parcels of land.[8] Second, Congress could provide an executive branch

official authority to reserve or withdraw lands to protect federal

interests or for particular purposes. Congress passed numerous statutes

bestowing broad discretion, first to the President and later to the

Secretary of the Interior or Commissioner of the General Land Office, to

withdraw or reserve lands.[9] And, third, the President could exercise his

inherent authority to reserve or withdraw public lands subject to

---

[7] "A 'withdrawal' merely removed lands or resources from disposition, while a 'reservation' committed the federal lands to a specific purpose." Mansfield, *A Primer of Public Land Law*, 68 Wash. L. Rev. 801, 821 (1993); *see also S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 784 (10th Cir. 2005) (explaining the difference between a "withdrawal" and a "reservation" of public lands).

[8] *See*, *e.g.*, 4 Stat. 505 (1832) (reserving Warm Springs, Arkansas, to retain the land for public purposes).

[9] *See*, *e.g.*, Act of Mar. 1, 1817, 3 Stat. 347 (authorizing the Secretary of the Navy, with the approval of the President, to reserve public lands for timber to be used for naval purposes); Act of May 29, 1830, 4 Stat. 420, 421 (providing that "no entry or sale of any land shall be made, under the provisions of this act, which … is reserved from sale … by order of the President …"). *See generally* Leshy, *Our Common Ground* 175 (2022) ("It was [] not uncommon for Congress to give the executive broad power to reserve public lands from divestment laws for particular reasons, or to acquiesce in presidential reservations made without express sanction.").

further direction from Congress.[10] The ability to withdraw particular lands from entry, settlement, or other forms of appropriation has long been a quintessential feature of land management by the federal government.

Exercising these broad authorities, the President or other executive officials made numerous reservations and withdrawals of lands from the operation of the general land laws across the first hundred years of our Nation's history, all consistently upheld by the courts, including military reservations,[11] Indian reservations,[12]

---

[10] Presidential reservations made without express statutory authority were a common "executive practice since the founding era." Leshy, *supra*, at 175. The President frequently exercised this inherent authority to reserve lands from the operation of the general land laws throughout the Nineteenth Century, a practice that was expressly upheld by *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), and remained a basis for potential presidential reservations until explicitly repealed in 1976 by section 704(a) of the Federal Land Policy and Management Act, 43 U.S.C. § 1701 note.

[11] *See*, *e.g.*, *Wilcox v. Jackson*, 38 U.S. 498 (1839); *Grisar v. McDowell*, 73 U.S. 363 (1867); *Scott v. Carew*, 196 U.S. 100 (1905).

[12] *See*, *e.g.*, *United States v. Leathers*, 26 F. Cas. 897 (D. Nev. 1879); *United States v. Payne*, 8 F. 883 (W.D. Ark. 1881); *United States v. Martin*, 14 F. 817 (D. Or. 1883); *McFadden v. Mountain View Mining & Milling Co.*, 97 F. 670 (9th Cir. 1899); *Gibson v. Anderson*, 131 F. 39 (9th Cir. 1904).

reservations to preserve the status quo on public lands pending

potential actions by Congress,[13] and for other public purposes.[14]

Importantly, these executive actions all remained subject to

further direction from Congress given its plenary authority over federal

property. *See* U.S. Const. Art. IV Sec. 3 Cl. 2 (Property Clause). If

Congress disagreed with an executive action, it always could provide

further direction on the use or disposition of the lands in question.

As the turn of the century approached, policy sentiments began to

shift away from divestment and towards maintaining federal lands in

federal ownership to serve national purposes. This shift was embodied

in numerous enactments at the end of Nineteenth and beginning of the

Twentieth Centuries, including section 24 of the General Revision Act

of 1891, a/k/a the Forest Reserve Act; the Organic National Forest Act

---

[13] *See*, *e.g.*, *Wolcott v. Des Moines Co.*, 72 U.S. 681 (1866); *Riley v. Welles*, 154 U.S. 578 (1870); *Williams v. Baker*, 84 U.S. 144 (1872); *Homestead Co. v. Valley Railroad*, 84 U.S. 153 (1872); *Wolsey v. Chapman*, 101 U.S. 755 (1879); *Litchfield v. Webster Cty.*, 101 U.S. 773 (1879); *Dubuque & S.C. R. Co. v. Des Moines Valley R. Co.*, 109 U.S. 329 (1883).

[14] *See*, *e.g.*, *United States v. Gratiot*, 39 U.S. 526 (1840) (describing executive policy, in providing for the sale of public lands, to reserve lands containing "lead mines" and "salt-springs"); *Wilcox v. Jackson*, 38 U.S. at 515 (1839) (discussing the reservation of public lands for use as a military outpost, lighthouse, and Indian trading post).

of 1897; the Reclamation Act of 1902; the General Withdrawal Act

of 1910, a/k/a the Pickett Act; the National Park Service Act of 1916; the

Mineral Leasing Act of 1920; and the Taylor Grazing Act of 1934, as

well as the statutory creation of multiple national parks.[15] It was in this

context that Congress enacted the Antiquities Act of 1906.

### 2. The Antiquities Act

#### a. Drafting history

The Antiquities Act developed out of a series of competing

conservation proposals considered by Congress in the early 1900s. *See*

*generally* Robert F. Lee, *The Antiquities Act of 1906* 47–77 (1970),

https://perma.cc/L5QT-3CCX; Rothman, *Preserving Different*

*Pasts* 34–51 (1989); Leshy, *supra*, at 253–58. The Act "was the result of

a convergence of two loosely related movements that arose during

the 1880s: the protection of notable archaeological sites and the desire

to preserve a variety of other significant public land parcels." Norris,

---

[15] During this era, Congress established numerous national parks, including Yellowstone (1874); Yosemite (1890); Sequoia (1890); Mount Rainier (1899); Crater Lake (1902); Mesa Verde (1906); Glacier (1910); Rocky Mountain (1915); Hawaii Volcanoes (1916); Denali (then Mount McKinnley, 1917); Grand Canyon (1919); Zion (1919); Acadia (1919); Bryce Canyon (1924); Shenandoah (1926); Great Smoky Mountains (1926); and Grand Teton (1929).

"The Antiquities Act and the Acreage Debate," 23:3 *The George Wright Forum* at 6 (2006).

The earliest proposed draft, a combined effort of the American Association for the Advancement of Science and the American Institute of Archaeology, sought to preserve and protect things of both historic and scientific interest on public lands. *See*, *e.g.*, Lee, *supra*, at 47–48. The primary provision of this initial proposal provided that

> The President of the United States may from time to time set apart and reserve for use as public parks on reservations, in the same manner as now provided by law for forestry reservations, any public lands upon which are monuments, cliff-dwellings, cemeteries, graves, mounds, forts, or any other work of prehistoric, primitive, or aboriginal man, and also any natural formation of scientific or scenic value of interest, or natural wonder or curiosity together with such additional area of land surrounding or adjoining or adjoining the same, as he may deem necessary for the proper preservation and subsequent investigation of said prehistoric work or remains.

*Id.* at 48. A revised form of this proposal was introduced in the House in early 1900 as H.R. 8066. *Id.* at 50.

Over the next five years, Congress considered competing proposals to address these issues. Some Western interests offered counterproposals providing narrower authority to protect certain antiquities and placing express limits on the size of parcels reserved.

12

*See*, *e.g.*, *id.* at 51 (discussing H.R. 8195 and H.R. 9245 proposed by Representative Shafroth of Colorado). The Department of the Interior opposed these limited proposals and instead proposed legislation providing the President or the Secretary of the Interior even broader discretion to set aside and protect an array of historical, natural, and scenic resources as national parks. *See*, *e.g.*, *id.* at 52–54 (discussing Interior proposal introduced as H.R. 11021 authorizing the President to reserve tracts of public lands as national parks "for their scenic beauty, natural wonders or curiosities, ancient ruins or relics, or other objects of scientific or historic interest, or springs of medicinal or other properties"); S. 5603, 58th Cong. § 2 (1905) (introduced in January 1905). Disagreements about these approaches scuttled legislative efforts from 1900 to 1905.[16]

Following a second failure to move antiquities legislation, the American Anthropological Association turned to Edgar Lee Hewett in 1905 to lead a renewed legislative effort. Lee, *supra*, at 70. Hewett

---

[16] While Individual Plaintiffs emphasize that Congress "unambiguously rejected" the Interior proposals, (*Dalton* Br. at 20), so too were the narrow proposals advanced by Western interests that included specific limits on the size of reservations and excluded objects of scientific interest "unambiguously rejected."

was well-positioned to find a compromise between competing interests: a westerner with farming experience who also had archaeological credentials and first-hand experience with Native American sites on federal land in the Southwest, Hewett had also undertaken a survey of historic structures on federal lands for the General Land Office and had taken congressional delegations on tours of such resources. *Id.* at 68–70. Hewett worked with interested constituencies, including federal agencies, to develop a revised draft bill that preserved the interests of archaeologists but "at the same time met the wishes of the various federal departments." *Id.* at 71.

Hewett's proposed draft "reconciled the conflicting interests," *id.*, that had prevented passage of earlier legislation. It adroitly dodged potential bureaucratic disputes over which agency would manage reserved lands. It provided for the protection of "other objects of historic and scientific interest" in addition to specific types of archaeological resources. *Id.* at 74. And it did not include a specific size limit for national monument reservations, instead leaving to the President's judgment the area necessary to ensure protection of the designated objects. *Id.* at 75. As such, Hewett's draft was a compromise between

14

the various proposals that had failed to pass, including both the

narrower proposals advocated by Western interests and the broader

proposals advanced by Interior.[17]

### b.    Enactment and codification

In 1906, the Senate and the House passed bills adopting Hewett's

draft without change. On June 8th, President Roosevelt signed the

Antiquities Act into law. Section 2 of the Act provides:

> That the President of the United States is hereby
> authorized, in his discretion, to declare by public
> proclamation historic landmarks, historic and prehistoric
> structures, and other objects of historic or scientific interest
> that are situated upon the lands owned or controlled by the
> Government of the United States to be national monuments,
> and may reserve as a part thereof parcels of land, the limits
> of which in all cases shall be confined to the smallest area
> compatible with the proper care and management of the

---

[17] The truncated legislative history Plaintiffs present, (*see Garfield* Br. at 3–5, 19–20; *Dalton* Br. at 5–6), thus omits important aspects of the Act's drafting history. Indeed, the law review article that *Garfield* Plaintiffs cite for the proposition that many commentators have concluded that the Act "was designed to protect only very small tracts of land around archeological sites," (*Garfield* Br. at 5 (quoting Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 477 (2003)), goes on to explain why that oversimplified understanding of the legislative history was incorrect. Among other things, "Hewett consulted with officials from the affected government agencies, and surely was influenced by Interior Department officials …. Thus it should have been no surprise that the final bill reflected at least some of the Department's long-held views on the need for more expansive legislation." *Id.* at 482.

> objects to be protected: Provided, That when such objects are situated upon a tract covered by a bona fide unperfected claim or held in private ownership, the tract, or so much thereof as may be necessary for the proper care and management of the object may be relinquished to the Government, and the Secretary of the Interior is hereby authorized to accept the relinquishment of such tracts in behalf of the Government of the United States.

Pub. L. 59-209, 34 Stat. 225 (1906), *codified at* 54 U.S.C. § 320301

(previously codified at 16 U.S.C. § 431).

### c.    Context

Consistent with other significant turn-of-the-century developments in public land laws, the Antiquities Act was one of several statutes enacted in that era reflecting a shift away from divestment towards stewardship of land in federal ownership as the primary land policy. These statutes vested the executive with broad discretion to withdraw or reserve lands from the operation of the general land laws and hold them for particular purposes. *See*, *e.g.*, Forest Reserve Act of 1891, 26 Stat. 1103; Reclamation Act of 1902, 32 Stat. 388; the Pickett Act of 1910, c. 421, 36 Stat. 847.

Congress was well-aware of the operation of these provisions when it enacted the Antiquities Act. Presidents had made broad use of their authority to create forest reserves, reserving more than 150 million

acres of public land as forest reserves from 1891 through 1907, Lee*,*

*supra*, at 67, including thirteen reserves totaling more than 15 million

acres in President Roosevelt's first year in office, *id.* at 44–45, and one

reservation of 4.5 million acres alone in 1902, *see* Leshy, *supra*,

at 227–28 (discussing the Alexander Archipelago Forest Reserve).

Congress was also aware of the practice of the General Land Office to

"withdraw tracts of public land containing features of scientific or

cultural interest" prior to the passage of the Act, including several sites

later designated as national monuments. *Id.* at 255.

Presidents in this era also made broad use of their inherent

reservation and withdrawal authority: President Roosevelt created

several bird sanctuaries, *id.* at 248–49, and also withdrew more than

60 million acres in 1906 to prevent the divestment of coal deposits,

Peffer, *supra*, at 69. In 1908 and 1909 Presidents Roosevelt and Taft

together withdrew more than 7 million acre of federal lands containing

petroleum notwithstanding an 1897 statute opening such lands to

"occupation, exploration, and purchase," and the Supreme Court upheld

these withdrawals in *Midwest Oil Co.*, 236 U.S. 459. And after this

experience, as well as more than twenty reservations for national

17

monuments by Presidents Roosevelt and Taft, discussed next, Congress again extended additional broad reservation authorities to the President in the Pickett Act, 36 Stat. 847.

### d.   Contemporaneous practice reflected in early monument designations

Practice in the years immediately following the enactment of the Antiquities Act reflects the contemporaneous understanding that the Act conveyed broad authority to the President to designate both historical and scientific objects for preservation and to reserve such public lands as the President determined necessary without narrow acreage limitations. Three months after the passage of the Act, President Roosevelt proclaimed the first national monument, Devil's Tower National Monument, in Wyoming. *See* Proclamation 658, 34 Stat. 3236 (Sept. 24, 1906). The Proclamation designated a 1,500-foot igneous rock formation and surrounding area, describing Devil's Tower as "a lofty and isolated rock" which is "such an extraordinary example of the effect of erosion in the higher mountains as to be a natural wonder and an object of historic and great scientific interest." *Id.* This was shortly followed by proclamations designating an area of petrified forest (Petrified Forest), a large stand of old-growth redwoods (Muir Woods),

volcanic peaks (Cinder Cone and Lassen Peak), and caverns (Jewel

Cave and Lewis & Clark Cavern) as objects of scientific interest to be

preserved as national monuments. Twelve of President Roosevelt's

eighteen national monument designations were made primarily to

protect objects of scientific interest.[18]

Many aspects of the 2021 Proclamations that Plaintiffs criticize

were features of the early monument designations. Many early

monuments reserved comparable amounts of federal land to the 2021

Proclamations.[19] Early monuments also designated rare species and

---

[18] *See* Proclamation 658, 34 Stat. 3236 (1906) (Devil's Tower);
Proclamation 697, 34 Stat. 3266 (1906) (Petrified Forest);
Proclamation 753, 35 Stat. 2131 (1907) (Cinder Cone);
Proclamation 754, 35 Stat. 2132 (1907) (Lassen Peak);
Proclamation 793, 35 Stat. 2174 (1908) (Muir Woods);
Proclamation 794, 35 Stat. 2175 (1908) (Grand Canyon);
Proclamation 796, 35 Stat. 2177 (1908) (Pinnacles); Proclamation 799,
35 Stat. 2180 (1908) (Jewel Cave); Proclamation 804, 35 Stat. 2183
(1908) (Natural Bridges); Proclamation 807, 35 Stat. 2187 (1908) (Lewis
& Clark Cavern); Proclamation 831, 35 Stat. 2214 (1908) (Wheeler);
Proclamation 869, 35 Stat. 2247 (1909) (Mount Olympus).

[19] The challenged 2021 Proclamations restored roughly 1,162,124 acres
of federal land to the reservation for Bears Ears National Monument
and roughly 861,737 acres to the reservation for Grand Staircase-
Escalante National Monument respectively. By comparison, the lands
reserved in many monuments declared in the first 30 years of the Act
ranged from 600,000 to 1.3 million acres of federal land. *See*
Proclamation 794, 35 Stat. 2175 (1908) (reserving roughly 800,000 acres
for the Grand Canyon National Monument); Proclamation 869,

their habitat for protection.[20] And many of the early monuments,

including the very first monument, also designated for protection the

land itself or large-scale natural formations that formed integral parts

of the landscape.[21]

---

35 Stat. 2247 (1909) (reserving over 600,000 acres for Olympic National Monument); Proclamation 1487, 40 Stat. 1855 (1918) (reserving 1.08 million acres for Katmai National Monument); Proclamation 1733, 43 Stat. 1988 (1925) (reserving 1.379 million acres for Glacier Bay National Monument); Proclamation 2028, 47 Stat. 2554 (1933) (reserving 848,000 acres for the Death Valley National Monument); Proclamation 2193, 50 Stat. 1760 (1936) (reserving 825,000 acres for the Joshua Tree National Monument).

[20] For example, President Roosevelt's 1909 designation of the Mount Olympus National Monument specifically designated a rare species of elk for preservation and protected its habitat. Proclamation 869, 35 Stat. 2247 (1909). The Muir Woods National Monument likewise designated a stand of undisturbed old-growth redwood trees for protection. Proclamation 793, 35 Stat. 2174 (1908).

