<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 23, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

GARFIELD COUNTY, UTAH, a Utah
political subdivision; KANE COUNTY,
UTAH, a Utah political subdivision; THE
STATE OF UTAH; SPENCER J. COX;
SEAN D. REYES; ZEBEDIAH GEORGE
DALTON; BLUERIBBON COALITION;
KYLE KIMMERLE; SUZETTE RANEA
MORRIS,

     Plaintiffs - Appellants,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;[*]
DOUGLAS BURGUM, in his official
capacity as Secretary of Interior;[**] THE
DEPARTMENT OF THE INTERIOR;
STEVE PEARCE, in his official capacity
as Director of the Bureau of Land
Management;[***] BUREAU OF LAND
MANAGEMENT; BROOKE ROLLINS,
in her official capacity as Secretary of
Agriculture;[****] DEPARTMENT OF
AGRICULTURE; TOM SCHULTZ, in his
official capacity as Chief of the Forest

Nos. 23-4106 & 23-4107

_____

[*] In accordance with Federal Rule of Appellate Procedure 43(c)(2), Donald J. Trump is substituted for Joseph R. Biden, Jr. as a Defendant-Appellee in this action.
[**] In accordance with Federal Rule of Appellate Procedure 43(c)(2), Douglas Burgum is substituted for Deb Haaland as a Defendant-Appellee in this action.
[***] In accordance with Federal Rule of Appellate Procedure 43(c)(2), Steve Pearce is substituted for Tracy Stone-Manning as a Defendant-Appellee in this action.
[****] In accordance with Federal Rule of Appellate Procedure 43(c)(2), Brooke Rollins is substituted for Tom Vilsack as a Defendant-Appellee in this action.

Service;***** FOREST SERVICE,

Defendants - Appellees,

and

HOPI TRIBE; NAVAJO NATION; PUEBLO OF ZUNI; UTE MOUNTAIN UTE TRIBE; SOUTHERN UTAH WILDERNESS ALLIANCE; CENTER FOR BIOLOGICAL DIVERSITY; GRAND CANYON TRUST; GREAT OLD BROADS FOR WILDERNESS; NATIONAL PARKS CONSERVATION ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; THE WILDERNESS SOCIETY; WESTERN WATERSHEDS PROJECT; WILDEARTH GUARDIANS,

Defendant Intervenors - Appellees.

------------------------------

MANHATTAN INSTITUTE; REASON FOUNDATION; ARIZONA SENATE PRESIDENT WARREN PETERSEN; ARIZONA HOUSE SPEAKER BEN TOMA; STATE OF IDAHO; STATE OF ALASKA; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS; STATE OF WYOMING; BLANDING CITY, UTAH; SENATOR TED CRUZ;

---

***** In accordance with Federal Rule of Appellate Procedure 43(c)(2), Tom Schultz is substituted for Randy Moore as a Defendant-Appellee in this action.

SENATOR MIKE LEE; PACIFIC LEGAL FOUNDATION; AMERICAN FOREST RESOURCES COUNCIL; UTAH DINE BIKEYAH; FRIENDS OF CEDAR MESA; ARCHAEOLOGY SOUTHWEST; PATAGONIA WORKS; THE ACCESS FUND; NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES; MARK S. SQUILLACE; RALPH J. MOSES; BRET C. BIRDSONG; JOHN E. BONINE; NICHOLAS S. BRYNER; JOHN P. LABORDE; ALEJADRO E. CAMACHO; CHELSEA COLWYN; MYANNA DELLINGER; TIM DUANE; ROBERT L. GLICKSMAN; SAM KALEN; ALEXANDRA B. KLASS; ALBERT LIN; GREGOR A. MACGREGOR; JOEL A. MINTZ; DAVE OWEN; JESSICA OWLEY; JAMES G. DEGNAN; WILLIAM T. SCHWARTZ; PATRICK A. PARENTEAU; HEATHER PAYNE; ZYGMUNT J. B. PLATER; JAMIE PLEUNE; DAN J. RHOLF; NICHOLAS A. ROBINSON; JASON ANTHONY ROBISON; SUSAN LEA SMITH; WILLIAM J. SNAPE, III; RICHARD WALLSGROVE; WILLIAM S. RICHARDSON; DAVID A. WESTBROOK; MARY CHRISTINA WOOD; JOHN D. LESHY; AMERICAN ANTHROPOLOGICAL ASSOCIATION; ARCHAEOLOGICAL INSTITUTE OF AMERICA; SOCIETY FOR AMERICAN ARCHAEOLOGY; GRAND STAIRCASE ESCALANTE PARTNERS; SOCIETY OF VERTEBRATE PALEONTOLOGY; CONSERVATION LANDS FOUNDATION,

       Amici Curiae.

_____

3

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 4:22-CV-00059-DN)**

_____

Stanford E. Purser, Utah Attorney General's Office, Salt Lake City, Utah (Kathy A.F. Davis, Utah Attorney General's Office, Tyler R. Green, Consovoy McCarthy PLLC, Salt Lake City, Utah, Taylor A.R. Meehan, Kathleen L. Smithgall, Jeffrey S. Hetzel, Consovoy McCarthy PLLC, Arlington, Virginia, with him on the briefs) for Plaintiffs-Appellants Garfield County, Utah, Kane County, Utah, The State of Utah, Spencer J. Cox, and Sean D. Reyes.

Harry S. Graver, Jones Day, Washington, District of Columbia (Brett A. Shumate, Jones Day, Washington, District of Columbia, James M. Burnham, King Street Legal, PLLC, Washington, District of Columbia, and Brady Brammer, Brammer Ranck, LLP, Pleasant Grove, Utah, with him on the briefs) for Plaintiffs-Appellants Zebediah George Dalton, BlueRibbon Coalition, Kyle Kimmerle, and Suzette Ranea Morris.

John E. Bies, U.S. Department of Justice Environment and Natural Resources Division, Washington, District of Columbia (Todd Kim, Andrew M. Bernie, U.S. Department of Justice, Washington, District of Columbia with him on the briefs) for Defendants-Appellees.

Matthew Campbell, Native American Rights Fund, Boulder, Colorado (Jason Searle, Allison Neswood, Malia Gesuale, Native American Rights Fund, Boulder, Colorado, Whitney A. Leonard, K. Amanda Saunders, Sonosky, Chambers, Sachse, Miller & Monkman, LLP, Anchorage, Alaska, David Mielke, Sonosky, Chambers, Sachse, Miller & Monkman, LLP, Albuquerque, New Mexico, Paul Spruhan, Sage Metoxen, Louis Mallette, Tamara Hilmi Sakijha, Navajo Nation Department of Justice, Window Rock, Arizona, Stephen H.M. Bloch, Michelle White, Southern Utah Wilderness Alliance, Salt Lake City, Utah, Jacqueline Iwata, Natural Resources Defense Council, Washington, District of Columbia, Katherine Desormeau, Natural Resources Defense Council, San Francisco, California, and Heidi McIntosh, Thomas R. Delehanty, Earthjustice, Denver, Colorado, with him on the briefs) for Intervenor Defendants-Appellees.

_____

Before **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

4

The President of the United States must carefully exercise the power Congress delegates to him, remaining within statutory limits and avoiding the wilderness beyond. When the President acts within these limits, he acts on behalf of the sovereign and enjoys immunity from suit. This sovereign immunity ensures that federal courts have no role in policing discretionary decisions properly delegated by Congress to the President. But when the President exceeds statutory limits placed on his power, his actions are not those of the sovereign. Instead, he acts ultra vires and enjoys no immunity from suit. In such circumstances, federal courts may review presidential acts alleged to exceed lawful authority.

President Biden, relying on the Antiquities Act, expanded two national monuments in Utah. Mindful of the statute's mandate that national monuments be "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest," he identified more than 500 items as objects worthy of such protection. The Antiquities Act limits presidential reservations to "the smallest area compatible with the proper care and management of the objects to be protected" around the monuments. Even so, President Biden set aside 3.23 million acres in total around both monuments. Utah and others affected by the reservations challenged the national monuments' expansion as exceeding the limits Congress placed on the President's powers in the Antiquities Act. The district court dismissed their suit, finding that sovereign immunity forbade it from reviewing the President's expansion of the national

monuments and that certain Plaintiffs lacked standing.  Our jurisdiction arises under 28 U.S.C. § 1291.  We affirm in part, vacate in part, and remand for further proceedings.

## I.

This case began when two Presidents created two national monuments in Utah. President Clinton created Grand Staircase-Escalante National Monument ("Grand Staircase") in 1996.  61 Fed. Reg. 50223 (Sept. 18, 1996).  President Obama created Bears Ears National Monument ("Bears Ears") in 2016.  82 Fed. Reg. 1139 (Dec. 28, 2016).  The Antiquities Act permits the creation of national monuments.  The Act states that "[t]he President may, in [his] discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."  54 U.S.C. § 320301(a).  The Act allows the President to reserve land around the monuments, provided the reservation is "confined to the smallest area compatible with the proper care and management of the objects to be protected."  Id. § 320301(b).  President Clinton reserved 1.7 million acres of land around Grand Staircase, 61 Fed. Reg. at 50225, and President Obama reserved 1.35 million acres around Bears Ears, 82 Fed. Reg. at 1143—a total of 3.05 million acres.

Later presidential administrations took opposing positions on whether the land Presidents Clinton and Obama reserved was the smallest required to protect the national monuments.  President Trump reduced the land reserved to 1.11 million acres.  82 Fed. Reg. 58081 (Dec. 4, 2017); 82 Fed. Reg. 58089 (Dec. 4, 2017).  But President Biden issued two proclamations reversing that order (the "Proclamations"), causing the

reservation of even more land than those made by Presidents Clinton and Obama—a total of 3.23 million acres.  See 86 Fed. Reg. 57321 (Oct. 8, 2021); 86 Fed. Reg. 57335 (Oct. 8, 2021).  President Biden relied on the need to protect "the entire landscape[s] within the boundaries reserved" for scientific study.  86 Fed. Reg. at 57330–31.  He protected over 500 "objects," including descript items such as "the well-known balancing rock at Mexican Hat," "[t]he Citadel cliff dwelling," "petroglyphs," "Ancestral Pueblo structures," and "Navajo and Ute carvings."  Id. at 57328–29.  He also included more generic appearing "objects," including "boulders," "mule deer," "minnow[s]," "pinyon," "shrubs," "cacti," "parts of a road," "wheel ruts and other traces of pioneer life," "perennial streams," and other natural formations.[1]  Id. at 57324–25, 57328–30.

Some government officials and local Utah residents opposed the President's declarations.  Utah's legislature passed two resolutions detailing their complaints.  They complained that "once-thriving rural Utah communities and their citizens are suffering economic deprivation at the hand of their own federal government, which a national monument tourism economy fails to alleviate," H.C.R. 11, 2017 Gen. Sess. (Utah 2017), and that Grand Staircase's reservations "resulted in a 44% reduction in Escalante High School enrollment," H.C.R. 12, 2017 Gen. Sess. (Utah 2017).