[21] *See* Proclamation 658, 34 Stat. 3236 (1906) (designating a large-scale igneous rock monolith, Devil's Tower, and surrounding area for protection); Proclamation 794, 35 Stat. 2175 (1908) (designating a large-scale natural formation for protection in the Grand Canyon National Monument); Proclamation 869, 35 Stat. 2247 (1909) (Mount Olympus National Monument); Proclamation 2028, 47 Stat. 2554 (1933) (Death Valley National Monument); Proclamation 2193, 50 Stat. 1760 (1936) (Joshua Tree National Monument); Proclamation 1664, 43 Stat. 1914 (1923) (declaring "certain *lands* ... known as Bryce Canyon" in Utah to be of both "scenic beauty" and "scientific interest") (emphasis added); Proclamation 1694, 43 Stat. 1947 (1924) (identifying the "weird and scenic *landscape*" of Craters of the Moon in Idaho as meriting protection) (emphasis added); Proclamation 2032, 47 Stat. 2557 (1933)

The Supreme Court has consistently confirmed the lawfulness of these early national monuments in suits brought by the United States. *Cameron v. United States*, 252 U.S. 450 (1920), considered President Roosevelt's designation of the Grand Canyon as an object of scientific interest and the reservation of over 800,000 acres for its care and management. The defendant in *Cameron* made arguments quite akin to those raised by Plaintiffs here more than a century later: that the Grand Canyon was not a landmark, structure, or object of historic or scientific interest but just an enormous canyon, and that the President's attempt to set it aside as an object of scientific interest merely because of its size was improper. Brief for Appellant at 44–48, *Cameron v. United States*, 252 U.S. 450 (1920). The Court gave these claims short shrift and confirmed the lawfulness of the monument. *Cameron*, 252 U.S. at 455–56.

Other cases were to the same effect. In *Cappaert v. United States*, 426 U.S. 128 (1976), the Court upheld federal reserved water rights at Devil's Hole, a sink hole in a cave that serves as habitat to a threatened

---

(declaring that Saguaro's "*lands* are of outstanding scientific interest.") (emphasis added).

species of fish protected as part of the 825,000-acre Death Valley National Monument. And in a suit brought by the State of Alaska to quiet title against the United States, the Supreme Court confirmed the lawful effect of reservations made in the 1925 Glacier Bay monument designation, which reserved more than one-million acres. *United States v. Alaska,* 545 U.S. 75 (2005).

### B.    Factual background

#### 1.    The challenged Monument designations

##### a.    The establishment of Grand Staircase-Escalante National Monument

President Clinton established Grand Staircase-Escalante National Monument in 1996 to protect, *inter alia*, "the last place in the continental United States to be mapped," as it provided "exemplary opportunities for geologists, paleontologists, archeologists, historians, and biologists." Establishment of the Grand Staircase-Escalante National Monument, 61 Fed. Reg. 50223, 50223 (Sept. 24, 1996). Prominent features in the Monument include "a vast geologic stairway, named the Grand Staircase by pioneering geologist Clarence Dutton, which rises 5,500 feet to the rim of Bryce Canyon in an unbroken sequence of great cliffs and plateaus," and "world class paleontological

sites" that provide "one of the best and most continuous records of Late Cretaceous terrestrial life in the world." *Id.* at 50223–24. Although the 1996 Proclamation reserved roughly 1.7 million acres, Congress adjusted the boundaries on three occasions, increasing the reserved lands by roughly 180,000 acres.[22]

In 2017, a proclamation by President Trump altered the boundaries and conditions of the Monument based on his judgment regarding the objects in need of protection and the land necessary for their proper care and management. Modifying the Grand Staircase-Escalante National Monument, 82 Fed. Reg. 58089 (Dec. 8, 2017). This proclamation excluded approximately 860,000 acres of previously reserved land. *Id.* at 58093.

### b.    The establishment of Bears Ears National Monument

President Obama established the Bears Ears National Monument in late 2016 to protect the Bears Ears buttes and the historic and scientific objects that surround them, including "[a]bundant rock art,

---

[22] *See* Utah Schools and Lands Exchange Act of 1998, Pub. Law No. 105-335, 112 Stat. 3139; Title II, Pub. Law No. 105-355, 112 Stat. 3247, 3252 (1998); the Omnibus Public Land Management Act of 2009, § 2604, Pub. Law No, 111-11, 123 Stat. 991, 1120.

ancient cliff dwellings, ceremonial sites, and countless other artifacts

[that] provide an extraordinary archaeological and cultural record."

Establishment of the Bears Ears National Monument, 82 Fed.

Reg. 1139, 1139 (Jan. 5, 2017). The area provides evidence of human

history from as early as 13,000 years ago, when early people hunted

now-extinct megafauna; to 2,500 years ago, when early farmers

occupied the land; to the late 19th century, when Mormon settlers

arrived in the area. *Id.* at 1139–40. Congress noted the historical

importance of the area in the legislative history of the Antiquities Act

itself. H.R. Rep. No. 59-2224 at 5 (1906), https://perma.cc/3L9N-3T4Q

(discussing the "Bluff" district in the San Juan Basin, now part of the

Monument). The 2016 Proclamation reserved roughly 1.35 million acres

of federal lands and interests in lands. 82 Fed. Reg. at 1143.

In late 2017, President Trump issued a proclamation altering the

boundaries and conditions of the Monument based on his judgment

regarding the objects in need of protection and the land necessary for

their proper care and management. Modifying the Bears Ears National

Monument, 82 Fed. Reg. 58081 (Dec. 8, 2017). This proclamation

removed over 1.1 million acres of federal lands from the Monument, while adding 11,200 new acres of federal land. *Id.* at 58085.

### c.    The challenged 2021 Proclamations

In October 2021, President Biden issued Proclamations 10,285 and 10,286. Those proclamations restored the boundaries and conditions that existed for both monuments before President Trump's 2017 Proclamations, while retaining approximately 11,200 acres that President Trump had added to Bears Ears National Monument. *See* 86 Fed. Reg. 57321 (Oct. 15, 2021) (Proclamation 10,285) (Bears Ears Proclamation), https://perma.cc/5VZ3-KJRY; 86 Fed. Reg. 57335 (Oct. 15, 2021) (Proclamation 10,286) (Grand Staircase-Escalante Proclamation), https://perma.cc/LVY9-S9TS.

The President found that numerous "historic and scientific resources" in these lands are "objects of historic or scientific interest in need of protection" under the Antiquities Act. 86 Fed. Reg. at 57344. Those objects include geologic features (*e.g.*, the mazes of the Upper Paria River, the Valley of the Gods); paleontological resources (*e.g.*, world-class paleontological sites amidst the fossil-rich formations in Kaiparowits Plateau); archaeological resources (*e.g.*, a "village with

structures and pottery from multiple Ancestral Pueblo periods"),

86 Fed. Reg. at 57326; and biological resources (*e.g.*, the "habitat for

*Eucosma navajoensis*, an endemic moth that lives nowhere else," in the

Valley of the Gods), *id.* at 57328.

The Proclamations also determined that both monuments contain

"innumerable objects of historic or scientific interest," some so "rare" or

"vulnerable to vandalism and theft" that "revealing their specific names

and locations could pose a danger to the objects." *Id.* at 57322; 86 Fed.

Reg. at 57336. Consistent with statutory confidentiality obligations, *see*,

*e.g.*, 16 U.S.C. § 470hh(a), the Proclamations do not disclose the

locations of all designated objects.

As the maps below illustrate,[23] the objects designated in the

Proclamations are distributed at high density throughout the lands

reserved for their proper care and management. Beginning with Grand

Staircase-Escalante National Monument, the map shows numerous

geologic formations (*e.g.*, Grand Staircase), paleontological sites (*e.g.*,

---

[23] The district court appropriately took judicial notice of these maps.
(4-JA-974–75 (Order at 10–11).) *See Pahls v. Thomas*, 718 F.3d 1210,
1216 n.1 (10th Cir. 2013). Full size versions of these maps are available
in the Joint Appendix at 2-JA-533–35.

*Nasutoceratops*), and archaeological sites (*e.g.*, Circle Cliffs and the

Alvey Wash area)—each designated in the Proclamation—distributed

throughout the monument:



Similarly, the Bears Ears National Monument map shows

numerous geologic formations (*e.g.*, Bears Ears Buttes, Grand Gulch),

archaeological sites (*e.g.*, House on Fire, Doll House), and habitats (*e.g.*,

Valley of the Gods), each of which the Proclamation also designates:

27





These maps depict only a fraction of the many objects of historic and scientific interest expressly designated in the Proclamations and omit objects subject to statutory confidentiality obligations. So the actual density of protected objects is much higher than depicted.

In addition to these objects, the Proclamations identify certain geographic "areas" as objects of historic or scientific interest. For example, the Kaiparowits Plateau area of Grand Staircase-Escalante contains "roughly 1,600 square miles of sedimentary rock that towers over the surrounding area." 86 Fed. Reg. at 57339. The "stratified geology" of this area provides, *inter alia*, "the only evidence in our hemisphere of mammals from the Cenomanian through Santonian ages and one of the world's best and most continuous records of Late Cretaceous terrestrial life." *Id.* at 57340. "To date, many thousands of fossil sites have been documented on the plateau, including evidence of at least 15 previously unknown species of dinosaur." *Id.* The Proclamation describes the significant historical and scientific features of each region of the Kaiparowits Plateau, ranging from the Smoky Mountain area with "naturally occurring underground coal fires that have been smoldering for hundreds, if not thousands, of years"

providing a "home to a number of rare and endemic plant species," to the "Fiftymile Mountain area" with "a high density of archaeological sites, including masonry structures" suggesting a convergence of the Ancestral Pueblo and Fremont cultures. *Id.* at 57340–41.

The Proclamations also designate certain "landscapes" themselves as objects of historic and scientific interest. For example, the Bears Ears Proclamation explains how the Bears Ears landscape provides "one of the most extraordinary cultural landscapes in the United States" due to its "unique density of significant cultural, historical, and archaeological artifacts."[24] 86 Fed. Reg. at 57321. "[O]wing to the area's arid environment and overall remoteness, as well as the building techniques that its inhabitants employed," this landscape "retains remarkable" evidence of human use and habitation "from the Paleoindian Period, through the time of the Basketmakers and Ancestral Pueblos, to the more recent Navajo and Ute period," to a "series of passages and

---

[24] These specific cultural, historical, and archaeological artifacts were recognized in Hewett's 1904 report for the General Land Office as world class resources in need of protection. *See* Edgar L. Hewett, *Circular Relating to Historic and Prehistoric Ruins of the Southwest and Their Preservation* (Gov't Printing Ofc. 1904) (discussing the "Bluff area"), https://perma.cc/4QNF-XFKG. This report was incorporated in the legislative history and served as part of the impetus for the Antiquities Act in 1906. H.R. Rep. No. 59-2224 at 2, https://perma.cc/3L9N-3T4Q.

hideouts used by men like Butch Cassidy, the Sundance Kid, and other members of the Wild Bunch," to archaeological evidence demonstrating "the settlement of Latter-day Saint communities." *Id.* at 57322–33. "Despite millennia of human habitation," the Bears Ears landscape also contains unique paleontological resources and habitat for rare and endemic species. *Id.* Given "the unique nature of the Bears Ears landscape, and the collection of objects and resources therein," the President determined, in his discretion, that "the entire landscape within the boundaries reserved by this proclamation" constitutes "an object of historic and scientific interest in need of protection." *Id.* at 57330–31; 86 Fed. Reg. at 57345.

Although the 2021 Proclamations reserve federal lands from new disposition under the public land laws, mining laws, and mineral and geothermal leasing laws, the Proclamations are "subject to valid existing rights," including existing valid mining claims. And they do not displace "livestock grazing as authorized under existing permits or leases" to the extent it is consistent with the protection of objects identified in the Proclamations. *Id.* at 57346; 86 Fed. Reg. at 57332.

## 2.     The challenged BLM memoranda

The 2021 Proclamations direct the Secretaries of the Interior and Agriculture (collectively, the Secretaries) to prepare management plans for the monuments. *See* 86 Fed. Reg. at 57345 (Grand Staircase-Escalante); 86 Fed. Reg. at 57332 (Bears Ears). "The Secretaries shall provide for maximum public involvement in the development of [those plans], including consultation with federally recognized Tribes and State and local governments." *Id.*

While those management plans are being prepared, the monuments are governed by other existing legal authorities, including previously adopted management plans, statutes, regulations, and Proclamations. Two interim guidance memoranda sent by the Director of the Bureau of Land Management ("BLM") to BLM's Utah State Director on December 16, 2021, summarize those existing legal authorities.[25] The interim guidance memoranda themselves do not impose or implement any legal obligations on third parties.

---

[25] *See* BLM-Utah, Interim Management of the Bears Ears National Monument (Dec. 16, 2021), https://perma.cc/MEP6-2LD7; BLM-Utah, Interim Management of the Grand Staircase-Escalante National Monument (Dec. 16, 2021), https://perma.cc/63AC-GLXH.

C.    Proceedings below

Garfield County, Kane County, and the State of Utah (the

"*Garfield* Plaintiffs") filed suit in August 2022, alleging that the

2021 Proclamations exceed the President's authority under the

Antiquities Act. The next day three individuals (Zebediah Dalton, Kyle

Kimmerle, and Suzette Morris) and an organization (BlueRibbon

Coalition) (the "Individual Plaintiffs") filed a similar suit. Both suits

sought declaratory and injunctive relief against the President and other

federal officials, alleging that the challenged Proclamations designate

ineligible objects as monuments and reserve more land than is

necessary to care for the eligible objects.[26] Plaintiffs subsequently filed

Amended Complaints, including their original claims and a new APA

challenge to BLM's interim guidance memoranda.[27] (2-JA-406–07

(*Garfield* Am. Compl. ¶¶ 386, 394).).

---

[26] The district court granted intervention to four Tribes (the Tribal
Nation Intervenors) and ten conservation groups (the SUWA
Intervenors) as Defendant-Intervenors. (1-JA-30, 40 (ECF 52, 122).)

[27] Before the district court, Individual Plaintiffs also challenged other
unspecified "agency actions done to implement President Biden's
proclamations" under the APA. (1-JA-198–99 (*Dalton* Am. Compl.
¶ 192–94).) Individual Plaintiffs join *Garfield* Plaintiffs' arguments
regarding the BLM memoranda on appeal, (*Dalton* Br. at 46 n.14), but
their opening brief does not address the dismissal of these additional

Federal Defendants moved to dismiss Plaintiffs' amended complaints for want of jurisdiction and for failure to state a claim. On August 23, 2023, the district court granted the motion on jurisdictional grounds. The district court held that judicial review of Plaintiffs' statutory challenges to the 2021 Proclamations was not permitted without a waiver of sovereign immunity. (4-JA-977 (Order at 13).) It then held that the challenged actions do not fall within the *ultra vires* exception to sovereign immunity, because at most Plaintiffs alleged the President "misused" his Antiquities Act authority, not that he lacked such authority. (4-JA-981–83 (Order at 17–19).) Finally, the district court found that the challenged BLM memoranda were not "final agency action" for purposes of Plaintiffs' APA claims because they are purely informational and advisory.[28] (4-JA-483–90 (Order at 19–26).) Having found dismissal appropriate, the district court did not reach any of Federal Defendants' substantive arguments that Plaintiffs failed to state a claim under Rule 12(b)(6).

---

purported APA claims. Any such claims have been forfeited. *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

[28] The district court also found Individual Plaintiffs lacked standing to challenge a purported denial of permits. (4-JA-990–92 (Order at 26–28).) Individual Plaintiffs have not appealed this determination.

## SUMMARY OF ARGUMENT

The district court properly dismissed Plaintiffs' amended complaints for failing to meet basic jurisdictional requirements.

1.     Plaintiffs' challenges to the 2021 Proclamations are nonjusticiable.

a.     Plaintiffs identified no applicable waiver of sovereign immunity, instead citing only to general jurisdictional statutes that do not reflect consent by the United States to be sued. The APA's waiver of sovereign immunity does not apply to the President's actions and Plaintiffs challenge no final agency action by any other official.

b.     Plaintiffs have also failed to identify any statutory cause of action, or traditional right of action at law or equity, for their claims. Where the President is exercising his discretion under a statute, such as the Antiquities Act, his determinations are not reviewable by the courts, at least absent an express statement by Congress authorizing such review. There is no express authorization for judicial review of the President's actions in either the Antiquities Act or any other statute.

c.     Plaintiffs argue that the judge-made *ultra vires* doctrine allows them to litigate the President's exercise of discretion absent a

statutory waiver of sovereign immunity. But that contention suffers from several independently fatal flaws.

First, the *ultra vires* doctrine does not apply to claims that the President acted in excess of *statutory* authority. Second, even if it did apply, the *ultra vires* doctrine only addresses sovereign immunity; it does not solve Plaintiffs' failure to identify a right of action at law or equity. And third, the *ultra vires* doctrine does not apply to the alleged wrongful acts here. Plaintiffs at most allege the President made errors of fact or law in the challenged Proclamations. But the *ultra vires* doctrine only reaches conduct that is plainly outside the officer's authority, not disputes about whether determinations of fact or law within the officer's authority were correct.

2.    Plaintiffs did not establish Article III standing to challenge the 2021 Proclamations. Plaintiffs failed to show that the proclamations' restoration of the monuments' boundaries caused concrete and actual or imminent injury, or that any putative injury likely would be redressed by returning the monuments to their prior boundaries.

3.     The district court also lacked jurisdiction over Plaintiffs'
APA claims challenging the BLM memoranda. Those memoranda,
which simply summarize existing legal requirements, are not final
agency actions. Plaintiffs also did not establish Article III standing to
challenge the memoranda.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a
complaint for lack of jurisdiction. *Safe Streets Alliance v. Hickenlooper*,
859 F.3d 865, 878 (10th Cir. 2017). The burden of establishing subject-
matter jurisdiction is on the party asserting jurisdiction. *Id.*

## ARGUMENT

### I. Congress has not provided for judicial review of presidential declarations under the Antiquities Act.

The district court lacked jurisdiction to entertain Plaintiffs' claims challenging President Biden's proclamations. Plaintiffs did not identify an applicable waiver of federal sovereign immunity *or* a cause of action that provides them an avenue for judicial relief. *See FDIC v. Meyer*, 510 U.S. 471, 484 (1994) (parsing those "analytically distinct" requirements).