The State of Utah and two of its counties ("Utah Plaintiffs") sued President Biden and the Secretary of the Interior, the Secretary of Agriculture, the Director of the Bureau of Land Management, the Chief of the United States Forest Service, and their various

---

[1] We reference this non-exclusive list of items President Biden sought to protect simply to demonstrate the variety of items covered by the Proclamations.

departments ("Agency Defendants") to enjoin implementation of the Proclamations expanding the Bears Ears and Grand Staircase reservations.  Zebediah Dalton, Kyle Kimmerle, Suzette Morris ("the Individual Plaintiffs"), and the BlueRibbon Coalition ("BlueRibbon") sued soon after.  The district court consolidated the cases.  Various Indian tribes and several environmental groups intervened on behalf of Defendants.[2] Plaintiffs challenged both the Proclamations and the executive agencies' interim management plans implementing them.

Plaintiffs' claims fall into two categories.  First, they brought ultra vires claims, arguing that the President exercised authority exceeding that which Congress delegated to him.  Plaintiffs alleged that the Proclamations exceeded the President's statutory authority in two ways: by designating things other than "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" as national monuments, and by ignoring the Antiquities Act's requirement that he reserve only the "smallest area compatible" to preserve the objects mentioned in the Proclamations. Stated otherwise, Plaintiffs claimed that the President lacked statutory authority to designate many of the things named in the Proclamations as monuments and that he lacked authority to set aside over two million additional acres of land.  Second, Plaintiffs argued that the Agency Defendants violated the Administrative Procedure Act ("APA") by implementing the Proclamations because the President exceeded his authority under the Antiquities Act.  All of Plaintiffs' claims turned on the same contention: President

---

[2] For ease of reference, the term "Defendants" in this opinion will only refer to the President and the Agency Defendants.

8

Biden, in issuing the Proclamations expanding the monuments, exceeded his delegated authority under the Antiquities Act.

Defendants sought dismissal of Plaintiffs' Complaints on a few grounds but primarily contended two things: that the doctrine of sovereign immunity forbade suit against the President and that Plaintiffs' APA challenges against the Agency Defendants lacked ripeness because the agencies' interim regulations were not final agency action. Defendants alternatively argued that Plaintiffs lacked standing and attacked Plaintiffs' Complaints as not stating claims upon which relief may be granted under Rule 12(b)(6).

The district court dismissed Plaintiffs' claims with prejudice, ultimately based on sovereign immunity and other justiciability grounds.[3] As to Plaintiffs' ultra vires claims, the district court found Plaintiffs' challenges to the Proclamations unreviewable because (1) Plaintiffs brought statutory, rather than constitutional, challenges, (2) the APA did not waive sovereign immunity for the President, and (3) Plaintiffs' claims did not invoke the ultra vires exception to sovereign immunity because they did not "assert that President Biden lacks the authority to withdraw federal land as national monuments." The district court also stated that Plaintiffs could not plead the ultra vires exception because "[n]o court of appeals has addressed . . . how to interpret the [Act's] 'smallest area compatible' requirement" and "without additional guidance from Congress or a higher court, the President's actions are not *ultra vires*." As to Plaintiffs' APA claims against the Agency

---

[3] The district court's order discussed the standard of review for dismissal under Rule 12(b)(6), but the court only ruled on Defendants' jurisdictional arguments that are appropriate for dismissal under Rule 12(b)(1). The district court did not reach Defendants' Rule 12(b)(6) arguments.

Defendants, the district court concluded that the interim management plans Plaintiffs challenged were not final agency actions as required to sue under the APA. The district court also found that the Individual Plaintiffs and BlueRibbon lacked standing to sue. Thus, the district court granted Defendants' motions to dismiss.

## II.

Plaintiffs appeal the district court's dismissal of their claims. They contend the district court ignored the "raft of precedent" that sovereign immunity's ultra vires exception permits challenges to presidential actions that exceed authority Congress delegated through statutes like the Antiquities Act. Plaintiffs also argue that the district court erred in dismissing their APA claims, asserting that the agencies' interim management plans are final agency action. Finally, the Individual Plaintiffs and BlueRibbon argue that the district court erred in determining they lacked standing.

## A.

Sovereign powers enjoy a common-law immunity from suit absent their consent. Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788–89 (2014). The United States, as sovereign, typically enjoys this immunity unless Congress chooses to waive it. Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 48 (2024). This immunity extends to executive officials acting on behalf of the sovereign. Wyoming v. United States, 279 F.3d 1214, 1225 (10th Cir. 2002) (citing Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994)). But an executive official only has power to the extent Congress describes and the Constitution permits. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 (1984). So when an executive official's conduct "is not

within the officer's statutory powers" or "those powers, or their exercise in the particular case, are unconstitutional," the official's acts are ultra vires and not those of the sovereign. Wyoming, 279 F.3d at 1225 (citing Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 702 (1949)). In these narrow circumstances, sovereign immunity does not apply and a plaintiff may seek relief against the executive official. Id. To bypass sovereign immunity, then, a plaintiff must not allege merely that an official acted illegally in using the powers Congress gave him, but rather that "in committing the alleged wrong, [the officer] was not exercising the powers delegated to him by the sovereign." Id. at 1230 (citing United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 548 (10th Cir. 2001)); see also Larson, 337 U.S. at 693.

Plaintiffs contend their suit falls within the ultra vires exception to sovereign immunity. They argue that the Antiquities Act limits the President's authority to declare national monuments in two important ways. First, national monuments can only be "[1] historic landmarks, [2] historic and prehistoric structures, and [3] other objects of historic or scientific interest . . . ." § 320301(a). Second, the President must only reserve "the smallest area compatible with the proper care and management of the objects to be protected." § 320301(b). Plaintiffs contend that even though President Biden declared over 500 things to be "objects of historic or scientific interest," only nine objects the President protected within the Bears Ears and Grand Staircase reservations were within the Antiquities Act's three permissible groups. Plaintiffs further argue that the millions of acres President Biden reserved for Bears Ears and Grand Staircase, which they emphasize is "twice as large as Delaware" and "larger than 20 percent of all the nations

11

in the world," exceeds his authority because of the Antiquities Act's smallest area proviso. Plaintiffs reason that theirs is a classic ultra vires case because they allege the President acted outside the powers delegated to him by the Antiquities Act.[4]

Although we decline to go so far as to hold Plaintiffs plausibly alleged an ultra vires claim, we conclude that the district court erred in dismissing Plaintiffs' claims. The district court based its determinations on a flawed view of sovereign immunity's ultra vires exception, and we must correct those errors.

First, the district court erred in determining that Plaintiffs alleged the President simply "misused his authority, not that he lacked it." According to the district court, it

---

[4] Against the Agency Defendants, Plaintiffs argue that the APA independently waives sovereign immunity because it permits suit by any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. As Plaintiffs concede, this provision does not apply to the President. See Bradford v. U.S. Dep't of Lab., 101 F.4th 707, 731 n.10 (10th Cir. 2024) (citing Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). But we need not decide whether the APA waives sovereign immunity against the Agency Defendants for Plaintiffs' ultra vires claims. Plaintiffs allege ultra vires claims against the President and the Agency Defendants based on the President's conduct. Plaintiffs do not allege that the Agency Defendants engaged in separate ultra vires conduct. Thus, the claims against the Agency Defendants—and whether Defendants enjoy sovereign immunity—are inextricably tied to the President's actions. In other words, if the President did not act ultra vires, then the Agency Defendants did not either and Defendants enjoy sovereign immunity. But if the President did act ultra vires, Defendants do not enjoy sovereign immunity and Plaintiffs' assertion of these claims against the Agency Defendants is remedial in nature. Indeed, Plaintiffs argue that their ultra vires claims "sought non-monetary relief—an injunction and declaration preventing enforcement of the proclamations—against all Federal Defendants." Neither the Supreme Court nor this court has ever found an injunction may issue in an ultra vires action against the President for actions taken not in accordance with a statute. Any possible remedy may need to run, instead, against the Agency Defendants. Given our disposition, we leave for the district court to resolve what remedies may be available and against whom those remedies can run, should it find any of the President's conduct not authorized by statute.

12

could not review Plaintiffs' case because Plaintiffs "d[id] not assert that President Biden lacks the authority to withdraw federal land as national monuments." In the district court's view, Plaintiffs had to specifically allege that, as a general matter, "President Biden lacked the authority to designate federal land as [Bears Ears] and [Grand Staircase]" to properly plead an ultra vires claim. We disagree.

The district court's conclusion misses the point. Plaintiffs concede that the President has the authority to designate national monuments as a general matter. Instead, they argue that the President lacked authority to designate some of the "objects" protected by the Proclamations and that he lacked authority to increase the area previously set aside by more than two million acres.

Consider a hypothetical case in which Congress passed a statute giving the President authority to "designate *cattle herds* for protection from slaughter." Suppose also that the President used that authority instead to protect a farmer's *flock of sheep*. Under the district court's ultra vires interpretation, the farmer would have to allege that the President lacked the authority to protect cattle herds even though flocks of sheep definitionally do not fall under that designation. This would result in the "untenable" conclusion that "there are no judicially enforceable limitations on presidential actions . . . so long as the President *claims* that he is acting pursuant" to some statutory authority. Chambers of Com. of U.S. v. Reich, 74 F.3d 1322, 1332 (D.C. Cir. 1996). Such a "position would permit the President to bypass scores of statutory limitations on governmental authority." Id. This conclusion would also undermine long "settled" law

13

that courts have jurisdiction to consider whether an executive official's acts "are in *excess*

of his authority." Harper v. Jones, 195 F.2d 705, 706 (10th Cir. 1952) (citations omitted).

The district court's error turns, in part, on a less than clear distinction the case

law interpreting the ultra vires exception makes between merely illegal acts and those

for which an executive official lacked authority. As the Supreme Court explained,

> In a suit against an agency of the sovereign, as in any other suit, it is
> therefore necessary that the plaintiff claim an invasion of his recognized
> legal rights. If he does not do so, the suit must fail even if he alleges that
> the agent acted beyond statutory authority or unconstitutionally. But, in a
> suit against an agency of the sovereign, it is not sufficient that he make
> such a claim. Since the sovereign may not be sued, it must also appear that
> the action to be restrained or directed is not action of the sovereign. The
> mere allegation that the officer, acting officially, wrongfully holds property
> to which the plaintiff has title does not meet that requirement. True, it
> establishes a wrong to the plaintiff. But it does not establish that the
> officer, in committing that wrong, is not exercising the powers delegated to
> him by the sovereign. If he is exercising such powers the action is the
> sovereign's and a suit to enjoin it may not be brought unless the sovereign
> has consented.