#### A. Congress has not waived sovereign immunity and consented to suits challenging presidential declarations under the Antiquities Act.

Congress has not waived the United States' sovereign immunity for challenges to presidential declarations issued exercising statutory authority Congress provided in the Antiquities Act. "It is well settled that the United States ... [is] immune from suit, unless sovereign immunity has been waived." *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989) (per curiam); *see also Meyer*, 510 U.S. at 475. That immunity extends to federal officials where the relief seeks to compel official action. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 687–88 (1949).

"[T]he defense of sovereign immunity is jurisdictional in nature." *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (citation omitted). A party asserting a claim against the United States bears "the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007); *accord Lonsdale v. United States*, 919 F.2d 1440, 1444 (10th Cir. 1990). Any such waivers must "be strictly construed … in favor of the sovereign." *Iowa Tribe Of Kansas and Nebraska v. Salazar*, 607 F.3d 1225 (10th Cir. 2010) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

Neither Amended Complaint identifies an applicable waiver of sovereign immunity. Plaintiffs point to several general jurisdictional provisions. (*E.g.* 2-JA-319 (*Garfield* Am. Compl. ¶ 26 (citing 28 U.S.C. §§ 1331, 1361, 2201, 2202).) But "[s]overeign immunity is not waived by general jurisdictional statutes such as 28 U.S.C. § 1331 ... and 28 U.S.C. § 1361 …." *Lonsdale*, 919 F.2d at 1444. "Nor does the declaratory judgment statute, 28 U.S.C. § 2201, itself confer jurisdiction on a federal court where none otherwise exists." *Wyoming*, 279 F.3d at 1225.

Instead, Plaintiffs "must find an explicit waiver of sovereign immunity."

*Lonsdale*, 919 F.2d at 1444. Because "a complaint must state the

jurisdictional basis for all of the claims alleged therein," Plaintiffs'

failure to identify an explicit statutory waiver of sovereign immunity

requires dismissal. *Mocek v. City of Albuquerque*, 813 F.3d 912, 932

(10th Cir. 2015).

Section 702 of the APA does not waive sovereign immunity for

challenges to Presidential actions. (1-JA-141 (*Dalton* Am. Compl. ¶ 28);

2-JA-321 (*Garfield* Am. Compl. ¶ 40).) That provision is limited to

claims against "an agency or an officer or employee thereof." 5 U.S.C.

§ 702. As Congress explained when adding that provision, it constituted

a "[p]artial [e]limination of [s]overeign [i]mmunity" "applicable only to

functions falling within the definition of 'agency'" under the APA.

S. Rep. No. 94-996, at 10 (1976). The President is not an "agency" for

purposes of the APA. *Franklin*, 505 U.S. at 800–01. Therefore section

702 does not waive sovereign immunity for challenges to Presidential

actions.[29]

---

[29] Plaintiffs argue that the APA's waiver of sovereign immunity at least
allows suit against the Federal Defendants other than the President.
(*Garfield* Br. at 33–34; *Dalton* Br. at 44–45.) But any challenge to the

B.  There is no cause of action for private challenges to the President's exercise of discretion in issuing the challenged Proclamations.

Nor is there a cause of action to review the challenged Proclamations. Plaintiffs' complaints are artfully pled to avoid highlighting the absence of any available right of action. Individual Plaintiffs simply identify their first claim as arising from the Antiquities Act itself. (I-JA-195.) *Garfield* Plaintiffs instead describe their claims as arising from a "Lack of Statutory Authority Under Antiquities Act." (II-JA-404–05.) But the Antiquities Act contains no express or implied private right of action, and Plaintiffs point to no other applicable right of action at law or equity.

1.  Only an "express statement" by Congress can authorize judicial review of the President's performance of his statutory duties.

Plaintiffs' claims fail because they have not identified a right of action that subjects the challenged Proclamations to judicial review.

---

purported actions of other Federal Defendants is premature. Beyond challenging BLM's (non-final) interim guidance memoranda, *see* Part III, *infra*, Plaintiffs are not challenging any agency action by any Federal Defendant, or any federal officer, other than the President. The Court has no jurisdiction to review speculative actions that may be taken by agency officials in the future. *See United Tribe of Shawnee Indians v. U.S.*, 253 F.3d 543, 549–51 (10th Cir. 2001).

Where Congress intends to create a cause of action against the President, it does so expressly. *See*, *e.g.*, 42 U.S.C. § 9659(a)(2) (authorizing suit "against the President or any other officer of the United States" for alleged failure to perform certain nondiscretionary acts); 43 U.S.C. § 2011(b) (authorizing "action seeking judicial review of an action or decision of the President or any other Federal officer" about certain crude-oil transportation systems). No comparable statute authorizes review of the President's restoration of the monument boundaries here. Nothing in the Antiquities Act authorizes judicial review. And the APA does not provide for judicial review of presidential action. *Franklin*, 505 U.S. at 800–01.

Absent a statutory right of action created by Congress, the President's decisions in the challenged Proclamations are not subject to judicial review. The Supreme Court has emphasized the strict limits on judicial review of presidential actions. *See Dalton v. Spencer*, 511 U.S. 462, 468–70 (1994); *Franklin*, 505 U.S. at 798–99. In *Dalton v. Spencer*, the Supreme Court "assume[d] for the sake of argument" that some claims that the President violated a statutory mandate may be judicially reviewable but concluded that regardless such "review is not

42

available when the statute in question commits the decision to the discretion of the President." 511 U.S. at 474. Instead, the Supreme Court "require[s] an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion." *Franklin*, 505 U.S. at 801.[30]

Congress has not provided such an "express statement" here. Plaintiffs' challenge to the President's performance of his statutory duties is therefore precluded by a long line of Supreme Court precedent, including *Dalton v. Spencer*, with roots in the Founding era. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827); *Dakota Central Telephone Co. v. State of South Dakota ex rel. Payne*. 250 U.S. 163 (1919); *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948). These cases uniformly stand for the principle that where Congress has provided the President with discretionary authority to act when certain conditions

---

[30] The Supreme Court's refusal to subject presidential action to judicial review absent express statutory authority comports with the separation of powers. *See Franklin*, 505 U.S. at 800–01 ("Out of respect for the separation of powers and the unique constitutional position of the President ... textual silence is not enough to subject" the President's decisions to judicial review under the APA).

are met, courts will not second-guess the President's determination that those conditions have been met unless Congress has expressly provided for review.

Thus, in *Martin v. Mott*, Justice Story held that the courts could not review whether an "actual invasion, or ... imminent danger of invasion" supported the President's decision to call forth the state militias, as required by statute, in a replevin action to recover goods seized in payment of a fine issued to a militia member who refused to muster. 25 U.S. (12 Wheat.) at 29, 32. In reaching this conclusion, the Supreme Court set forth the broad principle that:

> [w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts.

*Id.* at 31–32.

Likewise, in *Dakota Central*, the Supreme Court rejected a challenge to a proclamation issued under a statute that provided the President authority to assume control of telephone companies "during the continuance of the present war" "whenever he shall deem it necessary for the national security or defense." 250 U.S. at 181. Like

44

here, the plaintiff argued that the President "exceeded the authority given [to] him" because the conditions were not met. *Id.* at 184. The Supreme Court rejected this claim, explaining that claims asserting an excess or abuse of discretion by the President are not judicially reviewable:

> But as the contention at best concerns not a want of [presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, *the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.*

*Id.* at 184 (emphasis added).

Similarly, in *George S. Bush & Co.*, the Court declined to consider whether the President's changes to tariff rates were "necessary to equalize [] differences in the costs of production," as required by the statute, rejecting the plaintiffs' contention that the President lacked authority because the decision rested on improper factors. 310 U.S. at 377. The Court held that it is "the judgment of the President on those facts which is determinative of whether or not the recommended rates [of duty] will be promulgated," and "the judgment of the President ... is

no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment." *Id.* at 379–80.

Plaintiffs' claims here fall squarely within this precedent. Plaintiffs assert that the President exceeded his authority under the Antiquities Act by designating items that do not qualify as "objects of historic or scientific interest," and by failing to reserve only "the smallest area compatible with the proper care and management of" the identified objects. 54 U.S.C. § 320301. This is precisely the sort of claim for review of the President's exercise of statutory discretion that the Supreme Court rejected in *Dalton v. Spencer* and earlier precedents.

Individual Plaintiffs attempt to distinguish this dispositive precedent by arguing that the principles outlined in *Dalton v. Spencer* only apply where the statute gives the President unfettered discretion. (*Dalton* Br. at 42.) By contrast, they contend, those principles do not apply where the statute provides some guidance regarding the exercise of discretion delegated to the President, as they maintain the Antiquities Act does. But that purported distinction cannot be reconciled with the cases.

The questions presented in *Dakota Central*, *George S. Bush & Co.*, and *Mott* were functionally identical to the Antiquities Act question presented here. Plaintiffs insist that statutes at issue in these earlier cases "assigned the President discrete discretion but provided no limits on the exercise of the discretion." (*Dalton* Br. at 43 n.11.) That is incorrect. Each statute conditioned the President's discretionary authority on the existence of a condition precedent—the continuation "of the present war" and necessity for the purposes of "the national security or defense" in *Dakota Central*, 250 U.S. at 181; a determination that changes in the tariffs were "necessary to equalize [] differences in the costs of production" in *George S. Bush & Co.*, 310 U.S. at 377; and the presence of an "actual invasion, or ... imminent danger of invasion" in *Mott*, 25 U.S. (12 Wheat.) at 29—and Congress granted the President authority, in his discretion, to act only if the President determined the conditions were met.[31] The Supreme Court has uniformly rejected judicial review of the President's determination that such conditions

---

[31] *See Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (per curiam) ("[B]oth *Dakota* and *Bush* involved situations where the Court insulated Presidential action from judicial review for abuse of discretion despite the presence of some statutory restrictions on the President's discretion.").

necessary to his exercise of discretionary authority were met. *See*, *e.g.*, *Dakota Central*, 250 U.S. at 184 (declining to review whether the "conditions at the time the power was exercised" met broad statutory requirement).

The Antiquities Act has the same structure as these statutes. Congress has authorized the President "in [his] discretion" to declare objects of historic or scientific interest to be national monuments and provided that the President "may reserve" as a part thereof, parcels of land "confined to the smallest area compatible with the *proper* care and management" of the designated objects. *See* 54 U.S.C. § 320301(a) & (b) (emphasis added). As above, these presidential determinations are not subject to judicial review.

That Congress has thus chosen to foreclose judicial review of the President's Antiquities Act determinations does not compel a different view of the President's authority or render its exercise problematic (*see* Part I.D *infra*). As the Supreme Court explained in the context of a challenge to the President's decision regarding a recommendation from the Civil Aeronautics Board:

> The dilemma faced by those who demand judicial review of the Board's order is that, before Presidential approval, it is

> not a final determination ... and after Presidential approval,
> the whole order, both in what is approved without change, as
> well as in amendments which he directs, derives its vitality
> from *the exercise of unreviewable Presidential discretion*.

*Chicago & Southern Air Lines*, 333 U.S. at 113 (emphasis added).

Nor, for that matter, does the Act provide any judicially-manageable standards for second-guessing the President's determination that an object is of historical or scientific interest, or that he has selected the smallest area compatible with designated objects' proper care and management. More granular consideration of the content of Plaintiffs' claims highlights the problematic nature of the task Plaintiffs ask the Court to undertake.

For instance, one of Plaintiffs' lines of argument is that "historic" objects must be "memorable, or assured of a place in history." (*Garfield* Br. at 36.) Consequently, Plaintiffs contend that the President exceeded his authority by identifying overly "generic" Native American structures and archaeological sites as "objects of historic interest" in the challenged Proclamations. (2-JA-387–89 (*Garfield* Am. Compl. ¶¶ 306–10).) This argument has several flaws: it imports an anachronistic understanding of "historic" to try to limit the scope of the

Act,[32] and effectively renders "or scientific" surplusage,[33] among others. But set aside these flaws and consider what such an inquiry would entail. Plaintiffs essentially ask the court to pass on their contention that the designated objects are not sufficiently *significant* to merit designation as national monuments. But this is precisely the question that Congress committed to the President's judgment in the Act.

Similarly, Plaintiffs argue that the boundaries identified in the challenged Proclamations are larger than necessary to protect the designated objects. Plaintiffs mistakenly seem to think that the magnitude of the reservations in acreage, alone, somehow renders the

---

[32] Plaintiffs appeal to current connotations of the word "historic" and cite to selective dictionary definitions from 1922 and 1913. (*Garfield* Br. at 36.) But multiple 1906 dictionaries treat "historic" and "historical" as synonyms. *See* Modern World Dictionary of English Language (1906) (defining "historic" as "pertaining to or connected with history"); Webster's Practical Dictionary (1906) (defining "historic" as "containing, pert. to, contained or exhibited in, deduced from, or representing history"). And this was also how Hewett's 1904 report for the General Land Office, incorporated into the Act's legislative history, used the term. *See* Hewett, *supra* note 24.

[33] "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Tellingly, Individual Plaintiffs omit the words "or scientific" in one instance when purporting to quote the Act. (*Dalton* Br. at 15.)

Proclamations problematic, but this cannot be reconciled with the text[34]

or contemporaneous understanding[35] of the Antiquities Act; in any

event, Plaintiffs fail to plead with sufficient particularity precisely

which lands were improperly reserved, (2-JA-472–76 (Mot. to Dismiss

at 49–53); 4-JA-941–43 (Reply 24–26)). But must fundamentally,

Plaintiffs point to no judicially-manageable standards for a court to

evaluate and set appropriate boundaries "compatible with the proper

---

[34] "Congress," of course, "knew how to impose" a specific acreage limitation "when it chose to do so." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). Some of the rejected proposals that preceded the Antiquities Act included specific acreage limitations to 320 or 640 acres, a restriction explicitly excluded from the compromise that led to passage of the Act. And Congress has used specific acreage limitations in other executive reservation provisions. *See* 16 U.S.C. § 3213 (placing limits on the executive's authority to make withdrawals of lands within in the State of Alaska aggregating more than 5,000 acres); 43 U.S.C. §§ 155–158 (1964) (limiting reservations for defense purposes to 5,000 acres for any one defense project or facility unless approved by Congress).

[35] Plaintiffs repeatedly emphasize that the two monuments now exceed "3 million acres" combined. This overstates the scope of each challenged Proclamation's impact: Proclamation 10,286 reserves only an additional approximately 861,737 acres for Grand Staircase-Escalante National Monument, and Proclamation 10,285 reserves only an additional approximately 1,162,124 acres of federal land for Bears Ears National Monument. Multiple monuments designated in the early years of the Act included reservations of comparable or larger size, including monuments the lawfulness of which the Supreme Court has expressly confirmed. *See* Statement of the Case, Part A.d., *supra*.

care and management of the objects to be protected," or review the President's judgment in doing so. Indeed, the difficulty of this very task is underscored by Plaintiffs' own failure to propose how the boundaries would need to change with any particularity. Plaintiffs ask the court to substitute their judgments for the President's on the boundaries necessary for proper care and management of the objects, but Congress properly committed these questions to the President's judgment.

> ### 2. Even setting aside the "express statement" requirement, Plaintiffs fail to identify *any* available right of action for their claims.

Plaintiffs' complaints point only to the Antiquities Act itself as the basis for their claims against the President. But the Antiquities Act provides no indication whatsoever that Congress intended private parties to be able to litigate to enforce the Act's terms, nor does any other act of Congress. This Court has previously expressed skepticism that the Antiquities Act included an implied right of action as asserted. *See Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094, 1098 n.4 (10th Cir. 2006) (noting the "strict standard" for implying rights of action despite dismissing the case on standing grounds).

The question of whether a federal statute creates a cause of action allowing private parties to sue to enforce the statute's requirements is governed by congressional intent. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Statutory intent" to create a private cause of action "is determinative."); *accord Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004); *Sonnenfeld v. City & County of Denver*, 100 F.3d 744, 747 (10th Cir. 1996). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286; *see also Safe Streets Alliance*, 859 F.3d at 901.[36]

The text of the Antiquities Act contains no indication of any intent to create a cause of action to enforce its terms. Nor does it contain any of the indicia usually considered in assessing whether to take the extraordinary step of implying such a right: no rights-creating language; no language identifying a particular class for whose benefit the statute was enacted; no place in a larger regulatory scheme that

---

[36] Individual Plaintiffs express confusion about why it mattered to the district court that their claims involve "statutory rather than constitutional challenges." (*Dalton* Br. at 44 n.12.) But that is because they simply ignore Congress's central role in determining when there is a private right of action to enforce federal statutory requirements.

supports the implication of such a right. *Cf. Boswell*, 361 F.3d at 1266–68. But "Congress must provide for an implied right of action 'in clear and unambiguous terms.'" *Utah Ass'n of Ctys.*, 455 F.3d at 1098 n.4 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)).

Plaintiffs blithely imply that they do not need to identify any specific federal cause of action in light of the "long history of judicial review of illegal executive action," citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). (*Dalton* Br. at 37; *Garfield* Br. at 23.) But any such review is a "creation of courts of equity," *id.*, and, as this Court has recognized in construing *Armstrong*, only a party with "substantive rights" under a federal statute can seek to enforce its requirements in an equitable action. *See Safe Streets Alliance*, 859 F.3d at 901.