Larson, 337 U.S. at 693. Here, Plaintiffs did more than allege that the President's actions

were "merely illegal." Plaintiffs pled that "[u]ltra vires review is available to Plaintiffs"

because a "declaration made under the [Antiquities] Act must be confined to 'historic

landmarks, historic and prehistoric structures, and other objects of historic or scientific

interest' and a reservation of land must be limited to those 'parcels of land' that are

'confined to the smallest area compatible with the proper care and management of the

objects to be protected.'" In other words, Plaintiffs argue that President Biden only had

14

the power to designate x, y, and z, but instead designated a, b, and c.[5]  They also allege

that, despite the Antiquities Act giving the President authority to reserve only the

"smallest area compatible" with protection, President Biden reserved for Bears Ears and

Grand Staircase land "twice as large as Delaware" and "larger than 20 percent of all

nations in the world."  Taking these facts as true and drawing all reasonable inferences in

Plaintiffs' favor, these comparisons could illustrate more than mere illegality given the

Antiquities Act's limit on the types of objects and amount of land the President can

reserve.[6]  All in all, Plaintiffs alleged statutory limitations on the President's authority,

not just that he acted illegally within the authority Congress delegated to him.  Plaintiffs'

suit, then, turns on whether Congress gave the President the authority to act as he did

rather than how he used that authority.

Despite the Antiquities Act's clear limitations on the President's authority,

Defendants and the dissent argue that judicial review is unavailable here because the

statute commits these decisions to the President's discretion.  Certainly, it is "well

settled" that judicial review is unavailable when Congress commits a decision to the

---

[5] The dissent seems to believe that a, b, and c could fall within the category of x, y and z.  And that could be true.  But we will not know unless a court interprets the statute to answer this question, and the district court did not engage in that analysis.  We leave for the district court to decide this in the first instance and then to determine whether Plaintiffs plausibly alleged an ultra vires claim within that scope.

[6] We include Plaintiffs' size comparisons to show only that Plaintiffs pled facts to support their assertion that President Biden lacked authority to reserve the land under the "smallest area compatible" limitation rather than that he misused his discretion to do so.  We leave it to the district court to determine, applying the appropriate principles of law, whether the President exercised authority Congress did not grant him under the Antiquities Act.

15

President's discretion.  Harper, 195 F.2d at 706 (citing Larson, 337 U.S. at 682).  But here, Plaintiffs do not challenge presidential actions committed to the President's discretion.  To be sure, the Antiquities Act gives the President discretion to designate "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" as national monuments.  § 320301(a).  But Plaintiffs do not make a claim challenging this grant of discretion.  Instead, they allege that the President designated things as national monuments that were not "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and set aside more land than necessary to protect them.  In other words, Plaintiffs argue that the President exercised authority Congress never gave him, not that he abused his discretion.

Thus, Defendants' reliance on specific cases determining that courts will not "second-guess" presidential determinations "where Congress has provided the President with discretionary authority to act" is misplaced.  In those cases, statutory and constitutional authority evinced Congress's intent to commit the decisions challenged by the plaintiffs exclusively to presidential judgment.  For example, there was "nothing" in the statute at issue in Dalton v. Specter that "prevent[ed] the President from approving or disapproving" military-base-closure recommendations "for whatever reason he s[aw] fit."  511 U.S. 462, 476 (1994).  By leaving the decision to the President's unfettered judgment, Congress granted the President complete discretion over it.  In such instances, "[n]o question of law is raised" and we do not get to review that exercise of discretion.  Id. (quoting United States v.

16

George S. Bush & Co., 310 U.S. 371, 380 (1940)).  In Martin v. Mott, a

congressional act granted the President power to call the militia into service

"whenever the United States shall be invaded, or be in imminent danger of

invasion . . . ."  25 U.S. 19, 29 (1827).  The Supreme Court held "that the authority to

decide whether" such an exigency had arisen "belong[ed] exclusively to the

President . . . ."  Id. at 30.  "[T]his construction necessarily result[ed] from the nature

of the power itself," which was to be "exercised upon sudden emergencies, upon

great occasions of state, and under circumstances which may be vital to the existence

of the Union" in military matters by "him who is, by the constitution, 'the

commander in chief of the militia . . . .'"  Id. at 30–31; see also Dakota Cent. Tel. Co.

v. State of S. Dakota ex rel. Payne, 250 U.S. 163, 181, 184 (1919) (stating that the

President may only exercise authority "during the continuance of the present

war . . . whenever he shall deem it necessary for the national security or defense" and

the existence of such conditions is committed to presidential discretion).  Finally, in

George S. Bush & Co., an act of Congress provided that the President could approve

changes to tariff rates if "in his judgment" such changes were "necessary" to equalize

differences in costs of production.  310 U.S. at 376–377.  The Supreme Court held

that judicial review was unavailable because the statute committed the factual

determination about the necessity of the rate changes solely to the President's

"judgment."  Id. at 379–380.

　　　But the Antiquities Act presents a "different case" because it "places

discernible limits" on the President.  See Mountain States Legal Found. v. Bush, 306

F.3d 1132, 1136 (D.C. Cir. 2002).  Of course, where Congress or the Constitution delegates decision-making to the President without limitations on that decision-making, judicial review "amount[s] to a clear invasion of the legislative and executive domains."  George S. Bush & Co., Inc., 310 U.S. at 380.  Yet, this separation-of-powers concern is diminished and, indeed, pushes in the opposite direction when Congress "entrust[s] to the courts" the "responsibility of determining the limits of statutory grants of authority . . . ." Mountain States, 306 F.3d at 1136 (quoting Reich, 74 F.3d at 1327). In these circumstances, we undermine rather than honor congressional intent by refusing to enforce Congress's statutory limits.[7]

---

[7] At least two other circuits have also determined that Dalton's restriction on reviewing presidential acts for abuse of discretion does not apply in a case in which a statute places discernable limits on the President's authority. See Murphy Co. v. Biden, 65 F.4th 1122, 1131 (9th Cir. 2023); Mountain States, 306 F.3d at 1136.  Even though, in Murphy, the statutory limitations placed on the President's authority derived from statutes other than the Antiquities Act itself, we see no difference in statutory limitations placed on the President's authority based on its location in the United States Code.  We join the D.C. Circuit in that regard.  See Mountain States, 306 F.3d at 1136 (distinguishing Dalton, stating that "[a] somewhat different case is presented, however, where *the authorizing statute* or another statute places discernible limits on the President's discretion" (emphasis added)).  To distinguish this case only because the limitations are within the Antiquities Act itself would mean giving priority to Congress's limits on the President's power in other statutes but disfavoring the limits it expressly placed in the authorizing statute.

We also join these same two circuits in rejecting the contention that the ultra vires exception to sovereign immunity does not apply to claims that the President exceeded statutory (rather than constitutional) authority.  The district court dismissed Plaintiffs' claims, in part, on this flawed conclusion.  Although the district court correctly stated that courts can review presidential actions alleged to exceed the President's constitutional authority, it erred in concluding that it lacked jurisdiction to review claims challenging the President's actions as exceeding his statutory authority.  Defendants correctly point out that the Supreme Court has never directly addressed this question.  See Dalton, 511

The crux of this dispute, then, turns on which decisions Congress delegated to the President's discretion in the Antiquities Act. Plaintiffs assert that the Antiquities Act limits the President's discretion in meaningful ways such that a court can police those boundaries. Let's return to the relevant text of the statute:

> **(a) Presidential declaration.** The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.

> **(b) Reservation of land.** The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

§ 320301. In the first subsection, we see that Congress delegated authority to the President to declare certain types of things as monuments—specifically, "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . ." We also see that the President's ability to "declare" is "in [his]

---

U.S. at 474 (assuming without deciding that "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA"); but see Dalton, 511 U.S. at 477–78 (Blackmun, J., concurring in part and concurring in the judgment) ("This conclusion, however, does not foreclose judicial review of a claim, for example, that the President . . . [acted] in contravention of his statutory authority."). But we are persuaded by the reasoning in Murphy and Mountain States that judicial review in cases in which the authorizing statute "places discernible limits on the President's discretion . . . does not implicate separation of powers concerns to the same degree" as statutes, like in Dalton, that do "'not at all limit' the discretion of the President." Mountain States, 306 F.3d at 1136 (quoting Dalton, 511 U.S. at 476). Thus, we join these circuits in holding that judicial review is available in such circumstances.

discretion . . . ."  The discretion clause directly modifies the word "declare" in subsection (a).  Importantly, the word "discretion" is nowhere in subsection (b).

Plaintiffs analogize these provisions to several other statutes that also confer discretion upon an entity but otherwise place meaningful limits upon that discretion.  For example, they point to 42 U.S.C. § 1988(b), which gives federal courts the ability to award attorneys' fees in certain civil rights cases.  That statute states that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ."  Plaintiffs assert that, for a court to use its discretion, a party must first be the "prevailing party."  The court does not get to use its unfettered discretion to decide who is the prevailing party—only whether to award attorneys' fees to whoever qualifies as the prevailing party.  They argue the same logic applies here—the President only gets to use his discretion to designate as monuments objects that qualify as "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . ."  See § 320301(a).  The President does not have unchecked discretion to decide what objects or landmarks fall into those categories.  To conclude otherwise would make much of the statutory text meaningless.  See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (1st ed. 2012) (discussing the "surplusage canon" of construction, which provides that "[i]f possible, every word and every provision is to be given effect . . . . None should be ignored.  None should needlessly be given an interpretation that causes it . . . to have no consequence.")

This logic makes sense.  Go back to our hypothetical cattle herd statute and assume the statute said, "The President may, in the President's discretion, designate cattle

20

herds for protection from slaughter." The President's discretion only applies to whether he wants to designate or not designate any given cattle herd for protection. His discretion does not apply when determining what a cattle herd is—in other words, he may not designate a flock of sheep and defend his decision by arguing that, in his discretion, he decided a flock of sheep was a cattle herd. In this instance, courts possess the full panoply of statutory construction tools necessary to determine what is a qualifying cattle herd.[8]

So too here. Congress explicitly confined the President's discretion by limiting his ability to only designate "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . ." § 320301(a). Within that same sentence, Congress also limited the designations to those "on land owned or controlled by the Federal Government . . . ." Id. Just as the President does not have sole discretion to declare private and state land as federal land, he similarly lacks sole discretion to determine what counts as historic or scientific such that the decision is shielded from

---

[8] The dissent concedes that ultra vires review is appropriate to resolve "whether the President reserved a monument that is within the boundaries of land owned or controlled by the federal government." "That determination," the dissent insists, "is not a discretionary decision by the President – either the United States owns or controls the land, or it does not." But the exact same can be said about whether an item is a historic "object" that the President may designate under the Act—either the item is such an "object," or it is not. The dissent's only response seems to be that distinguishing between objects and non-objects may be "much more difficult" than distinguishing between land owned by the United States and land not owned by the United States. But we see no reason to think the limits of judicial review turn on the difficulty of interpreting a given word in a statute. As the Supreme Court recently explained in a different context, an ambiguity in a statute "is simply not a delegation of law-interpreting power." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 399 (2024) (quoting C. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 405, 445 (1989)).

judicial review. And courts can determine what counts as historic or scientific in the context of the Antiquities Act within their usual function of interpreting the law. Indeed, courts have already done so. See United States v. California, 436 U.S. 32 (1978); Cappaert v. United States, 426 U.S. 128 (1976); Cameron v. United States, 252 U.S. 450 (1920); Mountain States, 306 F.3d 1132; Mass. Lobstermen's Ass'n v. Ross, 349 F. Supp. 3d 48 (D.D.C. 2018).