There is no "free-floating" general right in equity to act as a roving enforcer of statutory terms. *See id.* at 895–96 (rejecting argument that plaintiffs have some "free-floating" ability to seek "federal equitable relief in the absence of federal substantive rights"). Rather, "the Supreme Court has explained that 'to invoke the' Article III courts' equitable powers, a plaintiff asserting a cause of action to enforce a

54

federal statute must have 'a federal right that [he or she] possesses against' the defendant.'" *Id.* at 902 (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 260 (2011)). Far from being open to any plaintiff, "'[s]uch litigation *cannot occur* unless the' plaintiff 'has been *given a federal right of* his or her '*own* to vindicate ... under the ... statute at issue.'" *Safe Streets Alliance*, 859 F.3d at 902 (emphases original) (quoting *Stewart*, 563 U.S. at 261 n.8 (emphases added)). The Antiquities Act gives Plaintiffs no federal substantive rights to vindicate. So even if there were an implied equitable right of action contained in the Act, Plaintiffs could not avail themselves of it.

Plaintiffs' resort to an implied equitable right of action in the Act would fail for a second reason. Causes of action created by federal statute, including implied equitable causes of action, are limited to injuries within the "zone of interests" Congress intended the statute to protect. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining that the zone-of-interests test is a "requirement of general application" presumptively operating in the background for all federal causes of action). But Plaintiffs allege *no* legally protected injury, *see* Part II, *infra*, much less one within the

zone-of-interests protected by the Act. Plaintiffs' effort to rest their claim on the Antiquities Act thus fails.

### 3.    No court has ever found a monument designation to violate the terms of the Antiquities Act.

Not surprisingly, then, no court has ever found a presidential proclamation establishing a national monument to violate the requirements of the Antiquities Act. Each of the three district courts in this Circuit to consider litigation challenging monuments proclamations, including the court below, has rejected judicial review of the challenged proclamation. *See Wyoming v. Franke*, 58 F.Supp. 890 (D. Wy. 1945) (finding national monument designation unreviewable); *Utah Ass'n of Ctys. v. Bush*, 316 F.Supp.2d 1172, 1186 (D. Utah 2004) (same). And while the D.C. Circuit has said that a limited cause of action is available for review of national monument proclamations, the court in those cases did not undertake any *ultra vires* review of the proclamations in question because the plaintiffs had not alleged facts or law sufficient to support such a claim. *See Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1135–36 (D.C. Cir. 2002); *Tulare County v. Bush*, 306 F.3d 1138, 1142 (D.C. Cir. 2002); *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019). In any event,

the D.C. Circuit's statement that *ultra vires* review of monument
designations is available mistakes the Supreme Court precedent
discussed above.

Plaintiffs also rely on the Ninth Circuit decision in *Murphy Co. v.
Biden*, 65 F.4th 1122 (9th Cir. 2023), as well as *American Forest
Research Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023), as
further support that monument designations are reviewable. Those
cases, however, did not present a challenge to whether the President's
designations complied with the Antiquities Act itself, but instead
addressed claims that the designations violated the plain terms of
another statute, the Oregon and California Railroad and Coos Bay
Wagon Road Grant Lands Act, 43 U.S.C. § 2601 *et seq*. The reasoning
there—that "*Dalton*'s restriction on reviewing presidential acts for
abuse of discretion is inapposite where the claim instead is that the
presidential action independently violates another statute," *Murphy*, 65
F.4th at 1131 (cleaned up)—does not apply here.

Plaintiffs also point to two Supreme Court cases—*Cameron v.
United States*, 252 U.S. 450 (1920); and *Cappaert v. United States*, 426
U.S. 128 (1976)—and argue that the Court's willingness to engage in

analysis of the Antiquities Act in those cases "forecloses" the conclusion that monument designations are not subject to judicial review. (*Garfield* Br. at 19, 31; *Dalton* Br. at 23–24.) But Plaintiffs fail to note that in each of these cases, the United States itself initiated the lawsuit to protect its property rights. Those cases therefore presented no question of sovereign immunity or the availability of a private cause of action.[37] In the absence of an "express statement by Congress" that private parties can litigate to enforce the terms of the Antiquities Act, *Franklin*, 505 U.S. at 801, Plaintiffs have no available cause of action.

### C. Plaintiffs cannot rely on the nonstatutory *ultra vires* doctrine to circumvent federal sovereign immunity.

Plaintiffs contend the nonstatutory *ultra vires* doctrine nonetheless allows them to litigate their challenges. The judge-made *ultra vires* doctrine rests on the understanding that, "where [an]

---

[37] Those cases nonetheless interpret the Act consistent with the 2021 Proclamations, as do two other Supreme Court opinions—in another case brought by the United States, *United States v. California*, 436 U.S. 32, 36 (1978) (enlargement of Channel Islands Monument); and in a suit brought by hte State of Alaska against the United States under the Quiet Title Act, a statute that both waives sovereign immunity and creates a cause of action against the United States, *United States v. Alaska,* 545 U.S. 75 (2005) (finding submerged lands included in the Glacier Bay National Monument and therefore reserved against a claim under the Alaska Statehood Act).

officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," and do not enjoy sovereign immunity "because of the officer's lack of delegated power." *Larson*, 337 U.S. at 689–90. This exception "is intended to be of extremely limited scope." *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). As the Supreme Court explained, an action must be both "in excess of [the actor's] delegated powers *and* contrary to a specific prohibition" in the law before *ultra vires* review is available. *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (emphasis added). Plaintiffs' claims fail to meet this exacting standard.

### 1. The *ultra vires* doctrine does not apply to statutory claims against the President.

The President's unique status under the Constitution distinguishes him from other executive officials. *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). He is entrusted "with supervisory and policy responsibilities of utmost discretion and sensitivity," including the responsibility to "take Care that the Laws be faithfully executed." *Id.* at 750 (quoting U.S. Const. Art. II Sec. 3). Given this unique constitutional role, the President's actions cannot properly be viewed as

individual rather than sovereign acts when he is exercising official statutory powers. *See generally Franklin*, 505 U.S. at 800–01.

It thus makes little sense to apply *ultra vires* review to a claim that the President's exercise of discretion under statutory authority delegated to him by Congress did not meet the terms of the statute. The Supreme Court has not resolved whether nonstatutory review is available to determine whether a presidential action is foreclosed by a statute. *See*, *e.g.*, *Trump v. Hawaii,* 138 S. Ct. 2392, 2407 (2018) ("assum[ing] without deciding" that plaintiffs' *ultra vires* claim against the President based on the Immigration and Nationality Act was reviewable absent express authorization by Congress)*; Motions Sys. Corp.*, 437 F.3d at 1359–62 (finding no judicial review for claim that the President acted in excess of statutory authority). Where Congress has neither waived sovereign immunity nor provided a statutory right of action, separation-of-powers concerns should make courts wary of taking it upon themselves to craft a judicially-created right of action. *Cf. Safe Streets Alliance*, 859 F.3d at 904. Whatever the continuing viability of nonstatutory *ultra vires* review of constitutional claims against the President or statutory claims against other executive

branch officials, the Court should not allow Plaintiffs to litigate the President's compliance with broad statutory terms absent some indication Congress intended such review.

### 2. The *ultra vires* doctrine does not provide a right of action.

Even if the *ultra vires* doctrine did apply in the context of the President's statutory authorities, it cannot solve Plaintiffs' failure to identify an available right of action or invasion of a legal interest traditionally protected in equity. The *ultra vires* doctrine is an "exception to *sovereign immunity.*" *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1232–33 (10th Cir. 2005) (emphasis added). But the contention that an official acted in excess of authority does not, standing alone, also confer a right of action. *See* Part I.B.2, *supra*. Thus, even where *ultra vires* review is appropriate, a plaintiff must still establish either a right of action at law, or the invasion of a legal right traditionally protected in equity. The *ultra vires* doctrine simply removes the barrier of sovereign immunity and allows the prosecution of existing rights of action.

Thus, in *Larson v. Domestic & Foreign Commerce Corp.*, the plaintiff brought a breach-of-contract claim (a traditional action at law)

and sought specific performance (a traditional remedy in equity), and the question was whether the agency official's actions were immune from judicial review. 337 U.S. at 684–85. By contrast, Plaintiffs identify no independent right of action at law or invasion of a legal interest traditionally protected in equity.[38] And, as discussed above, even if an implied equitable right of action to enforce the Antiquities Act existed, such a cause of action would be available only to plaintiffs with federal substantive rights under the statute, *Safe Streets Alliance*, 859 F.3d at 901–02, and whose injuries—unlike those alleged by Plaintiffs— fall within the "zone of interests" intended to be protected by the statute, *Lexmark*, 572 U.S. at 129.

>   3.    The *ultra vires* doctrine does not apply to routine claims, such as Plaintiffs', that the challenged action rested on errors of fact or law.

In any event, Plaintiffs' claims do not meet the stringent standards for application of the *ultra vires* doctrine. The doctrine is

---

[38] The availability of equitable remedies under the Federal Rules of Civil Procedure does not, itself, create any new substantive rights of action in equity. Rather, the equity jurisdiction of the courts remains limited to "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Grupo Mexicano de DeSarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

limited to extreme circumstances where it is so plain that an official lacked statutory authority to act that it is reasonable to consider the action an act of the individual and not the sovereign. *See*, *e.g.*, *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("*Ultra vires* claims are confined to 'extreme' agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.") (cleaned up); *Florida Health Sciences Ctr. v. Secretary of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016). The absence of statutory authority must be "plain on the record and on the face of the [statute]." *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 n.7 (1968).

Simply alleging, as Plaintiffs do, that the President's action rested on errors of fact or law does not suffice: "A claim of error in the exercise of that power is therefore not sufficient." *Larson*, 337 U.S. at 690. "Only error that is 'patently a misconstruction of the Act,' that 'disregard[s] a specific and unambiguous statutory directive,' or that 'violate[s] some specific command of a statute' will support relief." *Fed. Express*, 39 F.4th at 764 (citation omitted). The Supreme Court has "long

required in ultra vires cases that the agency action go beyond mere legal or factual error and amount to a 'clear departure by the [agency] from its statutory mandate' or be 'blatantly lawless' agency action." *Id.* at 764 (quoting *Oestereich*, 393 U.S. at 238). In other words, "garden-variety errors of law or fact are not enough." *Id.* (cleaned up).

Here Plaintiffs contend that the President made "many legal errors," (*Dalton* Br. at 32), by designating objects in the challenged Proclamations that they argue are not valid "objects of historic or scientific interest" under the statute; and by reserving land that, in Plaintiffs' view, is not the "smallest area compatible with the proper care and management of" the identified objects. (*Dalton* Br. at 25–29; *Garfield* Br. at 25–27, 34–40.) These contentions rest on a misconception of the statute, as Federal Defendants argued in the district court. (2-JA-472–83 (Mot. to Dismiss at 54–60); 4-JA-941–46 (Reply at 24–29).) The very lengths to which Plaintiffs go to attempt to show that the President's designations did not comply with the terms of the statute, however, underscore that the *ultra vires* doctrine does not apply to their claims. For the *ultra vires* doctrine to apply, the claim should require no lengthy explanation; the absence of statutory

authority should be obvious. The lack of statutory authority must be "plain," the action contrary to a "specific command" of the statute or in disregard of "a specific and unambiguous statutory directive."

Plaintiffs do not dispute the President's authority to designate monuments but instead claim he abused his discretion in doing so. That the President's decisions were, in Plaintiffs' view, wrong—that is, incorrect as a matter of fact, or law, or both—does not change their character as sovereign acts entitled to immunity. Otherwise the *ultra vires* exception would swallow the rule. "The question of whether a government official acted *ultra vires* is quite different from the question of whether that same official acted erroneously or incorrectly as a matter of law." *Wyoming*, 279 F.3d at 1230. Indeed, the Supreme Court has expressly rejected "the argument that official action is invalid if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so." *Larson*, 337 U.S. at 695 (citation omitted).

A different question regarding the applicability of the *ultra vires* doctrine might be presented if the President took actions plainly prohibited by statute, such as reserving state-owned land or

designating a national monument in the State of Wyoming despite a statutory prohibition on such designations. *Cf.* 54 U.S.C. § 320301(d). But those questions are not presented here, where the issues are at base simply an interpretive dispute about the meaning of statutory terms amenable to multiple constructions.

Plaintiffs appear to believe that simply because their claims raise questions of statutory interpretation, the *ultra vires* doctrine necessarily applies. That view cannot be reconciled with the case law. "[C]hallengers must show more than the type of routine error in statutory interpretation … that would apply if Congress had allowed APA review." *Fed. Express*, 39 F.4th at 765 (quoting *Local 130, Int'l Union of Elec., Radio & Mach. Workers v. McCulloch*, 345 F.2d 90, 95 (D.C. Cir. 1965)). "Ultra vires claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* at 764. The absence of authority must be "plain … on the face of the [statute.]" *Oestereich*, 393 U.S. at 238 n.7; *see also National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971, 975 (D.C. Cir. 2022) (*ultra vires* review looks at whether the agency contravened a

"clear and specific statutory mandate," and then, if applicable, whether the agency's statutory construction is "utterly unreasonable").

The *ultra vires* doctrine employs a "demanding standard" "because ultra vires review seeks the intervention of an equity court *where Congress has not authorized statutory judicial review.*" *Fed. Express*, 39 F.4th at 765 (emphasis added). This stringent standard serves the important function of ensuring that the nonstatutory *ultra vires* doctrine does not override Congress's legislative authority to establish causes of action or evolve into a backdoor avenue to circumvent the United States' sovereign immunity. The *ultra vires* doctrine is intended for mandamus-like circumstances, where an official acts so clearly and indisputably beyond the bounds of her authority that the need for judicial redress is self-evident.[39] It is not supposed to be analogous to APA review. Plaintiffs seek to convert strictly limited *ultra vires* review into something more akin to a general writ of error, asking the court to review routine questions about the correctness of the President's

---

[39] *See Work v. United States*, 267 U.S. 175, 183 (1925) (holding that "the mere fact that the court might deem [a] ruling erroneous in law gave it no power to intervene" because "a mandamus could not be made to serve the function of a writ of error").

judgments of fact and law.[40] But Plaintiffs' effort "to dilute ultra vires review to the functional equivalent" of APA review "defies precedent and logic." *Id.* at 764.

The Antiquities Act undeniably confers "broad"[41] discretionary authority upon the President to create national monuments, and the President invoked that authority in issuing the 2021 Proclamations. Far from relying on an "utterly unreasonable" construction of the statute, the challenged Proclamations fall well within its terms. They designate bona fide objects of substantial historical and scientific interest and include a determination about the reservation necessary for the proper care and management of those objects.[42] They protect, in

---

[40] *Garfield* Plaintiffs contend, for instance, that *ultra vires* review is available if the President declares "*anything*" an object for protection that does not meet their cramped understanding of the Act. (*Garfield* Br. at 25.) Similarly, they contend that if the President reserves 100 acres when one would suffice, in Plaintiffs' view, for the protection of the objects, that action would be *ultra vires*. (*Garfield* Br. at 26; *see also Dalton* Br. at 32–33). But if so, *ultra vires* review would be more searching than even ordinary APA review.

[41] (1-JA-108 (*Garfield* Compl. ¶ 235).)

[42] Plaintiffs complain that the Proclamation did not "explain" how these determinations—such as "what 'care and management' was actually appropriate"— were made, or "specify" the significance of the designated objects or "what lands are set aside for what objects,"

part, objects explicitly discussed in the legislative history of the Act. *See supra* note 24. The lands reserved are so dense with Native American artifacts that Plaintiffs complain that only a percentage of them have been fully surveyed. (*Garfield* Br. at 12.) The President's decisions comport with the plain terms and ordinary meaning of the Act, its drafting history, and long-standing practices regarding the designation of monuments in which Congress has long acquiesced, *see supra* notes 19–21. They are consonant with every Supreme Court decision construing the Act. That Plaintiffs disagree with the understanding of the Act embodied in the challenged Proclamations does not render them *ultra vires*.

Plaintiffs miss the mark with their contention that the Antiquities Act would be an impermissible delegation if the Court does not adopt their cramped understanding of the statute. (*Garfield* Br. at 33.) This confuses whether the Act provides meaningful guidance to the President with the question of whether those standards are judicially administrable and subject to judicial review. The Act provides discernable direction to the President's exercise of the authority to

_____

(*Garfield* Br. at 12; *Dalton* Br. at 32), but the Act only requires the President to "declare," not to provide an APA-compliant explanation.

designate objects and reserve parcels of land. The Act requires the President to determine that the designated objects are of bona fide historical or scientific interest of sufficient significance to be worth protecting, and to reserve only that land necessary, in his judgment, for their proper care and management. But those limits are created by Congress, not the courts. Nor is it even clear that the cases cited by Plaintiffs apply to a provision that primarily guides the President regarding stewardship of federal property as a landowner, as opposed to statutes regulating private conduct.

The President's actions here also do not raise a "major question." (*Cf. Dalton* Br. at 31.) Rather, as explained, they are wholly consistent with contemporary practices under the Antiquities Act and other executive reservation authorities. Far from the large-scale economic impacts addressed in *W. Va. v. EPA*, 142 S.Ct. 2587 (2022), the President's actions here relate primarily to the United States' management of its own property, not the enforcement of laws against private parties. And Congress retains plenary authority to direct that any reserved lands be used otherwise. The "economic and political significance" of the challenged actions is far from "major" as well. The

lands restored to Grand Staircase-Escalante National Monument by these actions comprises less than 0.038 percent of the United States' land area and less than 0.135 percent of federally owned land, and for Bears Ears National Monument, the restored lands comprise less than 0.051 percent of the United States' land area and less than 0.182 percent of federally owned land.

Plaintiffs' recourse to address their disagreements with the President's discretionary judgments here is to petition Congress. Congress has repeatedly shown its ability and willingness to reverse or modify monument designations when it deems doing so appropriate. *See* Part I.D, *infra.* These are disputes for the political branches to resolve. Plaintiffs' claims that the President made errors of fact or law in making these designations are not subject to judicial review.