The "smallest area compatible" requirement is also not committed to the President's discretion. Congress's directive to limit the parcels is couched in mandatory language—"the limits of the parcels *shall* be confined to the smallest area compatible with the proper care and management of the objects to be protected." § 320301(b) (emphasis added). What's more, the Antiquities Act does not expressly subject the "smallest area compatible" requirement to the President's discretion at all—this limitation is in a separate subpart from the discretion clause.[9] If we were to read the

---

[9] The dissent argues that the determination of "compatibility" within this subsection of the statute "is certainly a discretionary decision left to the President." Again, this argument rests on the incorrect assumption that a conceivably broad term such as "compatible" automatically commits the interpretation of that term to the President's discretion. Such a reading has no basis in the text. The case that the dissent relies on, Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249 (10th Cir. 1998), only proves the point. There, a statute required the defendants to take a specified action within 90 days "[t]o the maximum extent practicable . . . ." Id. at 1253 (quoting 16 U.S.C. § 1533(b)(3)(A)). As the dissent points out, we concluded that—although the statute mandated certain action—the phrase "maximum extent practicable" gave the agency "discretion" to refrain from the mandatory act. Id. at 1256. But what the dissent fails to point out is that we did not conclude that the word "practicable" gave the agency unfettered discretion to decide whether and under what conditions it could defer action. Instead, we said that practicability limited the agency's discretion and "impose[d] a clear

statute as Defendants suggest, the practical implications would also be unreasonable.

Consider a situation in which the President wishes to preserve what is left of a single,

modest, turn-of-the century miner's cabin in Southern Utah.  Defendants' position, at

least as presented at oral argument, is that the President could "reserve" all of Utah's 35

million-plus acres of federal land (or approximately 63% of all land in Utah) for "the

proper care and management" of that lonely miner's cabin.  Defendants' position

demonstrates the problem with their view of reviewability—to accept it means that,

despite the statute's limiting language, the President has the unfettered authority to

reserve 63% of the State of Utah to protect a lone miner's cabin.  But that construction is

unreasonable, perhaps even absurd, given the express statutory terms suggesting

Congress sought to limit the President's exercise of authority.  A common-sense reading

---

duty on the agency to fulfill the statutory command to the extent that it is feasible or
possible."  Id. at 1254 (quoting Fund for Animals v. Babbitt, 903 F. Supp. 96, 107
(D.D.C. 1995)).  So too here.  Compatibility is not a blank check to the President to
reserve any amount of land and for whatever reasons he deems important.  Instead,
reservations "shall" be based on their compatibility "with the proper care and
management of the objects to be protected."  § 320301(b).  It is also noteworthy that we
decided Biodiversity under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467
U.S. 837 (1984), overruled by Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024).
Although our interpretation of that statute under Chevron afforded the agency broad
discretion "not to act," we did not suggest that the inclusion of broad terms automatically
commits the scope of a statutory limit (such as the requirement for something to be the
"smallest area compatible") to the decision-maker's unfettered discretion.  Instead, we
treated the term "practicable" as imposing a discernible limit on the agency's decision-
making.

of the Antiquities Act's statutory text demonstrates that Defendants' position on reviewability lacks merit.

Even so, Defendants argue (and the dissent assumes) that the Antiquities Act confers such broad discretion that the President alone determines the boundaries of the Act's statutory limitations. According to the dissent, the "statutory text says" that "it is the President who gets to decide" whether "a thing declared by the President is a landmark, structure, or object" within the meaning of the Antiquities Act. As discussed above, the Act gives the President discretion to decide whether to designate things falling within the specifically enumerated categories as national monuments. The dissent does not explain how the text could be read to suggest that the President also has unfettered discretion to define the scope of the enumerated categories. Instead, it implies that review is inappropriate because these terms are "amorphous," undefined, and have "no obvious plain meaning." In essence, the dissent appears to advocate that the potential ambiguity of the enumerated categories suggests that their meaning is committed to presidential judgment. But the potential ambiguity of a term alone does not demonstrate that Congress intended to commit the meaning of the term to the executive's sole discretion. Instead, courts exercise their foundational function "to say what the law is," Loper Bright Enters. v. Raimondo, 603 U.S. 369, 385 (2024) (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)), including in cases "involving ambiguous laws," id. at 392. At most, ambiguity might suggest that "great respect" should be afforded to executive interpretations under specific circumstances. Id. at 385–86 (quoting Edwards' Lessee v. Darby, 12 Wheat. 206,

210 (1827)).  But ambiguity alone is insufficient to demonstrate that we should

abdicate the judicial role in enforcing congressional limits on executive authority

altogether.  And it seems unlikely that Congress would impose mandatory limits ("the

parcels *shall* be confined to the smallest area compatible with the proper care and

management of the objects to be protected") on presidential power without expecting

some judicial check on its exercise.  Certainly nothing else about the Antiquities Act

clearly and convincingly overcomes the presumption favoring judicial review and the

court's role as statutory interpreter.  See Kucana v. Holder, 558 U.S. 233, 251–52 (2010)

(describing the need for clear and convincing evidence to dislodge the presumption

favoring interpretations of statutes to allow judicial review).[10]

Defendants' and the dissent's view would also create disturbing implications for

judicial review more broadly.  Defendants contend that judicial review extends only to

---

[10] For these same reasons, we reject Defendants' contention that no cause of action exists for Plaintiffs to challenge the President's actions here.  Defendants' argument that Plaintiffs have no cause of action rests, in part, on their assumption that the President acted within his discretionary authority and that no "judicially-manageable standards" exist for courts to evaluate a President's actions under the Antiquities Act.  We also reject their argument that no equitable cause of action exists here.  They assert that our decision in Safe Streets All. v. Hickenlooper, 859 F.3d 865 (10th Cir. 2017), forecloses Plaintiffs' equitable cause of action.  But Safe Streets is inapplicable.  There, we rejected the plaintiffs' assertion that they had a cause of action "in equity" to vindicate purported federal rights under the Supremacy Clause when they argued that a Colorado constitutional amendment conflicted with and was preempted by the Controlled Substances Act.  Safe Streets, 859 F.3d at 892.  In other words, the plaintiffs did not argue that any governmental official acted ultra vires, or outside of their statutory authority.  Here, Plaintiffs are not seeking to vindicate substantive rights under the Antiquities Act or any other statute.  Instead, they rely on a longstanding, equitable doctrine for relief.  See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327–29 (2015).

discerning whether Congress gave the President the discretion Plaintiffs challenge rather than to interpreting the terms by which Congress gave that discretion.  They state in their brief that "[t]he Framers of our Constitution did not intend the judicial branch to be the ultimate arbiters of every dispute of law or policy."  Maintaining that its proposed lack of judicial review "does not mean that the Antiquities Act's requirements are somehow 'limitless,' or 'entirely unchecked,'" Defendants argue that executive officials' oath of office to uphold the Constitution and the United States' laws and the possibility of congressional intervention both adequately check and limit the President's statutory authority.  Our review, according to Defendants, ends because "Plaintiffs do not dispute the President's authority to designate monuments."

We view judicial scrutiny more traditionally, believing that Congress intended for the judiciary to enforce its statutory limitations on the President's authority.  As the Constitution gives "the judiciary the duty of interpreting and applying [the law] in cases," we must discern not only whether Congress gave the President discretionary power but also whether that power applies to the facts of a particular case.  Patchak v. Zinke, 583 U.S. 244, 249 (2018) (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)).  The President could not use his discretion to protect a flock of sheep where Congress only gave him discretion to protect cattle herds, and a plaintiff could bring an ultra vires claim

against him if he did so.[11]  The same principle applies here because the statutory text places discernable limits on the President's power.

Precedent also suggests that the Supreme Court does not read such unchecked discretion into the Antiquities Act.  The Supreme Court has reviewed a President's actions under the Antiquities Act three times.  See California, 436 U.S. 32; Cappaert, 426 U.S. 128; Cameron, 252 U.S. 450.  In Cameron, the Court addressed the exact issue Plaintiffs allege here: whether a "monument reserve should be disregarded on the ground that there was no authority for its creation," specifically whether the Grand Canyon was an "object[] of historic or scientific interest."  252 U.S. at 455.  The Court answered the question in the affirmative, finding the Grand Canyon "is an object of unusual scientific interest."  Id.  Similarly, Cappaert required the Court to determine whether the Antiquities Act gave the President the authority to "reserve a pool."  426 U.S. at 141.  The Court unanimously determined the President had such authority because the pool in question was an "object[] of historic or scientific interest."  Id. at 141–142.  In both these cases, the Supreme Court did not hesitate to consider whether the President acted within his statutory authority and neither should have the district court.

The dissent argues that because the United States brought each of the above cases, the cases did not directly address the ultra vires doctrine or sovereign immunity and thus

---

[11] The Proclamations themselves suggest that President Biden understood that they would be subject to judicial review.  Both Proclamations said that "[i]f any provision of this proclamation, including its application to a particular parcel of land, is held to be invalid, the remainder of this proclamation and its application to other parcels of land shall not be affected thereby."  86 Fed. Reg. at 57333, 57346.

cannot guide our decision here.  But keep in mind that the district court, Defendants, and the dissent all believe that, in this context, the President's discretion cannot be questioned—at all.  If they were right, the answer in Cappaert and Cameron would have been: the President decides what does and does not qualify for designation as a monument and courts must accept the President's judgment as to whether his designation was lawful.  But in each case, the Supreme Court analyzed the monuments and determined, based on scientific qualities, that each was appropriately designated.  Thus, the Supreme Court's authority, although dealing with cases filed by the United States, makes clear that the judiciary may examine the President's authority under the Antiquities Act.

The dissent's argument also ignores the Supreme Court's general indication "that review is available to ensure that the Proclamations [under the Antiquities Act] are consistent with constitutional principles and that the President has not exceeded his statutory authority."  Mountain States, 306 F.3d at 1136 (citing California, Cappaert, and Cameron).  These cases, along with the general "responsibility of determining the limits of statutory grants of authority . . . entrusted to the courts by Congress," id. (quoting Stark v. Wickard, 321 U.S. 288, 310 (1944)), support our decision here.