### D.    The President's Antiquities Act authority is not "limitless" or unchecked.

Plaintiffs argue that unless review is available, the President's authority will be effectively "limitless." (*Dalton* Br. at 2, 15, 29.) But this reflects a misunderstanding of separation of powers and the role of courts. That Congress has not authorized Plaintiffs to seek judicial review of the President's determinations under the Act does not mean

that the Act's legal requirements no longer apply. There is nothing unusual or problematic about the fact Congress has not authorized private parties to enforce the statutory requirements of the Antiquities Act through litigation. The Framers of our Constitution did not intend the judicial branch to be the ultimate arbiters of every dispute of law or policy. *See Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981) ("[T]he Framers did not make the judiciary the overseer of our government.") (cleaned up).

The fact that private litigants cannot sue and compel courts to address their arguments about the President's determinations under the Antiquities Act is simply the natural operation of the United States' sovereign immunity, given that Congress has not opted to waive it. Plaintiffs' fear—that this may result in the prospect that a statutory authority could be used in circumstances that did not justify it—does not alter this conclusion: "It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse." *Mott*, 25 U.S. at 32.

This does not mean that the Antiquities Act's requirements are somehow "limitless," (*Dalton* Br. at 2), or "entirely unchecked," (Pac.

72

Legal Found. Amicus Br. at 9). Internal and external checks safeguard the President's compliance with the Act. To begin with, the legality of monument designations is carefully considered within the Executive Branch.[43] The President and Department of Justice officials, like judges, take an oath to uphold the Constitution, and their actions are entitled to a presumption of regularity. *United States v. Chemical Foundation*, 272 U.S. 1, 14–15 (1926).

But the commitment of these executive officials to their oaths is not the only check. Congress itself retains plenary power over the management and disposition of federal lands, including lands designated as national monuments. *See* U.S. Const. Art. IV Sec. 3 Cl. 2 (Property Clause). The Supreme Court has "repeatedly observed that the power over the public land thus entrusted to Congress is without

---

[43] The President himself is charged to "take Care that the Laws be faithfully executed." U.S. Const. Art. II. Sec. 3. And section 35 of the Judiciary Act of 1789, which created the office of the Attorney General, directs the Attorney General, among other responsibilities, "to give his advice and opinion upon questions of law when required by the President of the United States." 28 U.S.C. §§ 511. Proclamations designating national monuments under the Antiquities Act are reviewed for form and legality by the Department of Justice's Office of Legal Counsel on behalf of the Attorney General. *See* Executive Order 7298 (1936).

limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (cleaned up); *see also United States v. City of San Francisco*, 310 U.S. 16, 30 (1940) ("[I]t is not for the courts to say how that trust shall be administered. That is for Congress.").

Consistent with that broad authority, Congress not only granted the President authority to designate monuments but also has continued to actively manage federal lands after presidential monument designations. "Congress has authority to create, modify, and abolish national monuments on federal lands, and has done so on numerous occasions under its constitutional authority to enact legislation regarding federal lands." Congressional Research Services, *National Monuments and the Antiquities Act*, at 4 (R41339; May 3, 2023). This congressional authority "is not defined or limited by the provisions of the Antiquities Act." *Id.*

This continuing congressional authority is a key aspect of the operation of public land law: Congress always retains authority to change or undo reservations or withdrawals if it believes the land should be used differently. And Congress has not hesitated to use that authority to modify the management of lands designated as monuments

where it disagreed with presidential decisions. Congress has expressly

abolished eleven monuments designated by the President.[44] It has

created its own monuments in the absence of a presidential

designation.[45] It has adjusted the boundaries of monuments designated

by the President, including the Grand Staircase-Escalante National

Monument at issue in this case.[46] It has withheld appropriations for the

operation of a monument.[47] It has issued direction regarding the

---

[44] *See*, *e.g.*, Pub. L. No. 84-179, 69 Stat. 380 (1955) (revoking Old Kasaan National Monument); Pub. L. No. 84-891, 70 Stat. 898 (1956) (abolishing the Fossil Cycad National Monument); Pub. L. No. 83-360, 68 Stat. 98 (1954) (abolishing the Shoshone Cavern National Monument and transferring the lands to Cody, Wyoming); *id.* (abolishing the Castle Pinckney National Monument and transferring the lands to South Carolina).

[45] *See*, *e.g.*, Pub. L. No. 89-154, 79 Stat. 587 (1965) (establishing the Alibates Flint Quarries National Monument in Texas); Pub. L. No. 92-537, 86 Stat. 1069 (1972) (establishing the Fossil Butte National Monument in Wyoming); Act of Mar. 2, 1927, ch. 251, 44 Stat. 1264 (establishing the Kill Devil National Monument in North Carolina).

[46] *See supra* note 22 (statutes adjusting the boundaries of Grand Staircase-Escalante); *see also* Pub. L. No. 104-333 § 205, 110 Stat. 4093, 4106 (1996) (removing acreage from Craters of the Moon National Monument); National Parks and Recreation Act of 1978, Pub. L. No. 95-625, § 301(13), 92 Stat. 3467, 3474 (November 10, 1978) (adjusting the boundaries of Montezuma Castle National Monument).

[47] Squillace, *supra*, 37 Ga. L. Rev. at 498.

management of public lands reserved as monuments.[48] It has expressly authorized mining in certain monuments. *See* Act of June 22, 1936, ch. 700, 49 Stat. 1817 (authorizing mining in Glacier Bay National Monument). And where Congress had concerns about the President's exercise of his discretion under the Antiquities Act, it has placed limits on the President's authority to designate new monuments. *See* 16 U.S.C. § 3213 (limiting the executive's authority to make withdrawals of lands within in the State of Alaska aggregating more than 5,000 acres); 54 U.S.C. § 320301(d) (barring the President from making further monument designations in the State of Wyoming).

Congress has also taken numerous actions endorsing presidential decisions to reserve federal lands under the Antiquities Act for conservation and preservation purposes. It has renamed national

---

[48] *See*, *e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 408, 136 Stat. 49, 410–11 (2022) ("No funds provided in this Act may be expended to conduct preleasing, leasing and related activities under either the Mineral Leasing Act (30 U.S.C. 181 et seq.) ... within the boundaries of a National Monument established pursuant to the Act of June 8, 1906 (16 U.S.C. 431 et seq.) as such boundary existed on January 20, 2001, except where such activities are allowed under the Presidential proclamation establishing such monument.").

monuments.[49] It has enlarged the boundaries of national monuments.[50] And Congress has converted numerous national monuments designated by the President into national parks.[51] Indeed, many of the most renowned national parks got their start as national monuments: Grand Canyon, Olympic, Zion, Acadia, Bryce Canyon, Arches, Glacier Bay, Grand Teton, Death Valley, Saguaro, Joshua Tree, Denali.

Finally, Congress has considered legislation amending or repealing the President's authority under the Antiquities Act on several occasions and has opted not to do so. The most prominent occasion was in connection with the review and overhaul of public land laws that culminated in the 1976 enactment of comprehensive land management legislation, the Federal Land Policy & Management Act (FLPMA), Pub.

---

[49] *See*, *e.g.*, Pub. L. 100–225, title V, §506(g), 101 Stat. 1547 (1987) (renaming Capulin Mountain National Monument).

[50] *See supra* note 22 (statutes adjusting the boundaries of Grand Staircase-Escalante, collectively adding approximately 180,000 acres to the monument); National Parks and Recreation Act of 1978, Pub. L. No. 95-625, § 301(13), 92 Stat. 3467, 3474 (November 10, 1978) (adjusting the boundaries of Montezuma Castle National Monument).

[51] In all, Congress has converted lands reserved in roughly 60 monument proclamations into national park land. *See* National Park Service, *National Monument Facts & Figures*, https://perma.cc/W8P5-4QLT.

L. No. 94-579, 90 Stat. 2743, *codified at* 43 U.S.C. §§ 1701–1787.

Following conflicts over public land use and laws in the 1950s

and 1960s, Congress established the Public Land Law Review

Commission to undertake a comprehensive review and make

recommendations regarding public land law. Pub. L. No. 88-606,

78 Stat. 982 (*codified at* 43 U.S.C. §§ 1391–1400 (1964)). Based in large

part on the recommendations of the Commission,[52] FLPMA revoked

nearly all existing authorities for executive branch withdrawals and

reservations and established new standards and procedural

requirements for future withdrawals or reservations.[53] Despite the

Commission's express recommendation that Antiquities Act authorities

be repealed,[54] and proposed legislation doing so,[55] Congress opted not to

---

[52] *See* Public Land Law Review Commission, *One Third of the Nation's Land* (1970) (PLLRC Report).

[53] The carefully drawn limitations on executive withdrawal and reservation authority contained in FLPMA, as well as Congress's decision to repeal the President's implied withdrawal authority, show that Congress knows how to place limits on executive authority when it perceives it to be necessary.

[54] *See* PLLRC Report 54–56 (recommending that all permanent withdrawal or reservation authority, including the Antiquities Act, be repealed).

[55] *See* H.R. 7211, 92d Cong., § 502(b) (as reported in the House Aug. 7, 1972) (including the Antiquities Act among authorities repealed).

repeal or otherwise limit or modify the President's authority under the Antiquities Act when enacting FLPMA.[56] Congress's deliberate decision not to repeal the Antiquities Act when enacting FLPMA highlights its awareness and acquiescence in long-standing practices of presidential designations under the Act.

Congress's ongoing and robust supervision of lands designated as national monuments by the President demonstrates that Plaintiffs' concerns about unchecked presidential power under the Antiquities Act are both misplaced and overblown. As one scholar noted more than half a century ago, "[t]he frequency with which Congress has exercised its legislative powers since 1906 with respect to national monuments indicates its close concern with the use of public lands for monument purposes and the exercise of the delegated discretionary powers by the

---

[56] Plaintiffs' suggestion that the Proclamations cannot be reconciled with "the finely reticulated scheme[]" for executive withdrawals in FLPMA and other recent statutes, (*Dalton* Br. at 30, 32), thus misses the mark. Congress could have, but chose not to, repeal the Antiquities Act in 1976. Regardless, legislation passed in 1976 does not *sub silentio* change the terms of a law passed in 1906, particularly when Congress explicitly stated that "[n]othing in [FLPMA] shall be deemed to repeal any existing laws by implication." Pub. L. 94-579, § 701(f) (1976).

Executive."[57] The numerous actions by Congress then and since regarding monuments show that the structure of the federal government is, as designed, furnishing the proper checks and balances among the branches. Congress is highly engaged on issues of public land use and monument designations and, when Congress found it necessary, has acted to both modify existing monuments and limit the President's authority under the Antiquities Act. What Congress has not done all this while, however, is authorize private parties to enforce the terms of the Antiquities Act through litigation.

Plaintiffs worry that, without judicial review, the President may simply designate "any and all" federal lands as national monuments. (*Dalton* Br. at 13.) Presidents have exercised discretion to designate national monuments for nearly a hundred-and-twenty years, and no President has purported to make such a sweeping designation. Experience demonstrates that the structural checks afforded by our system of government have effectively deterred the sorts of extreme action Plaintiffs claim to fear. Indeed, even after more than a century of

---

[57] Charles F. Wheatley, Jr., *Study of Withdrawals and Reservations of Public Domain Lands* 259 (Public Land Laws Review Commission 1969).

presidential designations "unchecked" by judicial second-guessing,

national monuments currently comprise only a tiny fraction of all

federal landholdings.

## II.    Plaintiffs lack standing to challenge the 2021 Proclamations.

The Court lacks jurisdiction for the additional reason that
Plaintiffs have not demonstrated standing to challenge the
2021 Proclamations. To establish Article III standing, a plaintiff must
establish that (1) the challenged action causes the plaintiff "an 'injury
in fact' that is (a) concrete and particularized and (b) actual or
imminent, not conjectural or hypothetical; (2) the injury is fairly
traceable to the challenged action of the defendant; and (3) it is likely,
as opposed to merely speculative, that the injury will be redressed by a
favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.
(TOC), Inc.*, 528 U.S. 167, 180–81 (2000). This Court has emphasized
that where "a plaintiff challenges an action of the President, proper
evaluation of standing is particularly important." *Utah Ass'n of Ctys.*,
455 F.3d at 1099.

At the pleading stage, a plaintiff must "clearly allege facts
demonstrating" each standing element. *Spokeo, Inc. v. Robins*,
578 U.S. 330, 338 (2016) (cleaned up). Those alleged facts must

establish at least a plausible basis for the plaintiff's standing,[58] but "a district court may not presume the truthfulness of the complaint's factual allegations" when "reviewing a factual attack on subject matter jurisdiction." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (noting district court's "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)"), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001); *see also Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) (same); *Wyoming v. U.S. Dep't of Int.*, 674 F.3d 1220, 1231–33 (10th Cir. 2012) (same).[59]

---

[58] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss," including a motion to dismiss under Rule 12(b)(1)).

[59] Nor must the Court allow discovery, as Plaintiffs have suggested, before considering factual challenges to their standing. *See Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.*, 385 F.3d 1291, 1299 (10th Cir. 2004) (affirming district court's refusal to allow jurisdictional discovery). Plaintiffs made only an inadequate, general request for discovery and did not explain in specific terms what additional evidence they might adduce to establish their own injuries from the challenged Proclamations. Any evidentiary hearing is particularly unnecessary where the suit is based on the terms of the Proclamations.

Plaintiffs failed to meet their burden "to show they are

'immediately in danger of sustaining some direct injury' as a result of

the [challenged action] and that the threat of injury is 'real and

immediate, not conjectural or hypothetical.'" *State of Utah v. Babbitt*,

137 F.3d 1193, 1212 (10th Cir. 1998) (quoting *City of Los Angeles v.

Lyons*, 461 U.S. 95, 102 (1983)). Plaintiffs challenge the

2021 Proclamations restoring the prior boundaries of the Grand

Staircase-Escalante and Bears Ears National Monuments. Thus,

Plaintiffs must establish that *this boundary change* (and not simply the

Monuments' existence) has caused them injuries-in-fact, and that

reverting to the prior boundaries would redress those injuries.[60]

Plaintiffs have failed to do so. Rather than showing the sort of

"real and immediate" danger of "direct injury" required for standing,

---

[60] At most, if Plaintiffs prevail, the boundaries might revert to those established by President Trump's 2017 Proclamations. Those Proclamations themselves are also challenged in pending litigation, however, and if such claims are reviewable and those challenges are also successful, the boundaries would revert instead to the original boundaries established in the 2016 Proclamation establishing Bears Ears and the 1996 Proclamation establishing Grand Staircase-Escalante, as modified by Congress. Any new litigation challenging these earlier Proclamations, which issued more than six years ago, would be barred by 28 U.S.C. § 2401(a).

Plaintiffs instead offer conjecture about hypothetical future harms they might suffer.[61] That does not suffice, particularly when the Proclamations preserve valid existing rights. Similarly, Plaintiffs provide conclusory assertions that the challenged Proclamations foreclose various activities—*e.g.*, road repair, National Environmental Policy Act analyses, installation of water facilities[62]—that the Proclamations do not mention, let alone prohibit. To the contrary, BLM has approved and continues to undertake such activities in the Monuments since the Proclamations issued.[63] Plaintiffs thus have not met their burden to establish standing.

### A. The four Individual Plaintiffs fail to adequately allege standing.

None of the four Individual Plaintiffs—Zebediah George Dalton, owner of TY Cattle Company LLC; Suzette Ranea Morris, a member of

---

[61] (*E.g.*, 1-JA-160 (*Dalton* Am. Compl. ¶ 83 ("the Monuments portend a future [of] ... closed trails and roads; restricted campgrounds; limits on motorized access; and caps on group sizes that will block family or religious gatherings").)

[62] (*E.g.* 1-JA-163–64 (*Dalton* Am. Compl. ¶¶ 93–99); 2-JA-348–49 (*Garfield* Am. Compl. ¶¶ 163–64).)

[63] (2-JA-541–45 (Lundell Decl. ¶¶ 12–13, 15, 19, 21); 3-JA-551–54, 558 (Nelson Decl. ¶¶ 5, 11, 13, 15, 30, 33).)

the Ute Mountain Ute Tribe; Kyle Kimmerle, managing member of

Kimmerle Mining LLC; and the BlueRibbon Coalition—have

established standing to sue.[64]

### 1.    Zebediah Dalton

Plaintiff Zebediah Dalton claims that the reservation for Bears

Ears National Monument of federal lands he uses for ranching will

injure his ranching operations. (1-JA-184–87 (*Dalton* Am. Compl.

¶¶ 149–55).) But none of his allegations, if true, would show injury

caused directly by the challenged Proclamation. Instead, he complains

of federal regulation of his operations that predated the Proclamation,

(1-JA-185–88 (*Id.* ¶¶ 152, 158); 1-JA-290 (Dalton Decl. ¶ 11)), or that

relates to federal lands outside the Monument's borders, (2-JA-543–44

(Lundell Decl. ¶¶ 17–18)). His complaints relate, for instance, to

learning he must apply for a formal right-of-way to cross certain non-

Monument federal lands, (2-JA-189 (*Dalton* Am. Compl. ¶ 161)), or to

being asked to provide information about the hydrological impact of two

---

[64] Dalton, Morris, and Kimmerle only allege injury related to the
2021 reservation for Bears Ears. Accordingly, Individual Plaintiffs'
challenge to the 2021 Grand Staircase-Escalante Proclamation must be
dismissed unless the Court determines that BlueRibbon Coalition has
established standing to challenge that action.

off-Monument wells, (*Id.*). These alleged injuries cannot be fairly traced to Proclamation 10,285.

Dalton also speculates about possible future injuries that he worries may result from the Proclamation. Dalton expresses concern that federal oversight will become more onerous in light of the monument designation. (1-JA-186, 188 (*Dalton* Am. Compl. ¶¶ 154, 158).) But he fails to cite any supporting facts showing any actual or imminent injury traceable to it, and in fact BLM has not denied any applications by Dalton since the Proclamation was issued. (2-JA-541–43 (Lundell Decl. ¶¶ 12–16).) The requirement to seek federal approval for range improvements on federal lands is unrelated to the issuance of Proclamation 10,285 and applies to monument and non-monument lands alike.