Finally, the district court set forth an alternative and seemingly novel ground for finding that Plaintiffs' ultra vires claims lacked merit.  It reasoned that, because "[n]o court of appeals has addressed . . . how to interpret the [Antiquities Act's] 'smallest area compatible' requirement," the court lacked the authority to declare the President's actions ultra vires "without additional guidance from Congress or a

higher court." Although unclear, this statement may reference a related argument that Defendants raise in their response: that "ultra vires claimants must demonstrate that [the official] has plainly and openly crossed a congressionally drawn line in the sand." Fed. Express Corp. v. U.S. Dep't of Com., 39 F.4th 756, 765 (D.C. Cir. 2022); see also Apter v. Dep't of Health & Hum. Servs., 80 F.4th 579, 587–88 (5th Cir. 2023) ("To invoke [ultra vires] . . . [t]he complaint must allege facts sufficient to establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" (quoting Danos v. Jones, 652 F.3d 577, 583 (5th Cir. 2011))).

Indeed, the Supreme Court recently explained that, at least in some cases, an ultra vires claim "is essentially a Hail Mary pass" that "rarely succeeds." Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681–682 (2025) (quoting Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009)). In those cases, "a typical statutory-authority argument" will not suffice. Id. at 682. Instead, a plaintiff must show that the executive action is "entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." Id. at 681 (quoting Ry. Clerks v. Ass'n for Benefit of Non-contract Emps., 380 U.S. 650, 660 (1965)). Crucially, however, the Supreme Court based its analysis on the post-APA ultra vires review specified in Leedom v. Kyne, 358 U.S. 184 (1958). That case "arose from . . . an interlocutory order not subject to review under the judicial-review provisions of the APA or the National Labor Relations Act." Nuclear Regul. Comm'n, 605 U.S. at 681. As a result, ultra vires review in Kyne permitted judicial

29

review where it was otherwise prohibited by statute.  Because this review "could become an easy end-run around the limitations of" judicial-review statutes, the Court has "strictly limited" its application.  Id.

But Plaintiffs' claims against the President could not have been brought under the APA and are likely not an "easy end-run" around any statutory judicial-review limitations.  For that reason, it is not obvious that the rationale for the "painstakingly delineated procedural boundaries of Kyne" applies.  See id. (quoting Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964)).  But we need not decide whether Plaintiffs must meet the Kyne standard at this time.  Even assuming Plaintiffs' ultra vires claims must meet a high standard, this would not imply that a district court's authority to declare the President exceeded his statutory powers evaporates just because no court of appeals has ever addressed the question at issue.  The President's authority turns on the statutory text Congress enacted.  See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."); Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Kahn, 618 F.2d 784, 793 (D.C. Cir. 1979) (stating that statutory grants of authority to the President "must be exercised consistently with the structure and purposes of the statute that delegates that power").  District courts serve a vital interest in the function of judicial review and are routinely called on to decide complicated issues of first impression.  The district court erred when it concluded that it lacked authority to declare a President's actions ultra vires without additional guidance "from Congress or a higher court."

The district court did not decide, other than for jurisdictional purposes, whether the President, in fact, exercised authority delegated to him in extending the Bears Ears and Grand Staircase Monuments. Neither do we. [12] We therefore remand for the district court to interpret the scope of the Antiquities Act's limitations in the first instance and decide whether Plaintiffs have plausibly alleged that the President's actions exceeded those limits. In other words, the district court will need to interpret the scope of "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and whether Plaintiff plausibly alleged that the President acted ultra vires by declaring as monuments objects outside of that scope. Additionally, it will need to interpret the scope of the "smallest area compatible" proviso and determine whether Plaintiffs plausibly alleged that the President acted ultra vires that provision. The district court will also need to decide whether this case

---

[12] The dissent asserts that we "confuse[] the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." But the dissent mischaracterizes the Larson quote. Read in context, and as described above, Larson explains that plaintiffs cannot merely plead a legal injury to establish an ultra vires claim—they must plead "that the action to be restrained or directed is not action of the sovereign." Larson, 337 U.S. at 693. To do so, they must "establish that the officer, in committing [the alleged legal] wrong, is not exercising the powers delegated to him by the sovereign." Id. at 693. As discussed, Plaintiffs' claims rest not on whether the President acted unlawfully within his delegated powers but on whether the President "exercis[ed] the powers delegated to him by the sovereign." See id. That distinguishes this case from Larson, where the plaintiffs wanted to restrain allegedly unlawful executive action "whether or not it be within [the executive's] delegated powers." Id. at 692. To be sure, the inquiries into sovereign immunity and whether Plaintiffs stated a cause of action overlap to some degree. But that does not mean that we "confuse[]" the doctrines in the same way that Larson described. We also stress again that we do not decide today whether Plaintiffs' allegations overcome sovereign immunity.

31

requires Plaintiffs to meet the standard set forth in <u>Kyne</u> and, if so, whether Plaintiffs' allegations meet that standard.

B.

Plaintiffs next argue that the district court erred in dismissing their APA claims against the Agency Defendants. Plaintiffs challenge the district court's determinations that the interim management plans were not final agency action as required for reviewability under the APA. We do not reach these arguments.

Plaintiffs directed their APA challenge to BLM's interim management plans for the Bears Ears and Grand Staircase Monuments. After submission of this case to the panel, BLM adopted final resource management plans for both Monuments. <u>See</u> 90 Fed. Reg. 4778–01 (Jan. 16, 2025); 90 Fed. Reg. 2741–01 (Jan. 13, 2025). By their terms, these final management plans supersede the interim plans Plaintiffs challenge under the APA. Thus, the agency actions upon which Plaintiffs' APA claims are based no longer exist. For this reason, we vacate the district court's dismissal of Plaintiffs' APA claims and remand for the district court to consider the effect of the final resource management plans on these claims.

C.

The Individual Plaintiffs and BlueRibbon argue that the district court erred in dismissing them from the case because they lacked standing. The district court found that the Individual Plaintiffs and BlueRibbon all claimed standing because "they have had federal permits denied as a result of President Biden's proclamations and their implementing regulations." It explained, though, that they "d[id] not specify in their

32

'claims for relief' what specific permit was denied; which agency denied it; or specifically when it was denied." The closest they came was a reference to BLM's Utah office denying a special recreation permit to a Utah/Arizona ATV Club, but none of the Individual Plaintiffs belonged to that club and the ATV Club itself was not a party to the lawsuit. Although the ATV Club was a member of BlueRibbon, an organization that promoted event access on public lands, the district court decided that an "entire 'program'—consisting principally of the many individual actions referenced in the complaint . . . —cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of the respondent's members."

The Individual Plaintiffs and BlueRibbon ostensibly challenge this holding. But in doing so, they failed to mention standing in their opening brief, focusing instead on whether sovereign immunity bars their suit and whether President Biden and the Agency Defendants violated the Antiquities Act. Neither Utah nor the Counties mention the issue in relation to the Individual Plaintiffs and BlueRibbon. Nor should they have, as the district court did not question Utah or the Counties' standing in its order dismissing the case despite Defendants arguing that both had none.[13] Although the Individual Plaintiffs argued they had standing in their reply,

---

[13] Defendants also argue on appeal that Utah Plaintiffs do not have standing. But this argument lacks merit. To sufficiently allege standing, Utah Plaintiffs must demonstrate a concrete and particularized injury that is traceable to Defendants' conduct and redressable by a decision of the court. See Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555,

they did so too late.  See In re: Motor Fuel Temperature Sales Pracs. Litig., 872 F.3d 1094, 1110 n.4 (10th Cir. 2017) ("[A] party waives issues and arguments raised for the first time in a reply brief." (quoting M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d 753, 768 n.7 (10th Cir. 2009))).  As the Individual Plaintiffs and BlueRibbon waived that argument, we need not discuss it further and affirm the district court's dismissal of their claims.

III.

Plaintiffs argue we should decide the merits question of whether the items the President designated in the Proclamations are "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and whether the President reserved the smallest area compatible with their conservation rather than remand for the district court to do so.  But the district court never passed on these questions, and we generally refrain from deciding issues without full briefing and a holding below.  Throupe v. Univ. of Denver, 988 F.3d 1243, 1254 (10th Cir. 2021) (citing Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1130 (10th Cir. 2011)).

---

560–61 (1992)).  Utah Plaintiffs have sufficiently alleged a litany of harm, satisfying the injury-in-fact requirement.  For example, they allege the Proclamations prohibit their planned activities on the affected land, such as road maintenance and managing vegetation and wildlife.  Utah Plaintiffs also allege that the Proclamations cause them to lose revenue and experience other economic harms.  These alleged injuries also satisfy the traceability and redressability requirements, as the Proclamations directly caused the injuries and the requested declaratory and injunctive relief would bar the Proclamations' effects.  Thus, Utah Plaintiffs have satisfied the requirements for standing.

AFFIRMED in part, VACATED in part, and REMANDED for further

proceedings consistent with this opinion.[14]

---

[14] We note that the district court dismissed the Complaints with prejudice. The court based the dismissals, however, on jurisdictional grounds—which requires that they be dismissed *without* prejudice. See Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006). Accordingly, the district court erred by dismissing the Complaints with prejudice. We, therefore, modify the district court's order insofar as it is not vacated by this opinion to reflect that those claims are dismissed *without prejudice*.

Nos. 23-4106 &23-4107, *Garfield County, Utah, et. al. v. Trump, et. al.*
**FEDERICO**, Circuit Judge, dissenting

The power to dispose of and make rules for federal lands was granted to the legislative branch in the Constitution. In turn, Congress delegated some of that power to the President by statute. For 120 years, Presidents have used the power delegated to them from Congress in the Antiquities Act of 1906 to reserve federal lands as national monuments.

This court is now called upon to decide the proper role of the judiciary when a party files suit to challenge a national monument proclamation. The separation of powers – resting upon the statute, caselaw, and longstanding legal doctrines – requires that the judicial branch may only conduct a very limited review of proclamations for ultra vires actions, as a potential mechanism to side-step the doctrine of sovereign immunity, which is not absolute in this context. Otherwise, the judicial branch will overstep its constitutional bounds and interfere with the discretion that is vested through statutory delegation in the executive branch.

I agree with the majority that the district court's dismissal order was wrong to afford total immunity and absolute deference to the executive. However, I also conclude that the majority's opinion and remand swings too far in the opposite direction.

The majority's opinion requires the district court to determine the scope of the President's authority and to essentially dissect and pick apart the proclamations declaring Bears Ears and Grand Staircase-Escalante as national monuments. Binding precedent does not permit this expansive of a review. An ultra vires review is narrow and only applies when the executive "has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition* in a statute.'" *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)). But what the majority now commands of the district court "basically dress[es] up a typical statutory-authority" review "as an ultra vires claim." *Id*. at 682. Although my reasoning differs in part from the district court, I would affirm its judgment. As such, I respectfully dissent.