Dalton speculates that his pending and future requests for range improvements may be evaluated under different criteria in light of the challenged Proclamation. The Tenth Circuit has repeatedly rejected such challenges as "premature" before the agency has acted. *Kane County, Utah v. Salazar*, 562 F.3d 1077, 1089–90 (10th Cir. 2009) (finding claim "premature" for standing purposes because "it is entirely

87

possible that the BLM will grant [the application], in which event [plaintiff] will have suffered no injury").

Similarly, Dalton speculates that land he uses for cattle grazing currently owned by the State of Utah may be transferred to the United States in the future, where he hypothesizes it may be subjected to more onerous federal regulation. (1-JA-189–90 (*Dalton* Am. Compl. ¶¶ 162–64).) But the challenged Proclamation itself does not effect any land exchange, nor could it. Any putative injury resulting from any future land exchange, of course, would be caused by that future decision, not traceable to the challenged Proclamation. This sort of conjecture and speculation do not suffice to show the sort of "certainly impending injury" required to establish standing. *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1234 (10th Cir. 2020). Rather, "Article III injury must be more than a possibility"; "the threat of injury must be both real and immediate." *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1282 (10th Cir. 2002) (cleaned up) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)).

### 2.    Suzette Morris

Plaintiff Suzette Morris similarly fails to allege facts that demonstrate any actual or imminent injury. Morris, a member of the Ute Mountain Ute Tribe, expresses concern about continuing access to lands within the Bears Ears National Monument, for instance for gathering natural materials for tribal practices. (1-JA-193 (*Dalton* Am. Compl. ¶¶ 174–75.) But the challenged Proclamation does not prevent Morris from visiting the federal lands comprising the Monument, and it expressly recognizes the continuing importance of tribal practices such as those described by Morris. *See* 86 Fed. Reg. at 57323. While Morris contends that—unlike the 2016 Proclamation—the 2021 Proclamation does not protect "Native American access for 'traditional cultural and customary uses,'" (1-JA-193 (*Dalton* Am. Compl. ¶ 175), that is mistaken. The provision in the 2016 Proclamation protecting cultural and customary uses by individuals like Morris is incorporated by reference in the 2021 Proclamation. *See* 86 Fed. Reg. at 57332. Morris thus fails to "clearly allege facts" supporting an actual, imminent injury. *Spokeo*, 578 U.S. at 338 (cleaned up); *see also Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (quoting *D.L.S. v. Utah*, 374

F.3d 971, 975 (10th Cir. 2004)) (plaintiff claiming injury from chilling effect of statute must establish "an objectively justified fear of real consequences" such as a "credible threat of prosecution").

### 3.    Kyle Kimmerle

Plaintiff Kyle Kimmerle alleges that he is harmed by the 2021 Bears Ears Proclamation primarily because before BLM can process his plan of operations for his Geitus mine site, which is located on lands reserved for Bears Ears National Monument, the agency must first determine that his associated mining claims are valid. (1-JA-180–82 (*Dalton* Am. Compl. ¶¶ 136–42).) But even under Plaintiffs' view, the parcels where the Geitus claims are located contain valid objects for Antiquities Act purposes: "habitation structures ... documented in recorded cultural sites corresponding to the Pueblo I–III periods (from approximately 750 to 1350 CE)." (3-JA-552 (Lundell Decl. ¶¶ 8–9).)

Plaintiffs effectively concede that such structures are protectable under the Antiquities Act. (1-JA-197 (*Dalton* Am. Compl. ¶ 186).) So even assuming Plaintiffs are correct, this claimed injury cannot be traced to any illegality asserted by Plaintiffs in the challenged

Proclamation. The parcel would be properly reserved even under

Plaintiffs' theory of what objects can be protected under the Act, and no

plausible remedy in this lawsuit would redress this alleged injury. Even

if the court were to find other aspects of the Proclamation unlawful, the

Proclamation's severability clause[65] makes clear that the President

intended for valid elements of the Proclamation to remain in effect.[66]

*See Cache Valley Elec. Co. v. State of Utah Dept. of Transp.*, 149 F.3d

1119, 1123 (10th Cir. 1998) (rejecting standing because of lack of

redressability in light of severability). The remaining injuries claimed

by Kimmerle are speculative and likewise cannot be traced to the

---

[65] *See* 86 Fed. Reg. at 57333 ("If any provision of this proclamation, including its application to a particular parcel of land, is held to be invalid, the remainder of this proclamation and its application to other parcels of land shall not be affected thereby.").

[66] Individual Plaintiffs argue that, if they prevail, the courts should declare the entire challenged Proclamations unlawful despite this express severability clause. (*Dalton* Br. at 34–35.) The question of remedy is not before the Court—even the merits are not before this Court, as explained below. The issue of remedy raises significant questions about federal courts' authority to direct the conduct of the President, and Federal Defendants would reserve their arguments regarding remedy in the event the courts conclude that the Proclamations are reviewable and determine on summary judgment that the Proclamations include some invalid objects. But given that even Plaintiffs concede that the Proclamations designate at least some valid objects under the Act, declaring both Proclamations unlawful in their entirety would plainly go too far.

challenged Proclamation. (2-JA-278–79 (Kimmerle Decl ¶ 19 (alleging

that local mills will not refine ore from one of his claims "because of

political heat"); 2-JA-269 (Kimmerle Suppl. Decl ¶ 4 (speculating that

the value of his non-Geitus mining claims has decreased because of the

Proclamation).)

### 4.    BlueRibbon Coalition

Plaintiff BlueRibbon Coalition "work[s] to protect public

recreation access to public lands." (1-JA-139 (*Dalton* Am. Compl. ¶ 13).)

Such an organization can assert standing to bring suit on behalf of its

members (associational standing) "when its members would otherwise

have standing to sue in their own right, the interests at stake are

germane to the organization's purpose, and neither the claim asserted

nor the relief requested requires the participation of individual

members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181.

Alternatively, it can assert standing on its own behalf (organizational

standing) if it meets the standing requirements that apply to

individuals. *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397

(10th Cir. 1992). BlueRibbon Coalition has failed to allege facts

sufficient to establish either associational or organizational standing.

### a.    Associational Standing

BlueRibbon Coalition has not alleged facts sufficient to establish that its members have standing, as it has not alleged any actual or imminent injury to its members' recreational interests traceable to the challenged Proclamations. For instance, the Coalition contends that one of its members—Trail Hero—is injured because it is unable to hold off-roading events on the lands reserved by the challenged Proclamations. (1-JA-169 (*Dalton* Am. Compl. ¶ 112); 1-JA-248–49 (Klein Decl. ¶ 6); 1-JA-245 (Klein Suppl. Decl. ¶ 4).) But there is no allegation that Trail Hero has ever applied to hold such an event within the restored boundaries of the Monuments, much less that such an application was denied. Such vague statements of allegedly thwarted potential future plans are insufficient to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."); *see also Kane County*, 562 F.3d at 1089–90. The speculative nature of these supposed concerns is underscored by the fact that BLM has continued to approve other

93

organized rides within monument boundaries after the

2021 Proclamations issued.[67] (2-JA-544–45 (Lundell Decl. ¶¶ 20–21);

3-JA-556–558 (Nelson Decl. ¶¶ 25, 30).)

Other claimed injuries to members' recreational interests are

vague and speculative. (1-JA-171–73 (*Dalton* Am. Compl. ¶¶ 115, 120);

1-JA-256 (Johanson Decl. ¶ 5).) There is no allegation that members

used any specific road or campsite that was closed by the challenged

Proclamations. *See Summers v. Earth Island Institute*, 555 U.S. 488,

499 (2009) ("[P]laintiffs must show that they 'use the area affected by

the challenged activity and not an area roughly in the vicinity of' a

project site….") (quoting *Lujan*, 504 U.S. at 566). Nor could Plaintiffs

credibly include such allegations, given that, by their terms, neither of

---

[67] The allegation that another member of the Coalition—Utah/Arizona
ATV Club—received permits for a ride on Inchworm Arch Road within
the monument boundaries in 2020 and 2021 but not in 2022,
(1-JA-167–68 (*Dalton* Am. Compl. ¶¶ 106–08)), is simply incorrect.
In 2015, BLM granted the Club permission to hold once-a-year events
for the next ten years on *specific roads* designated in an operating plan
*submitted by the Club*. (3-JA-556 (Nelson Decl. ¶¶ 22–24).) But the
Club's 2015 proposed operating plan did not include Inchworm Arch
Road and so it was never included in any permits for the annual event.
(3-JA-556–58 (Nelson Decl. ¶¶ 22, 25–29).) The fact that the permits did
not include that road cannot be traced to the challenged Proclamation.

the 2021 Proclamations closes any roads or campsites.[68] Plaintiffs instead merely speculate about what the "future" may "portend" when the agencies adopt monument management plans. (1-JA-160 (*Dalton* Am. Compl. ¶ 83).) But again, speculation about possible future developments falls far short of Plaintiffs' burden to show a "*certainly impending*" injury. *Kan. Nat. Res. Coal.*, 971 F.3d at 1234 (emphasis added); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("allegations of *possible* future injury are not sufficient" (cleaned up)).

Nor do vague allegations of a chilling effect suffice to establish standing. (1-JA-174–76 (*Dalton* Am. Compl. ¶¶ 123–24).) Under Tenth Circuit precedent, to establish standing based on the alleged chilling effect of a law, "a plaintiff must typically demonstrate (1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute,' and (2) that 'there exists a credible threat of prosecution thereunder.'" *Colo. Outfitters*

---

[68] To the extent that the *Dalton* Amended Complaint purports to identify specific roads or off-roading areas as closed by the Proclamations, these allegations are false—either the referenced roads and areas remain open, (2-JA-493–94 (Barber Decl. ¶¶ 7–9, 11)), or their closed status predated the 2021 Proclamations, (2-JA-494 (*Id.* ¶ 10); 3-JA-558 (Nelson Decl. ¶ 31)).

95

*Ass'n v. Hickenlooper*, 823 F.3d 537, 545 (10th Cir. 2016) (alteration in original) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Thus, "mere allegations of a subjective chill are 'not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *D.L.S.*, 374 F.3d at 975 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). The plaintiff's conduct "must be inhibited by 'an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement.'" *Winsness*, 433 F.3d at 732 (quoting *D.L.S.*, 374 F.3d at 975).

The alleged concerns of the Coalition's members do not meet these standards. Plaintiffs allege no protected interest, such as a constitutional right, sufficient to justify pre-enforcement review of the Proclamations. *See, e.g.*, *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011). And, regardless, their allegations do not establish any credible threat of prosecution, much less one sufficient to warrant pre-enforcement review. There is no allegation that anyone, let alone members of the Coalition, has ever been prosecuted (or threatened with prosecution) under the Antiquities Act for driving a

vehicle or similar recreational activity on monument lands. Plaintiffs allege a desire to ride on land that remains "nominally open after the Proclamations," (1-JA-174–75 (*Dalton* Am. Compl. ¶ 123).) But all areas in both monuments that were previously available for all-terrain vehicle use remain so, and a BLM official has expressly disclaimed, to date, any new mandatory restrictions. (2-JA-493–94 (Barber Decl. ¶¶ 9–11).) Plaintiffs merely speculate about potential novel forms of enforcement. They have not been threatened with prosecution but instead have been assured that their planned conduct remains permissible. Such a remote prospect of future prosecution is not sufficient or credible enough to support standing.

Plaintiffs' remaining allegations regarding BlueRibbon Coalition's members do not suffice because they allege harms that predated the challenged Proclamations and involve economic injuries that are not germane to the Coalition's stated purposes. For instance, Plaintiffs allege that the two Monuments "gutted many local economies," causing harm to BlueRibbon Coalition's members—but describes these impacts as arising after the *original* creation of the two Monuments. (1-JA-160–64 (*Dalton* Am. Compl. ¶¶ 85–93 (describing ways in which

the 1996 Proclamation "gutted many local economies" and resulted in changes to local communities based on people leaving or having to find jobs related to seasonal tourist industry); *id.* ¶ 95 (alleging harm caused by the 2016 Proclamation, including causing "a massive influx of visitors")).) Plaintiffs, therefore, cannot establish a "substantial likelihood" that the *2021* Proclamations caused the alleged harm, which—by Plaintiffs' own admissions—commenced years before October 2021. *See Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008). Vacating the 2021 Proclamations and enjoining Defendants from implementing them will not re-establish allegedly harmed local economies, creating significant redressability problems. *See id.* (it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

Besides, these alleged injuries relate to the BlueRibbon Coalition members' economic prospects, not to the Coalition's purpose of "protect[ing] public recreation access to public lands." (1-JA-139 (*Dalton* Am. Compl. ¶ 13).) Injuries not germane to BlueRibbon Coalition's purposes cannot support its associational standing. *See Friends of the Earth, Inc*, 528 U.S. at 181. Allegations about the impact of the

Monuments on the Coalition members' business interests or the local economy therefore do not suffice. (1-JA-139, 161–62, 171 (*Dalton* Am. Compl. ¶¶ 10, 88, 91, 117).)

### b.    Organizational Standing

BlueRibbon Coalition also fails to allege organizational standing. An "organization has standing on its own behalf if it meets the standing requirements that apply to individuals." *Romer*, 963 F.2d at 1396. To do so, it must show more than "simply a setback to the organization's abstract social interests." *Id.* at 1397 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, it must show a "concrete and demonstrable injury to the organization's activities." *Id.* In some cases, this showing can be supported by a "consequent drain on the organization's resources." *Id.* However, the mere "expenditure of resources on advocacy is not a cognizable Article III injury." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 23–24 (D.C. Cir. 2015).

Plaintiffs fail to establish BlueRibbon Coalition's organizational standing under these principles. The Coalition claims that the challenged Proclamations have forced it to divert resources from its core programs—such as working toward "securing, protecting, and

99

expanding shared outdoor recreation access"—to "new efforts designed to educate members and other stakeholders about the consequences and regulations of the two national monuments at issue here." (1-JA-175–76 (*Dalton* Am. Compl. ¶ 124).) To start, this is hardly plausible on its face: both monuments had existed for many years prior to the challenged Proclamations. Plaintiffs make no particularized allegations about why the boundaries restored in the 2021 Proclamations, themselves, have required any diversion of resources to such educational initiatives. Anyway, these alleged new activities do not appear to be a diversion from its core activities—*e.g.*, "securing, protecting, and expanding shared outdoor access"—particularly since educating the public about access issues *is* one of its core activities as described in its mission statement, *see* BlueRibbon Coalition, *Mission, Vision, Values*, https://perma.cc/LSM4-47NL. Such activities, in any case, are the type of advocacy expenditures and self-inflicted budgetary choices that courts have refused to recognize as "cognizable Article III injury." *Turlock Irrigation Dist.*, 786 F.3d at 24; *Animal Leg. Def. Fund v. Kelly*, 434 F.Supp.3d 974, 996 (D. Kan. 2020).

Plaintiffs' only other allegation regarding an impact on organizational activities relates to the Coalition's advocacy "in favor of dispersed camping." (1-JA-176 (*Dalton* Am. Compl. ¶ 125).) The nature of this endeavor is unclear at best, but Plaintiffs allege no facts demonstrating that the Coalition is somehow no longer able to "advocate" with respect to dispersed camping because of the challenged Proclamations. Instead, the Coalition's claimed injury appears to be that it believes future management of the monuments may be inconsistent with its policy preferences. Such a concern—of a potential future "setback to the organization's abstract social interests"—is neither imminent nor concrete enough to be an actual injury for Article III purposes. *See Romer*, 963 F.2d at 1397. Accordingly, Plaintiffs also fail to allege facts that establish organizational injury to BlueRibbon Coalition.

B.   **The *Garfield* Plaintiffs do not allege a cognizable injury, caused by the Proclamations, that would be redressed by a favorable decision.**

The *Garfield* Plaintiffs advance four theories to support their standing to sue: alleged injuries from increased visitation to southern Utah; alleged injuries to claimed interests in the management of federal lands; decreased revenue to the State; and impairment of Garfield and Kane Counties' ("the Counties") road maintenance and search-and-rescue operations. None of these theories establishes a cognizable injury caused by the 2021 Proclamations that a favorable decision would likely redress.[69]

1.   **The *Garfield* Plaintiffs have not demonstrated harm from increased visitation caused by the challenged Proclamations.**

The *Garfield* Plaintiffs' primary claim to standing rests on the contention that the challenged Proclamations cause increased visitation, which in turn causes them injuries ranging from harm to local wildlife populations and archaeological and paleontological

---

[69] Separately, Bears Ears National Monument falls entirely within San Juan County, Utah. Although Garfield and Kane Counties challenge the 2021 Bears Ears Proclamation, they make no particularized allegations explaining how they are injured by changes to the boundaries of this monument in another county.

resources to increased search-and-rescue, law enforcement, and road-maintenance costs. (2-JA-318–19, 336, 338, 345–52, 366 (*Garfield* Am. Compl. ¶¶ 17, 21–23, 104, 116, 152, 155, 156, 159, 160, 164, 166, 168, 173, 221).) This claim is flawed. To begin with, the allegation that *Garfield* Plaintiffs are injured by—and would prefer to avoid—increased tourism to the area is neither plausible on its face nor consistent with Plaintiffs' own statements and efforts. All three *Garfield* Plaintiffs manage public websites designed to attract more visitors to southern Utah by advertising these very monuments, thereby causing themselves this purported "injury."[70] "[S]elf-inflicted injuries cannot satisfy the requirements for Article III standing because they break the causal chain linking the defendant's conduct to the asserted injury." *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021) (internal citation omitted).