## I

It is first prudent to recognize what the majority opinion decides and what it does not. As it explains, there were numerous plaintiffs[1] (hereafter to

---

[1] There are also two intervenor grouped defendants that both argue in support of the President's reservations of land to create and expand the national monuments: the Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Ute Tribe ("Tribal Nations"); and the Southern Utah Wilderness Alliance, Earthjustice, and National Resources Defense Council ("Environmental Groups").

be referred to collectively as "Utah plaintiffs") in these cases, which were consolidated by the district court, but their respective claims boiled down to allegations that the two monument declarations violated the Antiquities Act. The majority does not take on or decide another argument raised by Utah plaintiffs, whether executive branch or agency officials violated the Administrative Procedure Act, and the majority purports to not reach the "merits" of any of the claims themselves. Given this state of play, my opinion will likewise be confined to whether Utah plaintiffs properly alleged an ultra vires claim, which entails the limits of judicial review in this context.

There are two additional components of this appeal that are worth mentioning. First is that it is an appeal of the district court's order granting the defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).[2] We review dismissals under Rule 12(b)(1) de novo. *Colorado Environmental Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004). Like a Rule 12(b)(6) motion, "[i]n determining whether a dismissal is proper, we must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in

---

[2] The defendant's motion was filed under Rule 12(b)(1). J. App. II at 137. However, the district court's order references only Rule 12(b)(6). Sovereign immunity is jurisdictional, *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015), so 12(b)(1) is the rule on point. I note this distinction even though it makes no difference to our standard of review.

the light most favorable to the plaintiff." *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Per usual, our standard of review (de novo) is significant. For example, unlike many cases where the appeal turns on the plausibility of the facts alleged in the complaint, the question before us – whether the Utah plaintiffs properly brought a statutory ultra vires claim to evade sovereign immunity – is purely a legal question. *See Sac & Fox Nation v. Hanson*, 47 F.3d 1061, 1063 (10th Cir. 1995) ("We review *de novo* the legal question of when a party can assert sovereign immunity."); *Jean v. Gonzales*, 452 F.3d 392, 396 (5th Cir. 2006); *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003).

The second component of the appeal worthy of mention concerns the allegations in the complaint filed by Utah plaintiffs. In both claims, Utah plaintiffs allege that President Biden "exceeded" his statutory authority under the Antiquities Act, not that he lacked authority at all, or that he acted unconstitutionally. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("[W]e have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."). The targeted allegations inform our assessment of Utah plaintiffs' ultra vires claims, which is a narrow inquiry. *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002).

With these considerations in mind, I now explain why I part company with my colleagues in this case. This discussion will begin with the source of the power over federal lands granted to Congress under the Constitution and its delegation, in part, to the President under the Antiquities Act. Next, I will examine the text of the statute to pick out what is relevant to this lawsuit and to this appeal. Then, I will examine Supreme Court precedent to explain why and how it all points in one direction – that federal courts must refrain from reviewing the merits of decisions that are left to the discretion of the President. Finally, I will explain the limited ultra vires review that is proper for a court to undertake in this context.

## II

I begin by nailing down the source of the President's authority to remove land and proclaim a national monument. The President receives his land allocation authority from Congress, which in turn receives its enumerated power over federal property from the Constitution. "The Property Clause of the Constitution provides that 'Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.'" *Kleppe v. New Mexico*, 426 U.S. 529, 535 (1976) (quoting U.S. Const. art. IV, § 3, cl. 2). Congress' power under the Property Clause is "plenary." *Wyoming*, 279 F.3d at 1227 (quoting *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987)).

5

Congress delegated some of its plenary authority under the Property Clause to the President when it passed the Antiquities Act, which was legislation produced as a compromise to many competing interests. *See* Tribal Nations Resp. Br. at 29 (citing *Utah Ass'n of Counties v. Bush*, 316 F. Supp. 2d 1172, 1178 (D. Utah 2004)). Without this delegation, the President has no independent Article II authority to designate monuments because the Property Clause situates that power with the legislature. This appeal is about the scope of the President's delegated authority under the Antiquities Act, which is where I now turn.

### A

The Federal Defendants in this case are the President, Cabinet Secretaries, and executive agency heads. The Federal Defendants – representing the executive branch of the federal government – "are immune from suit, unless sovereign immunity has been waived." *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989) (per curiam); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The defense of sovereign immunity is jurisdictional. *Wyoming*, 279 F.3d at 1225. No party argues that Congress explicitly waived sovereign immunity relating to the two monument proclamations challenged in this suit.

Absent an explicit waiver, there are "[t]wo narrow exceptions to the general bar against suits seeking specific relief from the United States . . . if

6

(1) the conduct is not within the officer's statutory powers or, (2) those powers, or their exercise in the particular case, are unconstitutional." *Id*. Again, Utah plaintiffs do not argue the President's delegated authority under the Antiquities Act violates the Constitution, nor that he exercised that power in an unconstitutional manner. Rather, Utah plaintiffs' arguments are that the President's actions exceeded the scope of the statutory authority granted to him. Which is to say, Utah plaintiffs argue the President "acted ultra vires or beyond those powers Congress extended." *Id*. at 1229.

Because this is a question of the scope of statutory authority, we start with the text of the statute. *Wichita Ctr. for Graduate Med. Educ., Inc. v. United States*, 917 F.3d 1221, 1224 (10th Cir. 2019). The majority opines "that Congress intended for the judiciary to enforce its statutory limitations on the President's authority." Majority at 26. But the textual analysis it undertakes does not support this conclusion.

The full text of the Antiquities Act says:

**(a) Presidential declaration.** The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.

**(b) Reservation of land.** The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

7

**(c) Relinquishment to Federal Government.** When an object is situated on a parcel covered by a bona fide unperfected claim or held in private ownership, the parcel, or so much of the parcel as may be necessary for the proper care and management of the object, may be relinquished to the Federal Government and the Secretary may accept the relinquishment of the parcel on behalf of the Federal Government.

**(d) Limitation on extension or establishment of national monuments in Wyoming.** No extension or establishment of national monuments in Wyoming may be undertaken except by express authorization of Congress.

54 U.S.C. § 320301.[3]

Six principal points can be gleaned from the text of the statute itself.

*First*, Congress intended the Antiquities Act to vest in the President "significant discretion" and "broad authority" to declare national monuments and reserve parcels of land for this purpose. *Massachusetts Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., statement respecting the denial of certiorari); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (noting "the broad discretion the Antiquities Act vests in the President"), *cert. denied,* 144 S. Ct. 1110 (2024). The broad discretion is conveyed by the language "may," followed by a clear grant of authority to be exercised "in the President's discretion," which indicates the

---

[3] Subsection (c) has no relevance to this appeal but is included for completeness and to demonstrate the relative simplicity of the statute.

8

President gets to exercise his judgment and make the call. 54 U.S.C. § 320301(a).

**Second**, the statute says the President may declare "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest,"[4] but it does not define the terms "landmarks," "structures," or "objects." *Id*. Utah plaintiffs' first argument is that "President Biden's proclamation . . . is not confined to" these three categories. J. App. I at 131.[5] The individual plaintiffs made a similar allegation by pleading, "President Biden's proclamations, however, rest in whole and in part on protecting things that are not 'objects' *at all* under the Act." *Id*. at 195 (emphasis in original). Thus, according to the Utah and individual plaintiffs, President Biden declared things or places that do not fit within any of these three categories and, ergo, his declarations were ultra vires.

The majority opinion deems this allegation sufficient to survive a motion to dismiss because it interprets the operative complaint to allege the President "had the power to designate x, y, and z, but instead designated a, b, and c."

---

[4] The Antiquities Act also empowers the President to reserve submerged lands. *Alaska v. United States*, 545 U.S. 75, 103 (2005) (citing *United States v. California*, 436 U.S. 32, 36 (1978)).

[5] Utah plaintiffs also argue that "ubiquitous, generic, nondescript items like 'boulders' are not 'of historic or scientific interest.'" Garfield County Op. Br. at 46.

Majority at 14–15. This logic assumes, of course, that "x, y, and z" (landmarks, structures, and objects) are defined terms, such that one can be certain that "a, b, and c" are not, in fact, "x, y, and z." There is nothing in the Antiquities Act that guides the determination as to whether a thing declared by the President is a landmark, structure, or object, nor what it means for an object to be of "historic or scientific interest." However, and again, the statutory text says it is the President who gets to decide.

The majority opinion also remands for the district court to interpret the meaning of these terms in the Antiquities Act and then determine whether Utah plaintiffs "plausibly alleged an ultra vires claim within that scope." Majority at 15 n.5. But this inquiry is precisely what the Supreme Court has forbidden as an attempt to "basically dress up a typical statutory-authority

10

argument as an ultra vires claim." *Nuclear Regulatory Comm'n*, 605 U.S. at 682.[6]

Also, the majority opinion concocts a hypothetical case of the President designating a flock of sheep for protection from slaughter when a statute only permits the designation of cattle herds. Majority at 13. Of course, the difference between cattle and sheep is not analogous to the much more difficult line-drawing between objects and non-objects under the Antiquites Act. But more to the point, the majority declares it "untenable" that in this hypothetical case, "there are no judicially enforceable limitations on presidential actions." *Id.* at 13 (quoting *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)). Even if untenable, "sovereign immunity . . . shields the Government from suit (absent a waiver) regardless whether the Government violated the law." *Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 445 (2026) (citing *Meyer*, 510 U.S.

---

[6] The majority opinion cites *Harper v. Jones* for the proposition that it is "long 'settled' law that courts have jurisdiction to consider whether an executive official's acts 'are in *excess* of his authority.'" Majority at 13–14 (quoting *Harper*, 195 F.2d 705, 706 (10th Cir. 1952)). But *Harper* also says, "[i]t is equally well settled that where a federal officer acts within the limits of his legal power and authority and exercises a function legally delegated to him, an action to restrain him cannot be maintained without impleading the sovereign even though there is a claim of error in the exercise of that power or an abuse of discretion." *Harper*, 195 F.2d at 706 (citations omitted). Such is the case here, where Utah plaintiffs' allegations concern "a mere excess or abuse of discretion in exerting a power given" to the President, which "are beyond the reach of judicial power." *Id.* (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).

at 475). The majority persistently invokes the President's duty to follow the law but conflates this duty with a federal court's power to enforce it. Majority at 25–26. Only last year, the Supreme Court reminded us of the distinction: "No one disputes that the Executive has a duty to follow the law. But the Judiciary does not have unbridled authority to enforce this obligation – in fact, sometimes the law prohibits the Judiciary from doing so." *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

Also, one example from history illustrates that the terms used by Congress in the Antiquites Act have been broadly construed and that the use of these terms may be somewhat amorphous. In 1908, President Roosevelt designated the Grand Canyon as a national monument by declaring that it "is an *object* of unusual scientific interest, being the greatest eroded canyon within the United States." Proclamation No. 57, 35 Stat. 2175 (1908). If we were to stop people on the street and ask them, based on their plain meaning understanding of the words, whether the Grand Canyon is a landmark, structure, or object, I suspect we would get mixed responses as to which term

12

is the best fit.[7] So, not only does the Antiquities Act not define these terms, but there is also no obvious plain meaning distinction between them in this context.[8]

But throughout history, Presidents have exercised their statutory authority "to protect archeological sites and structures, paleontological resources, land formations, habitats, wildlife, and landscapes." Environmental Groups Resp. Br. at 14. Which is to say, there has historically been a long list of what the majority calls "a, b, or c's" that fit within the statutory definition of "x, y, or z" (landmarks, structures, or objects). It is not merely that the meaning of these terms or categories is ambiguous, it is that the breadth of these categories has always inherently required the exercise of judgment, and the statute vests that decision solely in the President. Moreover, "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," can "raise a presumption" that the Presidential

---

[7] Discussing this proclamation, the Supreme Court declared the Grand Canyon "is an object of unusual scientific interest" and noted "[i]t is the greatest eroded canyon in the United States, if not in the world." *Cameron v. United States*, 252 U.S. 450, 455–56 (1920).