---

[70] *See, e.g.,* 2-JA-495–528 (Barber Decl. Ex. A, Utah Office of Tourism Website, Grand Staircase-Escalante 2 ("Grand Staircase-Escalante National Monument is phenomenal."); Ex. B, Utah Office of Tourism Website, Bears Ears National Monument 2 ("A pair of towering buttes stand against beautiful scenery."); Ex. C, Kane County Travel Council Website 1; Ex. D, Garfield County Tourism Website 1; Ex. E, Bryce Canyon Country Website 2). The Court may take judicial notice of these websites. *Garling v. EPA*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017).

In any event, even assuming that increased visitation harms rather than benefits *Garfield* Plaintiffs, notwithstanding their own desire to increase it, they do not allege facts plausibly establishing that the 2021 Proclamations themselves—which did not *create* either monument—caused the increased visitation, or that any resulting injuries would be redressed if the Court grants them relief. To establish causation, a plaintiff must establish "a substantial likelihood that the [challenged action] caused plaintiff's injury in fact." *Habecker*, 518 F.3d at 1225 (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)). If "speculative inferences are necessary to connect the injury to the challenged action, this burden has not been met." *Habecker*, 518 F.3d at 1225 (cleaned up).

Here, not even speculative inferences connect the alleged injuries to the challenged 2021 Proclamations. Both monuments were established years prior to these Proclamations, and Plaintiffs' own allegations tie the alleged increased visitation, and hence any resultant harms, to the initial designation of these Monuments—that is, to federal actions which they do not (and cannot) challenge here. (2-JA-338 (*Garfield* Am. Compl. ¶ 116 ("The reservations [by Presidents Clinton

104

and Obama] also attracted visitation and attention from all over the world, straining local infrastructure and increasing litter and waste, damage to the land, harm to animals, and desecration of archaeological sites").) Other allegations corroborate this point. For instance, they describe the alleged harm from increased search-and-rescue costs as commencing in "1996, when the original Grand Staircase-Escalante reservation went into effect ...." (2-JA-351 (*Garfield* Am. Compl. ¶ 172).)

As a result, Plaintiffs cannot plausibly allege facts establishing a "substantial likelihood" that any increased visitation was caused by the 2021 Proclamations, as opposed to the earlier proclamations— unchallenged here—or to other factors, such as Plaintiffs' own tourism initiatives. Indeed, their own pleading primarily relies on sources showing the opposite: a July 2022 news article describing an increase in visitors to Kane County that largely occurred before the challenged Proclamations issued in October 2021, and attributing that increase to "pandemic tourism," (2-JA-346 (*Garfield* Am. Compl. ¶ 154 (citing Eddington, *As Kanab reels from pandemic tourism, officials hope kindness campaign can curb vandalism and trash*, Salt Lake Trib. (July 16, 2022))); 2-JA-529–32 (Barber Decl. Ex. F (article))); and agency

documents that discuss visitation increasing by 2020, also before the challenged Proclamations, (2-JA-347–48 (*Garfield* Am. Compl. ¶ 159 (citing a 2020 document from BLM and a Forest Service document discussing how visitor use increased by 2020)).) *Garfield* Plaintiffs' own allegations thus fail to show any link tracing increased tourism to the challenged Proclamations.

For similar reasons, *Garfield* Plaintiffs do not adequately allege redressability for their purported injuries from increased visitation. *See Habecker*, 518 F.3d at 1224 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). To adequately plead a redressable injury, a plaintiff "must allege facts from which it reasonably could be inferred that ... if the court affords the relief requested, the [injury] will be removed." *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, No. 19-9532, 2022 WL 538185, at *9 (10th Cir. Feb. 23, 2022) (alterations in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)).

But *Garfield* Plaintiffs do not allege that the relief sought here—judicial declarations that the 2021 Proclamations (and implementing actions) are unlawful and an injunction preventing Federal Defendants

from implementation, (2-JA-409 (Garfield Am. Compl. at p. 95))—would be likely to measurably reduce tourism; nor would such an allegation be plausible. Even accepting Plaintiffs' unsupported allegations that the 2021 Proclamations are responsible for the increased visitation to the region, the monuments—and their alleged "presidential-proclaimed notoriety," (2-JA-345, 400–01 (*Garfield* Am. Compl. ¶¶ 152, 356))—will continue to exist, and under Plaintiffs' theory, continue to draw visitors, regardless of whether Plaintiffs prevail. After the proclamations and *Garfield* Plaintiffs' own advertising, as well as the publicity of Plaintiffs' lawsuits, public awareness of the existence of resources within the relevant lands will not simply cease to exist because of a court order. Because Plaintiffs cannot plausibly allege that relief against the 2021 Proclamations would eliminate public knowledge of the world-class resources in the reserved monument lands, they cannot plausibly allege redressability for their purported tourism-related injuries.

> 2. **Claimed injuries to resources in which *Garfield* Plaintiffs do not have a legally protected interest do not establish standing.**

The *Garfield* Plaintiffs also allege that the 2021 Proclamations cause them injury because they "preempt [Utah's] laws and policies";

"impede its ability to work on the land"; "impose new administrative burdens on [Utah's] workers"; and cause unidentified "impositions" to the Counties' administrative planning, land management, facilities maintenance, etc. (2-JA-318–19 (*Garfield* Am. Compl. ¶¶ 21–23).) These alleged injuries do not suffice for purposes of Article III standing because Plaintiffs do not have a legally protected interest in the reserved federal lands.

To demonstrate an injury-in-fact, a plaintiff must, among other things, show "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (quotations and citations omitted). And the legally protected interest must be particularized to the plaintiffs—they must clearly "allege facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute." *Schaffer v. Clinton*, 240 F.3d 878, 883 (10th Cir. 2001) (quoting *United States v. Hays*, 515 U.S. 737, 743 (1995)).

Plaintiffs' various allegations about how the challenged Proclamations will limit their ability to manage the reserved federal lands are not cognizable injuries. Plaintiffs have no *legally protected* interests in how the federal government manages its lands. Thus

Plaintiffs' speculation that the United States will not manage its lands in the manner the State believes they should be managed, (2-JA-318, 370–71 (*Garfield* Am. Compl. ¶¶ 21, 236–37)), or concern that "the reservations preempt the resource-management plans of local governments, including Kane County and Garfield County," (2-JA-371 (*Id.* ¶ 237)), fail to identify a cognizable injury as a matter of law— states and counties do not have a legal right to impose their management preferences on federal lands within their boundaries. *See United States v. Bd. of Cnty. Cmm'rs of Cnty. of Otero*, 843 F.3d 1208, 1215 (10th Cir. 2016) (noting state law and county resolution "must yield to federal law regarding conduct on federal land"); *United States v. Texas*, 599 U.S. 670, 676–78 (2023).

Their management interests in federal lands are instead governed by, *inter alia*, 43 U.S.C. § 1712(c)(9). This provision affords a coordination role and limited other rights to states and counties while recognizing the supremacy of Federal law and management interests. Rather than conflict with the Antiquities Act, this provision will help to guide *Garfield* Plaintiffs' participation in the development of management plans for the monuments. Courts have made it clear that

FLPMA imposes no obligation on the federal government to yield to State or local government preferences.[71]

Furthermore, these allegations would not suffice anyway because they are entirely speculative. The federal management plans for the Monuments remain under development. Plaintiffs fail to allege any specific instance where they requested to undertake any land management activities in the lands reserved by the challenged Proclamations and were prohibited from doing so.[72] While the 2021 Proclamations require the preparation of new management plans, it cannot be predicted what specific management actions they will contain. It is rank speculation that the future plans (or implementation decisions made under the plans) will prohibit the types of projects to which Plaintiffs vaguely allude. Indeed, the agencies may well determine such efforts as are proposed by Plaintiffs are not only

---

[71] *Kane County*, 562 F.3d at 1088 (Section 1712(c)(9) "gives the Secretary of the Interior discretion to determine the extent to which the agency's land use plans are consistent with State and local plans").

[72] Instead, Plaintiffs point to a 2019 decision barring certain activities—the use of non-native seeds for limited revegetation work. (2-JA-356–57 (*Garfield* Am. Compl. ¶ 188).) But that decision took place years before the challenged Proclamations issued and was based on a management plan that is no longer in place. Order 12–15, IBLA 2019-94 (Sept. 16, 2019); Notice of availability, 85 Fed. Reg. 9802 (Feb. 20, 2020).

consistent with, but appropriate and necessary, for the protection of Monument objects. (2-JA-544 (Lundell Decl. ¶ 19); 3-JA-558 (Nelson Decl. ¶ 33).) There is no currently ripe dispute that might provide Plaintiffs with Article III standing.

### 3. The *Garfield* Plaintiffs cannot demonstrate standing based on speculative claims of lost revenue traceable to the 2021 Proclamations.

The *Garfield* Plaintiffs also allege that the Proclamations "deprive [the State] of revenue." (2-JA-318 (*Garfield* Am. Compl. ¶ 21).) But even if such a loss of revenue might qualify as a cognizable injury-in-fact, Plaintiffs' allegations in this regard are entirely speculative.[73] Plaintiffs first allege the State will lose revenue from lost fees tied to grazing allotments. (2-JA-360–61 (*Garfield* Am. Compl. ¶ 201).) But the challenged Proclamations do not themselves reduce the number of grazing allotments. Rather, they only provide that, should "grazing permits or leases be voluntarily relinquished by existing holders," the

---

[73] Plaintiffs allege there is increased visitation. If true, presumably the State and Counties would also gain revenues from any resulting economic activity. Plaintiffs make no effort to demonstrate that any putative lost revenues would be greater than any such putative gains. For example, annual grazing fees paid to *Garfield* Plaintiffs by Interior are typically in the low six-figures.

associated lands will be retired from grazing. *See*, *e.g.*, 86 Fed. Reg. at 57346 (Grand Staircase-Escalante Proclamation). The State's speculation about possible future injury from other entities' voluntary relinquishment of a permit or lease is inadequate to demonstrate a "certainly impending" injury as of the date of the Complaint. *Clapper*, 568 U.S. at 409 ("threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient") (cleaned up); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44–45 (1976). Furthermore, the Secretary of the Interior has discretion not to renew or grant a grazing permit or lease regardless of whether an allotment is subject to a monument proclamation, so it is unclear how any alleged injury from a reduction of grazing allotments would be redressable.[74]

---

[74] *Bischoff v. Myers*, 216 F.3d 1086 (Table) (10th Cir. 2000) (finding that, even for owner of grazing leases, the loss of such leases "is not redressable in court because a court may not order the agency to perform what is a purely discretionary act"); *Baca v. King*, 92 F.3d 1031, 1037 (10th Cir. 1996) ("No court has the power to order the BLM or the Department of [the] Interior to grant Mr. Baca another grazing lease, because the very determination of whether to renew grazing permits and whether public lands should even be designated for grazing purposes are matters completely within the Secretary of [the] Interior's discretion") (citing 43 U.S.C. §§ 315, 315b)).

Plaintiffs' allegation that the State will lose revenue from "rare-earth-mineral, critical-mineral mining and other mining," (2-JA-363 (*Garfield* Am. Compl. ¶ 213)), is similarly speculative rather than concrete and imminent. As an initial matter, the Proclamations do not bar all future mineral development within the monument boundaries. *See* 86 Fed. Reg. at 57331 (providing for Bears Ears that "[t]his proclamation is subject to valid existing rights"); 86 Fed. Reg. at 57345 (same for Grand Staircase-Escalante). Nor do Plaintiffs clearly allege supportable facts that the 2021 Proclamations, by restoring the lands reserved for the two monuments, have (or imminently will) result in lost revenue to the State. No lost revenue can be traced to the challenged Proclamations for any of the specific mining claims cited by Plaintiffs.[75]

---

[75] Plaintiffs vaguely allude to "the Avalanche Mine," a mining claim they assert "is still held by a family unable to mine it due to the reservation." (2-JA-365 (*Garfield* Am. Compl. ¶ 218).) But the only claims in BLM's records to which Plaintiffs might be referring were located in 2004 *and closed in 2010*, after the claimant failed to pay annual fees. (2-JA-539 (Lundell Decl. ¶ 6).) So any implication that the mine would soon be operational (and revenue-generating) but for the 2021 Proclamation is unwarranted. *See Utah Ass'n of Ctys.*, 455 F.3d at 1100 n.5.

Plaintiffs also allege that the "Spring Water mine on the eastern bank of South Cottonwood," estimated to hold over "one million pounds of uranium and up to millions of pounds of high-grade vanadium," is now "out of reach" because it is within monument boundaries. (2-JA-365

Indeed, Plaintiffs' specific allegations of potential lost revenue tie directly to the 1996 Grand Staircase-Escalante Proclamation, not the challenged actions, and even that alleged harm has been overtaken by congressional prohibition.[76] Thus, Plaintiffs have not made any factual allegations to support their contention that that the 2021 Proclamations have prevented any mineral development projects, much less demonstrated any current, or "certainly impending," loss of revenue caused by either of the Proclamations. *Clapper*, 568 U.S. at 409.

Plaintiffs' final claim—that the State is harmed by being somehow forced to give up its own school trust lands within the reservations' boundaries, (2-JA-369 (*Garfield* Am. Compl. ¶233))—plainly cannot be traced to the challenged Proclamations as a matter of law. The State

---

(*Garfield* Am. Compl. ¶ 218).) But because the relevant claim was located in 2017 and remains active, it may qualify as a valid existing right to which the 2021 Proclamation is subject. If so, it could potentially be developed. (2-JA-539 (Lundell Decl. ¶ 7).)

[76] (*See* JA cite *Garfield* Am. Compl. ¶ 216 (alleging that State was projected to receive substantial direct and indirect revenues from the "high-grade coal" in the Monument, as reported in a 1998 House of Representatives report).) *See also* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 408, 136 Stat. 49, 410–11 (2022), *supra* note 48 (prohibiting the expenditure of funds to facilitate any new mining claims with the boundaries of any national monument as those boundaries existed on January 20, 2001 unless allowed under the terms of the relevant presidential proclamation).

has already voluntarily exchanged its School and Institutional Trust Lands Administration lands within the boundaries of the Grand Staircase-Escalante National Monument *in 1998. See* Utah Schools and Land Exchange Act of 1998, Pub. L. No. 105-335, 112 Stat. at 3140. This can hardly have been caused by the 2021 Grand Staircase-Escalante Proclamation. And the 2021 Bears Ears Proclamation provides only that "the Secretary of the Interior shall explore entering into a memorandum of understanding with the State of Utah that would set forth terms, pursuant to applicable laws and regulations, for an exchange of land owned by the State of Utah ... within the boundary of the monument." 86 Fed. Reg. at 57332. The option for the State of Utah to explore a voluntary land exchange for state lands within the monument boundaries hardly constitutes a current or imminent injury to the State, since it would require the State's consent.[77] Accordingly, these claimed injuries cannot support standing for the State or its subdivisions.

---

[77] Plaintiffs also alleged that the State was "impeded in its attempt to complete water development well projects" on state lands in the Mancos Mesa and Grand Gulch areas, (2-JA-360–61, 369 (*Garfield* Am. Compl. ¶¶ 200, 234)), but BLM has received no applications from the State with respect to any such projects, (2-JA-545 (Lundell Decl. ¶ 23)).

4. **The *Garfield* Plaintiffs cannot demonstrate standing based on alleged impairment of road maintenance or search-and-rescue activities.**

The *Garfield* Plaintiffs also allege that the Counties have standing based on injuries relating to road maintenance and search-and-rescue activities. These allegations rely in large part on contentions regarding increased visitation which, as discussed above, are defective as to causation and redressability. However, to the extent the Counties claim that the Proclamations otherwise burden these activities, the allegations are also meritless.[78]

*Garfield* Plaintiffs allege that the Counties are impeded from "adequately maintaining and repairing roads within the [Grand Staircase-Escalante] reservation[]," (2-JA-366–67 (*Garfield* Am. Compl. ¶ 223),) but none of their allegations support the conclusion that the challenged Proclamations caused any delay in any identified road-maintenance project. Plaintiffs rely on three specific purported instance, but the facts of each of those instances make clear that the

---

[78] As noted above, it is also unclear how the 2021 Proclamation for Bears Ears National Monument, which lies entirely within San Juan County, Utah, could injure Garfield or Kane County's road-maintenance or search-and-rescue efforts, and Plaintiffs provide no specific allegations establishing such injuries.

challenged 2021 Proclamations played no role whatsoever in any

impediments the Counties faced in their road-maintenance projects.[79]

Plaintiffs also broadly allege that Kane County is no longer able to use

materials from beside and near the roads it maintains on Grand

Staircase-Escalante National Monument because, "[a]s a result of the

---

[79] First, the allegation that Kane County has been denied approval for culvert installation on House Rock Valley Road, (2-JA-367 (*Garfield* Am. Compl. ¶ 224)), is mistaken. Rather, BLM instructed Kane County to seek approval for the project under Title V of FLPMA *in 2019*, more than two years before the challenged 2021 Proclamation. (3-JA-551–52 (Nelson Decl. ¶¶ 6–7; *see also id.* ¶ 8 (BLM authorized road repair within Bears Ears National Monument in March 2022).) Kane County has not yet done so, but that avenue remains available to it. Any delay in that project cannot be traced to the challenged 2021 Proclamation.

Second, Plaintiffs allege that Garfield County sought to improve the surface of Hole in the Rock Road, but the request was denied, "due in part to President Biden's proclamation." (2-JA-367 (*Garfield* Am. Compl. ¶ 225).) To the contrary, the project was not allowed to commence as requested under the terms of the preexisting resource management plan and in light of pending Quiet Title Act litigation between the County and the United States—not the 2021 Proclamation. (3-JA-552–53 (Nelson Decl. ¶¶ 9–12).)