[8] As one amicus brief noted, "[m]onuments that protect landscapes, both as objects and as 'containers' of objects at the landscape level, are consistent with the Act's ordinary meaning." American Anthropological Assoc., *et. al.*, Am. Br. at 15.

13

action had been taken by congressional consent. *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)).

***Third***, the President may only declare landmarks, structures, and objects to be within national monuments if they are "situated on land owned or controlled by the Federal Government." 54 U.S.C. § 320301(a). This constraint ties directly back to the power over federal lands that is conferred upon the Congress in the Property Clause. So, according to the statutory text, the President cannot reserve or remove land for a national monument that is not "owned or controlled by the Federal Government." *Id.*; U.S. Const. art. IV, § 3, cl. 2.

***Fourth***, the Antiquities Act contains another "unique constraint" on the President's discretion by requiring that the parcels of land reserved or removed as national monuments "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b); *see also Massachusetts Lobstermen's Ass'n*, 141 S. Ct. at 980. This constraint is the second challenge raised by Utah plaintiffs, that the reservation of land for the two national monuments was "not confined" to the smallest area compatible constraint. J. App. I at 131.

Here again, Utah plaintiffs' complaint alleges a claim by quoting the language of the statute and arguing the President violated that language. The majority latches on to Utah plaintiffs' argument that the Bears Ears and

14

Grand Staircase monuments are "twice as large as Delaware" and "larger than 20 percent of all nations in the world."[9] Majority at 11, 15. It also concludes that the "smallest area compatible" constraint "is also not committed to the President's discretion." Majority at 22. Respectfully, I disagree.

The word "shall" is a mandatory command. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). But in the Antiquites Act, it is followed by a required determination of compatibility, which is certainly a discretionary decision left to the President. *See, e.g., Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1256 (10th Cir. 1998) (interpreting 16 U.S.C. § 1533(b)(3)(A) to "provide the [Secretary of the Interior] the discretion" not to act even though the statute uses the word "shall," because the specific provision directs that the Secretary "shall" act within 90 days "to the maximum extent practicable"); *see also Ames v. United States Dep't of Homeland Sec.*, 861 F.3d 238, 240 n.1 (D.C. Cir. 2017) (the word "compatible" in the Privacy Act, which expressly waives sovereign

---

[9] Although it makes for a good bullet point of fact in a brief or press release, I fail to see how the size of the reservation in acreage, alone, could render a proclamation ultra vires. Congress has placed acreage limitations on other federal land reservations but chose not to do so in the Antiquities Act. *See, e.g.*, 16 U.S.C. § 3213; 43 U.S.C. § 156 (1964). Also, as explained in one amicus brief, "[g]iven the density and size of significant cultural, historical, and archaeological objects distributed across the Bears Ears landscape, President Biden determined that the entire landscape was the 'smallest area' necessary for the proper care, management, and protection of those objects." Utah Diné Bikéyah, *et. al.*, Am. Br. at 19.

15

immunity, is broad). To be clear, I do not read the Antiquities Act to confer on the President boundless discretion. Whatever the bounds to his discretion and whether he has exceeded them, however, are merits issues that do not decide the antecedent jurisdictional question whether the President lacked authority to act altogether. *See Nuclear Regulatory Comm'n*, 605 U.S. at 681–82. It is here that the majority confuses stating an ultra vires claim with stating a cause of action and turning the former into a statutory-authority claim.

***Fifth***, tucked within subsection (d) of the Antiquities Act is a provision that was not included within the original Act when it was passed in 1906. It requires congressional approval for the removal of land in one state only – Wyoming. This subsection was added in 1950 when Congress passed legislation that incorporated Jackson Hole National Monument into the Grand Teton National Park. Pub. L. No. 787, § 1, 64 Stat. 849, 849. As discussed, *infra*, this amendment to the Antiquities Act demonstrates the interplay between the branches of government when it comes to federal lands and national monuments, and it shows the primacy of Congress's plenary power over federal lands under the Constitution.

***Sixth***, and driving closer to the destination of this appeal, the statutory text says nothing about judicial review of the President's declarations of national monuments. If, as the majority finds, Congress intended for courts to

16

"enforce its statutory limitations on the President's authority," this intention must be found somewhere other than the statutory text itself. Majority at 26.

**B**

This brings us back to the ultra vires doctrine. Because the Antiquities Act says nothing about the power of federal courts to review the President's national monument declarations, then precedent concerning a court's equitable powers to conduct an ultra vires review must be the key to this power.

The term "ultra vires" means "beyond the scope of power allowed . . . by law." Black's Law Dictionary (12th ed. 2024). In 1949, the Supreme Court explained this doctrine in the context of a lawsuit from a private company against an executive officer (War Assets Administrator) that sought to enjoin the officer from selling or delivering coal to anyone other than the plaintiff. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Although the Court held that sovereign immunity barred that suit, it recognized that when the officer's "powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way that the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." *Id.* Moreover, the Supreme Court required a plaintiff invoking the ultra

17

vires doctrine to "set out in his complaint the statutory limitation on which he relies" because "[a] claim of error in the exercise of that power is . . . not sufficient." *Id* at 690.[10]

Relying on *Larson*, in *Dalton* the Supreme Court reviewed a suit for an injunction sought against the Secretary of Defense from carrying out the decision of the President to close the Philadelphia Navy Yard. 511 U.S. at 464. Like this case, the claim raised in *Dalton* was "a statutory one," or that the President violated the terms of a statute empowering him to act. *Id.* at 474. The Court determined that "longstanding authority" held that judicial review "is not available when the statute in question commits the decision to the discretion of the President." *Id.* ("[T]he judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion." (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)); *Chicago & Southern Air*

---

[10] I agree with the majority that *Larson* explains a plaintiff cannot merely plead a legal injury to establish an ultra vires claim. Majority at 31 n.12 (citing *Larson*, 337 U.S. at 693). Where I disagree is whether Utah plaintiffs' allegations – that the President acted without authority – are alone sufficient to overcome sovereign immunity. Those allegations form a legal conclusion, and "we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Again, the majority's approach "confuses the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." *Larson*, 337 U.S. at 692–93.

*Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948)). The bottom line in *Dalton* applies here: "[w]here a statute, such as the [Antiquities Act], commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." 511 U.S. at 477.

The Federal Defendants noted, "[i]n the 117 years since the Antiquities Act became law, *no* court has *ever* found that any proclamation designating a national monument violated the terms of the Act." Federal Defendants Resp. Br. at 28. Given the reasoning and holdings of *Larson* and *Dalton*, this historical record is not a surprise, nor does the majority's opinion cast any doubt on the accuracy of this historical record. Rather, it concludes that sovereign immunity does not apply because "[t]he Supreme Court has reviewed a President's actions under the Antiquities Act three times." Majority at 27. However, a closer look at those cases reveals that none of those cases concerned sovereign immunity or the ultra vires doctrine, and, in fact, all three of those suits were brought *by* the United States, not against it.

In *Cameron v. United States*, a case decided by the Supreme Court in 1920, a lawsuit was brought by the United States to enjoin a private party from "occupying, using for business purposes, asserting any right to, or interfering with the public use of, a tract of land in Arizona. . .on the southern rim of the Grand Canyon." 252 U.S. 450, 454 (1920). Although the defendants in *Cameron* argued "the monument reserve should be disregarded on the ground that there

19

was no authority for its creation," *id.* at 455, the Supreme Court's opinion had little to do the scope of the President's power to reserve lands under the Antiquities Act. Rather, the thrust of the opinion centered upon whether the private party's mining claim was valid under federal law, as determined by the Secretary of the Interior, and whether he had a right to the land under those laws. Thus, *Cameron* does not support the majority's conclusion that courts can review and intrude upon presidential proclamations made under the Antiquities Act.

In the second case, *Cappaert v. United States,* sovereign immunity was again not at issue because the case was brought by the United States government as the plaintiff seeking an injunction against the Cappaerts, who were pumping groundwater on their ranch near the Nation's first national monument at Devil's Hole, Nevada. 426 U.S. 128, 135 (1976). The injunction aimed to protect the United States' reserved water rights associated with Devil's Hole. *Id.* The United States argued that when the President established the Devil's Hole monument, he also implicitly reserved the unappropriated water necessary to maintain the pool's level and protect the habitat of the endangered Devil's Hole pupfish. *Id.* at 133. The question presented in *Cappaert* was whether the monument reservation under the Antiquities Act also reserved water rights. *Id.* at 131. But again, *Cappaert* said nothing about

20

sovereign immunity as it relates to the scope of the President's power to withdraw lands to create national monuments under the Antiquities Act.

In the third case, *United States v. California*, sovereign immunity was not at issue because the case was, again, brought by the United States government as the plaintiff, seeking to resolve a dispute against the State of California over dominion and control of submerged lands and waters within the Channel Islands National Monument. 436 U.S. 32, 33 (1978). The United States argued that its reservation of these lands under the Antiquities Act established federal dominion, *id.* at 38, but the Supreme Court ultimately held that the Submerged Lands Act transferred title and control of the submerged lands to California, *id.* at 41. Yet again, this case was not about limitations on the President's broad discretion under the Antiquities Act, nor was it a green light for plaintiffs to bring suit and seek an injunction prohibiting the declaration of a national monument.

Although not cited by the majority, I will toss into the mix *Alaska v. United States*, a fourth case wherein the Supreme Court discussed the Antiquities Act. In that case, the State of Alaska invoked the Court's "original jurisdiction to resolve its dispute with the United States over title to certain submerged lands underlying waters located in southeast Alaska." 545 U.S. 75, 78 (2005). This dispute dealt with the interplay of claims of title to "lands beneath navigable waters within the boundaries of Alaska," *Id.* at 79 (quoting

21

the Submerged Lands Act, 43 U.S.C. § 1311(a)), and whether the submerged lands were reserved when the President created the Glacier Bay National Monument prior to Alaska becoming a state. *Id.* at 102–03. Although the Supreme Court discussed the creation of the monument under the Antiquities Act, this case did not require discussion, nor did the Supreme Court otherwise opine, as to whether the President's declaration of the monument was subject to judicial review for compliance with the Act.