Third, Plaintiffs allege that "[i]t takes sometimes up to a year for Kane County to perform simple maintenance fixes on [Cottonwood Canyon Road] because of the proclamation's restrictions." (2-JA-367 (*Garfield* Am. Compl. ¶ 226).) But in the only instance BLM is aware of where approximately a year passed between receiving a proposal for work on that specific road and Kane County completing it, the delay likewise had nothing to do with the 2021 Proclamation. (3-JA-553–54 (Nelson Decl. ¶¶ 13–14).)

reservations, this material is off-limits." (*Id.*) But there have been no operational mineral material pits within monument boundaries for many years, and the Counties have obtained mineral materials for road projects from areas located outside the monument boundaries, since long before the challenged Proclamations issued. (3-JA-555 (Nelson Decl. ¶ 19).) In sum, *Garfield* Plaintiffs' allegations of injury to the Counties' road-maintenance activities have no basis in fact.

Nor is there any basis for the Counties' claims of impairment of search-and-rescue operations. Plaintiffs allege that unidentified "federal agents" have "sought to prevent search-and-rescue personnel from entering closed roads, going off trails, and even from landing medical helicopters during search-and-rescue missions," "all in the name of protecting proclamation items." (2-JA-351 (*Garfield* Am. Compl. ¶ 171).) Plaintiffs allege no specific instances of such conduct—and BLM has been able to identify none, (3-JA-554 (Nelson Decl. ¶ 16); 2-JA-545 (Lundell Decl. ¶ 22))—but even if the Court were to credit such allegations, they could not arise from the 2021 Proclamations. To the contrary, the Proclamations explicitly authorize prior approaches to "emergency response activities." 86 Fed. Reg. at 57346 (Grand

Staircase-Escalante); *see also* 82 Fed. Reg. at 1145 (Bears Ears, incorporated at 86 Fed. Reg. at 57332). Under these circumstances, the Counties' vague allegations are not sufficient to establish standing.

III.   **The Court lacks jurisdiction over Plaintiffs' APA challenge to BLM's interim guidance memoranda.**

A.   **The memoranda are not "final agency actions."**

The Court also lacks jurisdiction over Plaintiffs' separate APA challenge to two BLM interim guidance memoranda[80] because they qualify as neither "final" nor "agency action." 5 U.S.C. §§ 702, 704; *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010). The These memoranda—issued by the BLM Director to the BLM Utah State Director in December 2021—simply summarize existing law applicable to management of the monuments and have no legal effect. They therefore are not final agency action.

APA review is limited to "agency actions" where the agency exercises its power in a manner that adversely affects, aggrieves, or otherwise causes a legal wrong to the challenging party. 5 U.S.C. § 702; *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 19 (D.C. Cir. 2006) (describing agency action as instances where an agency "exercise[s] its power") (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001)). To qualify as a "final" agency action, an action must (1)

---

[80] As noted above, *see supra* note 27, Individual Plaintiffs have abandoned any other APA claims in this appeal.

mark the "the consummation of the agency's decisionmaking process," and (2) have a legal effect: that is, determine "rights or obligations" or otherwise result in "legal consequences." *Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F.3d 1192, 1197–98 (10th Cir. 1999) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Plaintiffs offer two theories for why the memoranda qualify: First, they characterize the memoranda as "formal 'management' plans" for the two monuments that are "binding today" and applied by Federal Defendants "to regulate Utah and others." (*Garfield* Br. at 40, 42.) Alternatively, Plaintiffs characterize the memoranda as agency legal interpretations akin to "interpretive rules" and argue that "agency interpretations are classic final agency actions." (*Garfield* Br. at 45.) Review of the challenged memoranda themselves refutes both of these characterizations.

The guidance memoranda fail to qualify as final agency action for the simple reason that they impose no legal consequences at all. As the district court explained, (4-JA-986 (Order at 22)), the memoranda are directed only to the BLM Utah State Director. Nothing in the memoranda has any legal effect on Plaintiffs or any other private party.

Nor are the memoranda "the source of any binding legal obligations to which [the agency] is subject." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1009 (9th Cir. 2021). Rather, the memoranda simply direct the BLM Utah State Director to initiate the process of developing management plans for the monuments and identify existing legal requirements that already apply to the monuments in the meantime.[81] The memoranda do not "regulate activities on the land." (*Garfield* Br. at 2.) Any legal consequences flow from the sources of law summarized in the memoranda, not the memoranda themselves.

---

[81] *See* BLM-Utah, Interim Management of the Bears Ears National Monument (Dec. 16, 2021), https://perma.cc/MEP6-2LD7 (Bears Ear Mem.); BLM-Utah, Interim Management of the Grand Staircase-Escalante National Monument (Dec. 16, 2021), https://perma.cc/63AC-GLXH (Grand Staircase-Escalante Mem.).

The stark differences between this short memoranda and actual final management plans for monuments belie Plaintiffs' attempt to characterize the memoranda as "formal 'management' plans." These seven- to eight-page memoranda are nothing like monument management plans, which span hundreds of pages; are prepared following a thorough public participation and consultation process in accordance with detailed regulatory requirements, *see*, *e.g.*, 43 C.F.R. Part 1600; and explain in detail how each portion of the monument should be managed. The memoranda instead say their purpose is to provide "interim guidance for managing the monument[s] while the agency develops ... monument management plan[s]" of its own. *See* Bears Ears Mem. at 1; Grand Staircase-Escalante Mem. at 1.

Courts have regularly recognized that agency documents, such as these, that merely restate applicable law do not constitute final agency action. *E.g.*, *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 428, 431–32 (4th Cir. 2010) ("simply informational" publication was not final agency action); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). Such purely informational documents do not involve a "decisionmaking process," and thus cannot be said to represent the culmination such a process. *Golden & Zimmerman*, 599 F.3d at 432. And they have no legal consequences because they "*inform*" about—rather than establish—legal requirements, and thus do not themselves alter the legal landscape. *Id.* at 433. Consequently, agency explanations of existing law—whether in a letter,[82] a reference guide,[83] or an instruction manual[84]—are not "final agency action." These purely informational activities—merely expressing the agency's "view of what the law requires"—employ no agency power at all, and therefore do not

---

[82] *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1258 (9th Cir. 2022); *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020); *Clayton Cnty. v. Fed. Aviation Admin.*, 887 F.3d 1262, 1267 (11th Cir. 2018).

[83] *Golden & Zimmerman*, 599 F.3d at 432–33.

[84] *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1007–10.

even qualify as "agency actions" for APA purposes: they have no direct or immediate adverse effect on third parties. *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427 (cleaned up); *Golden & Zimmerman*, 599 F.3d at 431–32.

The absence of any binding legal effect or other legal consequences on rights or obligations flowing from the memoranda is dispositive. Plaintiffs attempt to artfully quote selections from the summaries of pre-existing legal obligations in the memoranda to suggest that the memoranda themselves are imposing obligations. (*See generally Garfield* Br. at 44–45.) But the guidance memoranda merely restate how the 2021 Proclamations fit into the existing legal framework for managing discretionary activities within national monuments.[85] Bears Ears Mem. at 3–5; Grand Staircase-Escalante Mem. at 3–5. The legal

---

[85] Thus the memoranda explain that when evaluating whether to authorize activities like recreation, grazing, and vegetation management, the memoranda provide that BLM personnel must "verify that the proposal conforms to the applicable resource management plan" and "determine that the proposal is also consistent with the protection of the monument objects and values." Grand Staircase-Escalante Mem. at 3; Bears Ears Mem. at 4.

consequences, if any, flow from the underlying legal sources
summarized.[86]

That the memoranda direct BLM personnel to apply existing legal
requirements to the interim management of the monuments does not
change this analysis. *Whitewater Draw* is instructive in this regard.
5 F.4th 997. In considering whether an instruction manual on how to
implement a statute was a "final agency action," the Ninth Circuit held
that the manual's use of mandatory language like "must" and
"requirement" was inconsequential. *Id.* at 1005, 1009. What mattered
was that the statute, not the manual, was "the source of any binding
legal obligations to which [the agency] is subject." *Id.* at 1009. Because
the manual "facilitat[ed]" but did not "augment or diminish" those
obligations, it was not a final agency action. *Id.* Because the
memoranda here likewise simply summarize the effects of the
challenged Proclamations and other applicable laws and management

---

[86] For example, *Garfield* Plaintiffs point to the statement in the
memoranda that "no new mining claims may be located, and no new
mineral leases may be issued," on monument land as a final agency
action. (4-JA-406, 408 (*Garfield* Am. Compl. ¶¶ 387, 395).) But the
memoranda are simply identifying the legal effect of the reservation in
the Proclamations, not creating or interpreting some new legal
requirement.

plans, they do not—and do not purport to—"make policy for the monument reservation." (4-JA-406–07 (*Garfield* Am. Compl. ¶¶ 385, 393).) The "interim" memoranda merely contemplate the development of new management plans for the Monuments and are not the final consummation of BLM's decisionmaking process regarding the management of the monuments.[87]

Plaintiffs' attempt to avoid this result by framing the memoranda as some sort of formal agency legal interpretation fares no better. By their own terms, the memoranda do not purport to undertake any legal interpretation, much less interpretation binding on the agency or third parties. Rather, the memoranda use language like "vegetation treatment … methods allowed [previously] *may* not be consistent with the protection of the objects" and that "[r]outes [previously] designated as open ... *may* have an adverse impact on monument objects." *See*

---

[87] Similarly, the court in *Tulare County v. Bush* rejected an APA challenge to an interim memorandum regarding the Giant Sequoia National Monument. 185 F.Supp.2d 18, 29 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002). As the court explained, the Forest Service's "memorandum" and "background document" guiding management until the agency developed a monument management plan were "merely a temporary measure" and therefore not a "final agency action." *Id.* at 28–29.

Bears Ears Mem. at 4–5; Grand Staircase-Escalante Mem. at 5. Far

from imposing legal consequences or announcing agency views

regarding the law, this language reaches no decisions about the

Proclamations' impact on any specific treatments or routes.[88] Similarly,

the memoranda's summary of limitations on mining claims derives from

existing regulations requiring the BLM to perform a mineral

examination report for mining claims on lands that have been

withdrawn from location and entry under the mining laws. 43 C.F.R.

§ 3809.100(b). So this too is not an "interpretation" of the

proclamations. Because the BLM interim guidance memoranda

themselves have no binding legal effect or other legal consequence, they

are not final agency actions subject to challenge under the APA.

---

[88] In this respect, the memoranda are unlike the order at issue in
*Frozen Food Express v. United States*, 351 U.S. 40 (1956), which
Plaintiffs cite. (*Garfield* Br. at 21, 44–45.) That order was a "final
agency action" because it found specific commodities were "agricultural"
and thus exempt from permitting requirements, a decision with
immediate regulatory consequences. 351 U.S. at 44. By contrast, the
memoranda here make no determinations regarding how the
Proclamations affect particular activities or authorizations.

### B.     Plaintiffs have not established Article III standing to challenge the memoranda.

Plaintiffs likewise fail to establish any "concrete and particularized" injury that is "actual or imminent" and can be traced to the memoranda. *Friends of the Earth*, 528 U.S. at 180–81. Plaintiffs point to no specific injury caused by the memoranda themselves, rather than purported effects of the Proclamations. As discussed above, *see* Part II, *infra*, Plaintiffs have not established that the proclamations caused concrete and actual or redressable injury either. But Plaintiffs have also identified no distinct injury that the memoranda themselves purportedly have caused. Nor could Plaintiffs plausible allege injury caused by the memoranda, as the memoranda have no legal effect. Plaintiffs' request that the court set aside the memoranda would also not redress any injury, because any injury would flow from the underlying legal sources described in the memoranda, not the memoranda themselves.

IV.  **If the Court concludes there is jurisdiction to consider any of Plaintiffs' claims, it should remand for the district court to consider Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6).**

Plaintiffs ask the Court to reverse the district court's judgment and remand "so that this case can proceed to summary judgment." (*Garfield* Br. at 46.) However, the district court granted Federal Defendant's motion to dismiss Plaintiffs' complaints on jurisdictional grounds and had no reason to consider Federal Defendants' additional arguments that Plaintiffs' complaints also failed to state a claim upon which relief could be granted.[89] For the reasons explained above, the district court properly concluded it did not have jurisdiction to hear Plaintiffs' claims. If this Court disagrees with that conclusion, however, the ordinary and proper course is to remand to the district court to

---

[89] Specifically, Plaintiffs failed to plead with adequate particularity that any relevant portion of either monument lacks historic or scientific value. *See Tulare County*, 306 F.3d at 1142 (holding that a plaintiff lodging an Antiquities Act challenge must, at a minimum, direct the court with specificity to the lands that are allegedly designated without statutory authority to survive Rule 12(b)(6)). (2-JA-472–76 (Mot. to Dismiss at 49–53); 4-JA-941–43 (Reply at 24–26).) Plaintiffs also failed to state a claim that the challenged Proclamations designated objects for protection that did not qualify under the Act. (2-JA-477–83 (Mot. to Dismiss at 54–60); 4-JA-943–46 (Reply at 26–29).)

consider Federal Defendants' substantive grounds for dismissal under Rule 12(b)(6).

Although Plaintiffs' briefs touch on aspects of these questions, (*Garfield* Br. at 34–40), those issues are not properly before this Court. It is this Court's general practice not to address issues in the first instance that have not been addressed by the district court's analysis. *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1256 (10th Cir. 2011) ("[A]ffirming on legal grounds not considered by the trial court is disfavored); *see also Safeway Stores 46, Inc. v. WY Plaza LC*, 65 F.4th 474, 496 (10th Cir. 2023). That practice should be followed here if this Court does not affirm the judgments of dismissal in their entirety.

# CONCLUSION

This Court should affirm the district court's dismissal of Plaintiffs' complaints.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

JOHN E. BIES
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

December 19, 2023
90-1-0-16648/90-1-0-16652

## STATEMENT REGARDING ORAL ARGUMENT

The Federal Defendants believe that oral argument would be useful to the Court given the significant and complex questions these appeals raise.

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as modified by the Court's September 14, 2023, Order, because, excluding the parts of the document exempted by Rule 32(f), this document contains 25,979 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century font.

s/ *John E. Bies*
JOHN E. BIES

Counsel for the Federal Defendants

133

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir.

R. 25.5;

(2)    if required to file additional hard copies, that the ECF

submission is an exact copy of those documents; and

(3)    the digital submissions have been scanned for viruses with

the most re-cent version of a commercial virus scanning program,

Windows Defender (version no. 1.399.79.0), and according to the

program are free of viruses.

s/ *John E. Bies*

JOHN E. BIES

Counsel for the Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2023, I electronically filed the foregoing consolidated answering brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in these cases are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ *John E. Bies*
JOHN E. BIES

Counsel for the Federal Defendants

# ADDENDUM

The Antiquities Act of 1906,
   Pub. L. 59-209, 34 Stat. 225..........................................................2a

   54 U.S.C. § 320301 ...................................................................4a

The Administrative Procedure Act,
   5 U.S.C. § 702 ........................................................................5a

   5 U.S.C. § 704 ........................................................................6a

## The Antiquities Act of 1906

Pub. L. 59-209, 34 Stat. 225

*An Act For the preservation of American antiquities*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### Section 1.

That any person who shall appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity, situated on lands owned or controlled by the Government of the United States, without the permission of the Secretary of the Department of the Government having jurisdiction over the lands on which said antiquities are situated, shall, upon conviction, be fined in a sum of not more than five hundred dollars or be imprisoned for a period of not more than ninety days, or shall suffer both fine and imprisonment, in the discretion of the court.

### Sec. 2.

That the President of the United States is hereby authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with proper care and management of the objects to be protected:

Provided, That when such objects are situated upon a tract covered by a bona fide unperfected claim or held in private ownership, the tract, or

so much thereof as may be necessary for the proper care and management of the object, may be relinquished to the Government, and the Secretary of the Interior is hereby authorized to accept the relinquishment of such tracts in behalf of the Government of the United States.

## Sec. 3.

That permits for the examination of ruins, the excavation of archaeological sites, and the gathering of objects of antiquity upon the lands under their respective jurisdictions may be granted by the Secretaries of the Interior, Agriculture, and War to institutions which the may deem properly qualified to conduct such examination, excavation, or gathering, subject to such rules and regulation as they may prescribe:

Provided, That the examinations, excavations, and gatherings are undertaken for the benefit of reputable museums, universities, colleges, or other recognized scientific or educational institutions, with a view to increasing the knowledge of such objects, and that the gatherings shall be made for permanent preservation in public museums.

## Sec. 4.

That the Secretaries of the Departments aforesaid shall make and publish from time to time uniform rules and regulations for the purpose of carrying out the provisions of this Act.

Approved, June 8, 1906

# 54 U.S.C. § 320310

Title 54— National Park Service and Related Programs

Subtitle III— National Preservation Programs

Division C— American Antiquities

Chapter 3203— Monuments, Ruins, Sites, and Objects of Antiquity

## § 320301. National monuments

(a) **Presidential declaration.**--The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.

(b) **Reservation of land.**--The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

(c) **Relinquishment to Federal Government.**--When an object is situated on a parcel covered by a bona fide unperfected claim or held in private ownership, the parcel, or so much of the parcel as may be necessary for the proper care and management of the object, may be relinquished to the Federal Government and the Secretary may accept the relinquishment of the parcel on behalf of the Federal Government.

(d) **Limitation on extension or establishment of national monuments in Wyoming.**--No extension or establishment of national monuments in Wyoming may be undertaken except by express authorization of Congress.

# 5 U.S.C. § 702

Title 5—Government Organization and Employees

Part I—The Agencies Generally

Chapter 7—Judicial Review

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein

(1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or

(2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

# 5 U.S.C. § 704

Title 5—Government Organization and Employees

Part I—The Agencies Generally

Chapter 7—Judicial Review

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.