These cases, which essentially cover the field of Supreme Court jurisprudence over Antiquities Act cases, say nothing about whether the President can be sued over his creation of a national monument, nor whether courts have the power to review these proclamations when asked to consider injunctive relief. The majority's discussion of these cases fatally overlooks why these cases are doctrinally not on point. Sovereign immunity is immunity *from* suit. *See Meyer*, 510 U.S. at 475 ("[S]overeign immunity shields the Federal Government and its agencies *from* suit." (emphasis added)) It is not a barrier to sue, so it has no relevance in the past Antiquities Act cases brought by the United States as a plaintiff. *See United States v. Peters*, 9 U.S. (5 Cranch) 115, 139 (1809); *United States v. The Thekla*, 266 U.S. 328, 339–40 (1924); *see also* Helen Hershkoff, 14 Wright & Miller's Federal Practice and Procedure § 3651 (4th ed. 2008, updated in 2026) ("No difficulties of subject matter jurisdiction

22

are presented when the United States is the plaintiff in an action in the federal courts.").

That said, in 2021 the Chief Justice of the Supreme Court issued a statement respecting the denial of a writ of certiorari wherein he said, regarding the scope of the Antiquities Act, "[t]he scope of the objects that can be designated under the Act, and how to measure the area necessary for their proper care and management, may warrant consideration – especially given the myriad restrictions on public use this purely discretionary designation can serve to justify." *Massachusetts Lobstermen's Ass'n*, 141 S. Ct. at 981. Taking what could be perceived to be a cue, Utah plaintiffs' counsel argued, "Just three years ago Chief Justice Roberts lamented how these limits [Antiquities Act limitations] had ceased to pose any meaningful restraint. . . . He hoped that the Supreme Court would get a case where it could review these limits. This is such a case." Oral Arg. 2:56–3:26.

Maybe so. But until the Supreme Court takes a case to reason through the scope of judicial review in this context, it is not for this court to foreshadow future precedents that would bind our holdings. *Spector Motor Service v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (Hand, J., dissenting), *vacated sub nom.*, *Spector Motor Service v. McLaughlin*, 323 U.S. 101 (1944). For now, we must ground our holdings in actual precedent, and there is no precedent that

authorizes courts to intervene and undertake a full merits review of the President's discretionary declarations regarding national monuments.

Any precedent that could provide even colorable support for the majority's position must be weighed against the Supreme Court's most recent pronouncement that ultra vires review is "strictly limited," "narrow," and "essentially a Hail Mary pass" that will "rarely succeed." *Nuclear Regulatory Comm'n*, 605 U.S. at 681–82. The Court held that the plaintiffs in that case could not obtain review for two independent reasons. First, the plaintiffs "basically dress[ed] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. So too here, and the majority never explains how Utah plaintiffs' arguments in this case are any different from the kind of arguments the Supreme Court said were "well shy of a meritorious" ultra vires claim in *Nuclear Regulatory Commission*. *Id.*

Second, the Court rejected the plaintiffs' transparent attempt to sidestep the requirements and limitations of ordinary statutory review. *Id.* at 682. This rationale, the majority responds, is inapplicable here because the President cannot be sued under the APA. Majority at 30. That defies logic. The APA does not extend reviewability to the President's actions, so seeking nonstatutory ultra vires review of the President's actions is by definition an end-run around an APA limitation. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01

24

(1992). I cannot reconcile the majority's approach with the Supreme Court's most recent on-point discussion of ultra vires review.

## III

Given the statutory text and the caselaw concerning the Antiquities Act, I conclude that the judicial review of a presidential proclamation, centered upon an ultra vires challenge, is narrower than the review announced by the majority. That said, I join the majority to reject the argument of the Federal Defendants, adopted by the district court, that the "ultra vires doctrine does not apply to statutory claims against the President." Federal Defendants Resp. Br. at 86.

Again, Utah plaintiffs primarily alleged the Bears Ears and Grand Staircase proclamations violated the Antiquities Act in two ways: (1) by designating things as objects that are not objects; and (2) by reserving too much land in acreage and thus violating the smallest area compatible requirement in the statute. Unlike other requirements of the Antiquities Act, both challenges are to decisions or determinations that are completely within the discretion of the President. By ordering the district court to take on these arguments, the majority has essentially collapsed an ultra vires review into a full review on the merits, which is forbidden under Supreme Court precedent.

Consider what happens now that this case is remanded back to the district court. But to do what, exactly? The majority says that it "decline[s] to

25

go so far as to hold Plaintiffs plausibly alleged an ultra vires claim." Majority at 12. But shortly afterwards, the majority holds that Utah plaintiffs' allegations "illustrate more than mere illegality"; rather, they show that the President exceeded "statutory limitations on [his] authority." *Id*. at 15. So, although the majority commands the district court to, on remand, "interpret the scope of the Antiquities Act's limitations in the first instance and decide whether Plaintiffs have plausibly alleged that the President's actions exceeded those limits," the majority seems to have already done that work. *Id*. at 31.

Compounding this confusion, the majority's bottom line is unclear. Perhaps it concluded that the district court applied the wrong legal test for the ultra vires exception and is remanding for the district court to apply the correct test in the first instance. Except, if that is so, the discussion above demonstrates how the majority has placed its thumb on the scale in favor of concluding that the Utah plaintiffs adequately alleged the ultra vires exception (or that the President's actions exceeded his authority). Or alternatively, the majority might be holding that the Utah plaintiffs have indeed satisfied the ultra vires exception and that the next step is for the district court to decide the merits of the claims. Even if that were the case, the majority opinion has already hinted at which party should prevail (not the President). Given the posture of the case, what is left for the district court to do when considering

26

whether the "objects" declared by the President in his monument proclamations are "objects" under the Antiquities Act?

However, when an ultra vires complaint is alleged, a court's jurisdiction to review a national monument proclamation is a narrow, targeted, facial review to ensure "that the President has not exceeded his statutory authority." *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). A court would only have jurisdiction to review whether the President has "patently" misconstrued its authority, "disregarded a specific and unambiguous statutory directive," or "violated some specific command" of a statute. *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). This review is limited to presidential errors that are "so extreme that one may view [them] as jurisdictional or nearly so"; it does not reach "[g]arden-variety errors of law or fact." *Id.* Otherwise, an ultra vires review is expanded to an abuse of discretion analysis, which is far beyond the narrow exception it is intended to be.

In my view, a facial review of a national monument proclamation must be limited to ensuring the President did not violate mandatory prohibitions set forth in the Antiquities Act. That is because the President's action could only be ultra vires if it was taken "entirely in excess of [his] delegated powers and contrary to a specific prohibition" in the Antiquities Act. *Nuclear Regulatory Comm'n*, 605 U.S. at 681 (citation modified).

27

For example, a court could entertain a basic complaint challenging whether the President intended to invoke the Antiquities Act and to exercise the authority and delegation afforded to him by Congress. *California*, 436 U.S. at 36 (noting the proclamation that created the national monument was "a question only of Presidential intent, not of Presidential power").

Another issue amenable to ultra vires review would be whether the President reserved a monument that is within the boundaries of land owned or controlled by the federal government. 54 U.S.C. § 320301(a). That determination is not a discretionary decision by the President – either the United States owns or controls the land, or it does not. This was the nature of the dispute the Supreme Court took up as part of its original jurisdiction in *California*, 436 U.S. at 33 ("[W]hether California or the United States has dominion over the submerged lands and waters within the [national monument]."), and *Alaska*, 545 U.S. at 78 ("The State of Alaska has invoked our original jurisdiction to resolve its dispute with the United States over title to certain submerged lands underlying waters located in southeast Alaska.").

Third, a court may consider an allegation that the national monument proclamation was made in contravention of another federal law. That is because the *Dalton* rule, barring judicial review, does not apply "where the claim instead is that the presidential action . . . independently violates" another statute. *Mountain States Legal Foundation*, 306 F.3d at 1136 (quoting

28

*Reich*, 74 F.3d at 1332). Such was a case before the Ninth Circuit, when it was called upon "to consider the intersection of the Antiquities Act . . . and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act." *Murphy Co. v. Biden*, 65 F.4th 1122, 1124 (9th Cir. 2023). That is, of course, not this case. Although the *Murphy* court found the plaintiffs' claims to be justiciable in that case, it also cautioned that its decision "should not be read to empower future objectors to frame any unpopular presidential action as '*ultra vires*' and thus open the floodgates to frivolous judicial challenges that hinder the President's power to respond to pressing issues."[11] *Id.* at 1131.

Finally, because Congress explicitly prohibited an "extension or establishment of national monuments in Wyoming . . . except by express authorization of Congress," 54 U.S.C. § 320301(d), one could imagine an invocation of the ultra vires doctrine if the President simply ignored this prohibition and reserved land in Wyoming as a national monument. This aligns with Supreme Court precedent that permits an ultra vires review for actions that exceed statutory authority and are "contrary to a specific

---

[11] To the extent *Murphy* can be read to authorize judicial review of the type of suit brought by Utah plaintiffs here (which I don't think is the best reading of it), I would simply note that case is persuasive but not binding authority for this court. Moreover, *Murphy* involved constraints on authority in a different statute, so it is consistent with the "specific prohibition" language in *Nuclear Regulatory Commission*. 605 U.S. at 681.

prohibition" in a statute. *Nuclear Regulatory Comm'n*, 605 U.S. at 681 (emphasis omitted).

Another example is Alaska. After President Jimmy Carter used the Antiquities Act to create or expand several national monuments in Alaska in the late 1970s, Congress passed the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3101, et seq., in 1980, which designated more than 100 million acres of land for conservation purposes in Alaska. Section 1326 of ANILCA limited the President's authority under the Antiquities Act in Alaska by requiring that any future withdrawal of national monuments over 5,000 acres must receive Congressional approval. *See* 16 U.S.C. § 3213.

In all, although I am sympathetic to those who cry foul for having the courtroom door closed to them in these circumstances, I suggest their answer lies in the political branches, not the courts. If Congress concludes the President has overstepped his authority in a particular national monument proclamation, it can follow the same path as it did with Wyoming and Alaska, pass a law that further limits the delegated authority given to the President, or undoes what the President has already done.

## IV

The majority's opinion does not expressly proclaim that President Biden's monument proclamations were ultra vires, but one cannot read the majority opinion without concluding that it is the result the district court is

30

commanded to reach on remand. Which is to say, the majority seems to be teeing up the district court to be the first court, *ever*, to strike down a national monument proclamation, in whole or in part.

Utah plaintiffs did not plead cognizable claims that a court can review, nor are there facts yet to be found that would change this result. Although my reasoning differs from the district court, upon our de novo review I would affirm the district court's order dismissing the case.[12] I respectfully dissent.

---

[12] Although I would affirm, I would modify the dismissal to be without prejudice. S*ee Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1 v. City of Guthrie*, 654 F.3d 1058, 1069 n.9 (10th Cir. 2011) ("[A] dismissal on sovereign immunity grounds or for lack of standing must be without prejudice.").